**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

_____
                                                            )
M&T CAPITAL AND LEASING CORPORATION        )
f/k/a PEOPLE'S CAPITAL AND LEASING CORP.,      )
                                                            )          CIVIL ACTION NO.
          Plaintiff,                                     )
                                                            )          _____
v.                                                          )
                                                            )
LOS PAISANOS AUTOBUSES, INC. AND            )
URIEL J. CHAVIRA,                                    )
                                                            )
          Defendants.                                  )
_____)

## VERIFIED ORIGINAL COMPLAINT

Plaintiff M&T Capital and Leasing Corporation, formerly known as People's Capital and Leasing Corp., by and through its undersigned counsel, for its Complaint against defendants Los Paisanos Autobuses, Inc., and Uriel J. Chavira (collectively, the "**Defendants**"), states and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff M&T Capital and Leasing Corporation[1] ("**M&T**") is a corporation organized and existing pursuant to the laws of the State of Connecticut with its principal place of business located at 850 Main Street, Bridgeport, Connecticut 06604.

2.      Defendant Los Paisanos Autobuses, Inc. ("**Los Paisanos**") is a corporation organized and existing pursuant to the laws of the State of Texas with its principal place of business located at 6767 Gateway West Boulevard, El Paso, Texas 79925. Los Paisanos may be

---

[1] M&T is successor by merger of the Loan Documents and Lease Documents, as those terms are defined herein. *See* ¶¶ 24–26.

served with process in this action through its registered agent Mannie Kalman at 1214 Montana Avenue, El Paso, Texas 79902.

3.      Defendant Uriel J. Chavira ("**Mr. Chavira**") is an individual who is a citizen of Texas and resides and may be served with process in this action at 1082 Eagle Ridge Drive, El Paso, Texas 79912.

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Los Paisanos has its principal place of business in this district and Mr. Chavira resides in this District.

6.      Additionally, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because, upon information and belief, a substantial part of property that is the subject of the action is situated in this district.

7.      Pursuant to Schedule No. 001, Schedule A, dated on or about December 14, 2015, Los Paisanos agreed that the equipment would be located at 6767 Gateway West Boulevard, El Paso, Texas 79925. *See* Exhibit B.

## GENERAL ALLEGATIONS

### I. Loan Agreement

1.      On or about December 14, 2015, People's Capital and Leasing Corp. ("People's Capital") and Los Paisanos entered into a Master Loan and Security Agreement No. 4075, as amended from time to time ("**Master Loan Agreement**"), pursuant to which People's Capital financed and obtained a purchase money security interest in certain collateral pledged as security

for the Master Loan Agreement. A true and correct copy of the original Master Loan Agreement is attached hereto as **Exhibit A**.

2.      On or about December 14, 2015, People's Capital and Los Paisanos entered into Schedule No. 001 to the Master Loan Agreement ("**Schedule No. 1**"). Pursuant to Schedule No. 1, Los Paisanos granted to People's Capital a security interest in the equipment described on the attached Schedule A to Schedule No. 1 ("**2015 Equipment**"). A true and correct copy of the original Schedule No. 1 is attached hereto as **Exhibit B**.

3.      On or about March 3, 2016, People's Capital and Los Paisanos entered into Schedule No. 002 to the Master Loan Agreement ("**Schedule No. 2**"). Pursuant to Schedule No. 2, Los Paisanos granted to People's Capital a security interest in the equipment described on the attached Schedule A to Schedule No. 2 ("**2016 Equipment**"). A true and correct copy of the original Schedule No. 2 is attached hereto as **Exhibit C**.

4.      On or about February 24, 2017, People's Capital and Los Paisanos entered into Schedule No. 003 to the Master Loan Agreement ("**Schedule No. 3**"). Pursuant to Schedule No. 3, Los Paisanos granted to People's Capital a security interest in the equipment described on the attached Schedule A to Schedule No. 3 ("**February 2017 Equipment**"). A true and correct copy of the original Schedule No. 3 is attached hereto as **Exhibit D**.

5.      On or about September 19, 2017, People's Capital and Los Paisanos entered into Schedule No. 004 to the Master Loan Agreement ("**Schedule No. 4**"). Pursuant to Schedule No. 4, Los Paisanos granted to People's Capital a security interest in the equipment described on the attached Schedule A to Schedule No. 4 ("**September 2017 Equipment**"). A true and correct copy of the original Schedule No. 4 is attached hereto as **Exhibit E**.

6.      On or about December 14, 2015, guarantor Mr. Chavira entered into an Individual Guaranty ("**Loan Guaranty**") in favor of People's Capital to induce People's Capital to enter into agreements with Los Paisanos. A true and correct copy of the original Loan Guaranty is attached hereto as **Exhibit F**.

7.      Pursuant to the terms of the Master Loan Agreement and Schedule No. 1, Los Paisanos agreed to pay People's Capital seventy-two (72) consecutive monthly payments in the amount of $16,319.50. The total principal amount of Schedule No. 1 was $974,408.72.

8.      On or about December 14, 2015, Los Paisanos acknowledged that the 2015 Equipment had been delivered to and was approved by Los Paisanos. A true and correct copy of the original Delivery Certificate related to Schedule No. 1 is attached hereto as **Exhibit G**.

9.      Pursuant to the terms of the Master Loan Agreement and Schedule No. 2, Los Paisanos agreed to pay People's Capital seventy-two (72) consecutive monthly payments in the amount of $7,922.65. The total principal amount of Schedule No. 2 was $475,000.00.

10.     On or about March 9, 2016, Los Paisanos acknowledged that the 2016 Equipment had been delivered to and was approved by Los Paisanos. A true and correct copy of the original Delivery Certificate related to Schedule No. 2 is attached hereto as **Exhibit H**.

11.     Pursuant to the terms of the Master Loan Agreement and Schedule No. 3, Los Paisanos agreed to pay People's Capital seventy-two (72) consecutive monthly payments in the amount of $17,364.75. The total principal amount of Schedule No. 3 was $1,049,274.00.

12.     On or about February 24, 2017, Los Paisanos acknowledged that the February 2017 Equipment had been delivered to and was approved by Los Paisanos. A true and correct copy of the original Delivery Certificate related to Schedule No. 3 is attached hereto as **Exhibit I**.

13.     Pursuant to the terms of the Master Loan Agreement and Schedule No. 4, Los Paisanos agreed to pay People's Capital seventy-two (72) consecutive monthly payments in the amount of $17,488.10. The total principal amount of Schedule No. 4 was $1,056,728.00.

14.     On or about September 19, 2017, Los Paisanos acknowledged that the September 2017 Equipment had been delivered to and was approved by Los Paisanos. A true and correct copy of the original Delivery Certificate related to Schedule No. 4 is attached hereto as **Exhibit J**.

15.     To evidence its interest in the Lease Equipment, People's Capital is listed as the sole lienholder on the State of Texas Certificate of Title for the Loan Equipment. A true and correct copy of the original Certificates of Title are attached hereto as **Exhibit K**.

## II. Lease Agreement

16.     On or about February 24, 2017, Summit Funding Group, Inc. ("**Summit Funding**") and Los Paisanos entered into a Master Lease Agreement No. 2665 ("**Master Lease Agreement**"). A true and correct copy of the original Master Lease Agreement is attached hereto as **Exhibit L**.

17.     On or about February 24, 2017, Summit Funding and Los Paisanos entered into Equipment Schedule No. 001 to the Master Lease Agreement ("**Equipment Schedule**"). Pursuant to the Equipment Schedule, Los Paisanos granted to Summit Funding a security interest in the Lease Equipment described on the attached Schedule A to the Equipment Schedule ("**Lease Equipment**"). A true and correct copy of the original Equipment Schedule is attached hereto as **Exhibit M**.

18.     On or about February 24, 2017, guarantor Mr. Chavira entered into a Personal Guaranty ("**Lease Guaranty**") in favor of Summit Funding to induce Summit Funding to enter

into agreements with Los Paisanos. A true and correct copy of the original Lease Guaranty is attached hereto as **Exhibit N**.

19.     All of Summit Funding Group, Inc.'s rights, title, and interest to the Master Lease Agreement and all related documents, including any notes, security agreements, schedules, exhibits, riders, modifications, amendments, restatements, or extensions thereto were assigned to People's Capital pursuant to that certain Purchase Schedule No. 034 dated March 6, 2017 to the Master Purchase Agreement dated December 13, 2013.

20.     Pursuant to the terms of that certain Amendment Agreement ("**Lease Amendment**") to the Master Lease Agreement dated December 14, 2020, Los Paisanos agreed to pay People's Capital thirty-seven (37) consecutive monthly payments consisting of the following: four (4) payments of $1,389.88 followed by thirty-three (33) payments of $8,863.36. A true and correct copy of the original Lease Amendment is attached hereto as **Exhibit O**.

21.     On or about February 28, 2017, Los Paisanos acknowledged that the Lease Equipment had been delivered to and was approved by Los Paisanos. A true and correct copy of the original Acceptance Certificate related to the Equipment Schedule is attached hereto as **Exhibit P**.

22.     To evidence its interest in the Lease Equipment, People's Capital is listed as the sole lienholder on the State of Texas Certificate of Title for the Lease Equipment. A true and correct copy of the original title to the Lease Equipment is attached hereto as **Exhibit Q**.

### III. Default and Merger

23.     On September 24, 2021, People's Capital sent to Los Paisanos a Notice of Default, Acceleration and Demand for Payment, which default was the result of Los Paisanos' failure to make all payments due under the terms of the Master Loan Agreement and Schedules

Nos. 1, 2, 3, and 4 in violation of Section 14(i) of the Master Loan Agreement and for failure to make all payments due in violation of Section 7(a) of the Lease Amendment. A true and correct copy of the original Notice of Default and Demand for Payment is attached hereto as **Exhibit R**.

24.    As of April 2, 2022, People's United Bank, N.A., a national banking association located in Bridgeport, Connecticut, merged with and into M&T Bank, a New York state-chartered bank with a principal place of business located at One M&T Plaza, Buffalo, New York, with M&T Bank as the surviving bank. People's Capital and Leasing Corp. became a subsidiary of M&T Bank as of April 2, 2022.

25.    People's Capital amended its name with the Connecticut Secretary of State on August 29, 2022 to M&T Capital and Leasing Corp. A true and correct copy of the Certificate of Amendment filed with the Connecticut Secretary of State is attached hereto as **Exhibit S**.

26.    Accordingly, M&T is successor by merger of the Master Loan Agreement, Schedules Nos. 1, 2, 3, 4, and Loan Guaranty, (collectively, the "**Loan Documents**"), and the Master Lease Agreement, Equipment Schedule, Lease Amendment, and Lease Guaranty (collectively, the "**Lease Documents**").

27.    Pursuant to the Loan Documents and the Lease Documents, Defendants remain obligated and responsible to M&T, as successor by merger, for the outstanding balance remaining in the total amount of $1,597,161.37 as of January 18, 2023, plus default interest at the rate of 1.5% per month, costs, expenses and attorneys' fees and are required under the Loan Documents and Lease Documents to surrender the equipment immediately to M&T.

28.    M&T has performed all of its obligations in accordance with the Loan Documents and Lease Documents.

**VERIFIED ORIGINAL COMPLAINT – Page 7**

29.    M&T is the legal and rightful owner of the Loan Documents and Lease Documents and has not assigned and/or transferred its rights in same.

### FIRST CLAIM FOR RELIEF –
### WRIT OF SEQUESTRATION (All defendants)

30.    M&T repeats and re-alleges paragraphs 1 through 29 as if fully set forth herein.

31.    The Loan Documents and Lease Documents entered into by and between M&T, as successor by merger, and the Defendants comport with the standard conduct of business within the industry.

32.    Pursuant to the Loan Documents, if one or more events of default shall occur and be continuing with regard to the obligations, M&T shall have such rights and remedies with respect to the equipment as provided under the Loan Documents and any and all of the rights and remedies at law and equity, including, but not limited to entry of any location where the equipment is located to take possession of it without process of law.

33.    Pursuant to the Lease Documents, if one or more events of default shall occur and be continuing with regard to the obligations, M&T shall have such rights and remedies with respect to the equipment as provided under the Lease Documents and any and all of the rights and remedies at law and equity, including, but not limited to entry of any location where the equipment is located to take possession of it without process of law.

34.    The Defendants have defaulted under the terms of the Loan Documents and Lease Documents pursuant to their failure to make all payments due under the terms of the Master Loan Agreement and Schedules Nos. 1, 2, 3, 4 in violation of Section 14(i) of the Master Loan Agreement and pursuant to their failure to make all payments due under the terms of the Master Lease Agreement, Equipment Schedule, Lease Amendment, and Lease Guaranty in violation of Section 7(a) of the Lease Amendment.

35.     M&T is entitled to possession of the Loan Equipment and Lease Equipment (collectively, the "**Equipment**") under the Loan Documents and the Lease Documents.

36.     Defendants wrongfully retain possession and control of the Equipment. As each day passes and the Equipment is not repossessed, the Equipment continues to depreciate in value.

37.     Upon information and belief, the Equipment is located in El Paso, El Paso County, Texas.

38.     The description of the personal property is the Loan Equipment described on Schedule A of Schedules Nos. 1, 2, 3, 4, specifically: Two (2) 2015 Van Hool TX45 56 Passenger Motor Coaches with Wheel Chair Lifts, VINs: YE2YC22B3F2041374 and YE2YC22B5F2041375; One (1) New 2016 Van Hool TX45 56 Passenger Motor Coach with Braun Wheel Chair Lift, VIN: YE2XC81B7G3048954; Two (2) 2017 CX45L Van Hool Buses with Braun Wheel Chair Lifts, VINs: YE2XC81B2H3049222 and YE2XC81B9H3049220; and Two (2) 2017 CX45L Van Hool Buses with Braun Wheel Chair Lifts, VINs: YE2XC81B5H3049537 and YE2XC81B7H3049538, and the Lease Equipment described on Schedule A of the Equipment Schedule, specifically: One (1) 2017 Van Hool CX45 Coach, VIN: YE2XC82B7H3049201, together with all property listed above together with all related software (embedded therein or otherwise), all parts, repairs, additions, attachments, replacements, replacement parts, accessions and accessories incorporated therein or affixed thereto, modifications and substitutions thereto and all proceeds thereof including insurance proceeds.

39.     The Equipment in question is not exempt from sequestration.

40.     The sequestration of the Equipment is not sought to hinder, delay, or defraud any other creditor of the Defendants.

41. Based upon the facts alleged herein, there is a substantial likelihood that M&T will prevail on the merits of its claim.

42. Upon information and belief, the Defendants appear to be exercising a degree of control over the Equipment.

43. Upon information and belief, the Equipment has not been taken for any tax, assessment or fine levied by virtue of the law of this state against property of the Defendants, or against M&T, nor seized under any lawful process against the goods and chattels of M&T subject to such lawful process nor held by virtue of any order of replevin against M&T. The Equipment has not been seized under a writ against the Equipment.

44. M&T has a right to replevy and recover the Equipment in which it has a security interest with a right to immediate possession and damages for such wrongful detention.

45. M&T has a right to pursue any legal remedy available to it to collect the obligations outstanding, to enforce its remedies available to it both under the Loan Documents and otherwise, including, without limitation, the right to take possession of the Equipment and dispose of the same.

46. Upon information and belief, the fair market value of the Equipment is approximately $750,000.00 depending on its condition.

47. By reason of such wrongful detention of the Equipment, M&T has sustained damages in the amount of $1,597,161.37 as of January 18, 2023, plus default interest, costs, expenses and attorneys' fees.

48. M&T may suffer irreparable harm if M&T's request for a writ of sequestration is denied.

**VERIFIED ORIGINAL COMPLAINT – Page 10**

49.    M&T has demanded return of the Equipment, however, the Defendants have failed and refused to return the same.

50.    The Defendants wrongfully retain possession and control of the Equipment, and the Equipment continues to depreciate in value.

51.    M&T has a security interest in the Equipment, as successor by merger, as evidenced by its being listed as the sole lienholder on the State of Texas Certificates of Title for the Equipment.

52.    M&T has retained the law firms of Updike, Kelly & Spellacy, P.C. and Akerly Law PLLC and has agreed to pay said firms a reasonable fee for their services. Pursuant to the Loan Documents and Lease Documents, M&T is entitled to recover from Defendants its attorneys' fees and costs incurred enforcing the Loan Documents and Lease Documents.

## SECOND CLAIM FOR RELIEF – BREACH OF CONTRACT
### (Los Paisanos Autobuses, Inc.)

53.    M&T repeats and re-alleges paragraphs 1 through 52 as if fully set forth herein.

54.    M&T is the owner of the Master Loan Agreement, pursuant to which Los Paisanos promised to make certain monthly payments for its possession and use of the Loan Equipment.

55.    M&T is the owner of the Master Lease Agreement, pursuant to which Los Paisanos promised to make certain monthly payments for its possession and use of the Lease Equipment.

56.    Los Paisanos has breached the Master Loan Agreement and Schedules Nos. 1, 2, 3, 4 due to its failure to pay all monthly payments due under the Master Loan Agreement and Schedules Nos. 1, 2, 3, 4.

**VERIFIED ORIGINAL COMPLAINT – Page 11**

57.     Los Paisanos has breached the Master Lease Agreement and Equipment Schedule due to its failure to pay all monthly payments due under the Master Lease Agreement and the Equipment Schedule.

58.     On September 24, 2021, M&T sent to Los Paisanos a Notice of Default, Acceleration and Demand for Payment, which default was the result of Los Paisanos' failure to make all payments due under the terms of the Master Loan Agreement and Schedules Nos. 1, 2, 3, 4 in violation of Section 14(i) of the Master Loan Agreement and failure to make all payments due under the terms of the Master Lease Agreement and Equipment Schedule in violation of Section 7(a) of the Lease Amendment.

59.     M&T has retained the law firms of Updike, Kelly & Spellacy, P.C. and Akerly Law PLLC and has agreed to pay said firms a reasonable fee for their services. Pursuant to the Loan Documents and Lease Documents, M&T is entitled to recover from Defendants its attorneys' fees and costs incurred enforcing the Loan Documents and Lease Documents.

### THIRD CLAIM FOR RELIEF – BREACH OF GUARANTY (Uriel J. Chavira)

60.     M&T repeats and re-alleges paragraphs 1 through 52 as if fully set forth herein.

61.     On or about December 14, 2015, guarantor Mr. Chavira entered into the Loan Guaranty in favor of M&T, as successor by merger, to induce M&T to enter into agreements with Los Paisanos.

62.     On or about February 24, 2017, guarantor Mr. Chavira entered into the Lease Guaranty in favor of M&T, as successor by merger, to induce M&T to enter into agreements with Los Paisanos.

63.     Mr. Chavira has breached the Loan Guaranty and Lease Guaranty due to his failure to pay all amounts due under the Master Loan Agreement and Schedules Nos. 1, 2, 3, 4

and failure to pay all amounts due under the Master Lease Agreement and the Equipment Schedule after Los Paisanos failed to pay the same.

64.    On September 24, 2021, M&T, as successor by merger, sent to Mr. Chavira a Notice of Default, Acceleration and Demand for Payment, which default was the result of Los Paisanos' failure to make all payments due under the terms of the Loan Documents in violation of Section 14(i) of the Master Loan Agreement and failure to make all payments due under the terms of the Lease Documents in violations of Section 7(a) of the Lease Amendment.

65.    Pursuant to the Loan Documents and Lease Documents, Mr. Chavira remains obligated and responsible to M&T for the outstanding balance remaining in the total amount of $1,597,161.37 as of January 18, 2023, plus default interest, costs, expenses and attorneys' fees.

66.    M&T has retained the law firms of Updike, Kelly & Spellacy, P.C. and Akerly Law PLLC and has agreed to pay said firms a reasonable fee for their services. Pursuant to the Loan Documents and Lease Documents, M&T is entitled to recover from Mr. Chavira its attorneys' fees and costs incurred enforcing the Loan Documents and Lease Documents.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff M&T Capital and Leasing Corporation claims the following relief from the Court:

1.      Sequestration of the Equipment;

2.      Damages;

3.      Costs of sequestration;

4.      Interest, Attorneys' Fees, Costs, and Expenses; and

5.      Such other relief as the Court deems just in law and equity.

Dated: January 24, 2023            Respectfully submitted,

**M&T CAPITAL AND LEASING CORPORATION**

By:      /s/ Bruce W. Akerly
                Bruce W. Akerly
                Texas Bar No. 00953200

AKERLY LAW PLLC
2785 Rockbrook Drive, Suite 201
Lewisville, Texas 75067
(469) 444-1878 Telephone
(469) 444-1801 Facsimile
bakerly@akerlylaw.com

ATTORNEYS FOR PLAINTIFF
M&T CAPITAL AND LEASING CORPORATION

**Of Counsel:**

Evan S. Goldstein (ct22994) (to be admitted)
Adam B. Marks (ct28787) (to be admitted)
Updike, Kelly & Spellacy, P.C.
225 Asylum Street, 20th Floor
Hartford, Connecticut 06103
Telephone: 860.548.2600
Facsimile: 860.548.2680
Email: egoldstein@uks.com
Email: amarks@uks.com

**VERIFIED ORIGINAL COMPLAINT – Page 14**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| M&T CAPITAL AND LEASING CORPORATION ) <br> f/k/a PEOPLE'S CAPITAL AND LEASING CORP., ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> LOS PAISANOS AUTOBUSES, INC. AND ) <br> URIEL J. CHAVIRA, ) <br> ) <br>     Defendants. ) <br> ) | CIVIL ACTION NO. <br><br> _____ |

### VERIFICATION OF COMPLAINT

I, Robert Van Tine, being duly sown, deposes and says:

I have read the foregoing Verified Complaint and do hereby verify that it is true and

correct to the best of my knowledge and belief.

Dated at Bridgeport, Connecticut, this 23rd day of January, 2023

_____

Robert Van Tine
Senior Vice President
M&T Capital and Leasing Corporation

Subscribed and sworn to before me
this 23rd day of January, 2023

_____
Notary Public / Commissioner of the Superior Court
My Commission Expires:

CYNTHIA A VRABEL
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires March 31 2023

VERIFIED ORIGINAL COMPLAINT – Page 15

# EXHIBIT A

## MASTER LOAN AND SECURITY AGREEMENT NO. 4075

This Master Loan and Security Agreement is entered into as of 14th Day of December, 2015, by and between **People's Capital and Leasing Corp.**, a Connecticut corporation, having its principal place of business at 850 Main St., BC-03 Bridgeport, CT 06604 (the "Lender") and **Los Paisanos Autobuses, Inc.** a corporation organized under the laws of the State of Texas with its chief executive office and place of business at 6767 Gateway West Blvd., El Paso, TX 79925, (the "Borrower"). The Lender and Borrower agree as follows:

**1.    THE LOANS.** Subject to the terms and conditions of this Agreement, the Lender will make one or more loans to the Borrower upon the terms and conditions set forth in this Agreement and each schedule which may be executed from time to time by the parties hereto and identified as a schedule to this Agreement (individually, a "Schedule" and collectively, the "Schedules") and all amendments, riders and supplements hereto and thereto. Each Schedule shall be deemed to incorporate the terms of this Agreement and this Agreement and each Schedule which may be executed pursuant hereto shall constitute a separate and distinct loan (each a "Loan" and collectively, the "Loans") repayable as provided in this Agreement and the applicable Schedule.

**2.    REPAYMENT OF LOANS.** Borrower agrees to repay each Loan in the number and the amount of successive monthly or quarterly installments (which shall be inclusive of interest, unless otherwise indicated) reflected in the applicable Schedule. The advance payment with respect to a Schedule, if any, shall be due and payable upon execution of the Schedule. The first periodic installment (exclusive of the advance payment, if any) with respect to a Schedule shall be due on the first (1st) day of the month following the advance of the Loan proceeds by Lender (the "Commencement Date"). The remaining periodic installment payments shall be due and payable on the same day of each successive month (or quarter, if quarterly payments are provided for in the Schedule). However, the parties may select another Commencement Date by noting the same in the Special Provisions section of the Schedule or by a separate writing signed by Lender and Borrower in which case the first periodic installment payment shall be due on such date. The Borrower authorizes the Lender to insert the Commencement Date in each Schedule, determined in accordance with the foregoing provisions. Unless otherwise specifically provided for in writing, no Loan may be prepaid.

**3.    SECURITY INTEREST.** To secure payment when due (at maturity by acceleration or otherwise) of the Loan described in the applicable Schedule, any interim funding against such Loan, the performance of all other obligations of the Borrower under this Agreement and the applicable Schedule and the payment and performance of any and all other Schedules, debts, obligations and liabilities of Borrower to Lender whether direct, contingent or joint and several, now existing or hereafter arising (including obligations assigned to Lender), and any renewals, extensions and modifications of such debts, obligations and liabilities, Borrower hereby conveys, assigns and grants to Lender a continuing security interest in and to (i) the equipment described in the applicable Schedule and all amendments, riders and supplements thereto including all related software (embedded therein or otherwise), all parts, repairs, additions, attachments, replacements, replacement parts, accessions and accessories incorporated therein or affixed thereto, modifications and substitutions

thereto (the "Equipment") and (ii) all proceeds thereof including insurance proceeds (all of the above, including the Equipment, collectively, the "Collateral").

**4.  FINANCING AGREEMENT.**  THIS AGREEMENT IS SOLELY A FINANCING AGREEMENT.  BORROWER ACKNOWLEDGES THAT THE EQUIPMENT HAS BEEN OR WILL BE SELECTED AND ACQUIRED SOLELY BY BORROWER AND THAT LENDER HAS NOT AND DOES NOT MAKE ANY WARRANTY WITH RESPECT TO ITS CONDITION, MERCHANTABILITY, SUITABILITY, CAPACITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

**5.  UNCONDITIONAL OBLIGATION TO PAY, LATE PAYMENTS, ETC.**  All payments due under a Schedule or hereunder shall be paid to Lender or its assigns without notice or demand and without abatement, offset, defense or counterclaim, at Lender's principal office shown above, or such other place as Lender or its assignee may designate in writing to Borrower.  Borrower's obligation to pay the installments and other payments due under a Schedule or hereunder shall be absolute and unconditional and shall not be affected by reason of (i) any defect in, lack of fitness for use of, damage to, loss of possession or use of or destruction of, all or any of the Equipment described in such Schedule; (ii) the prohibition or other restriction against Borrower's use of said Equipment; or (iii) for any other cause, it being the agreement of the parties that the Loan and any other amount payable by Borrower under a Schedule or hereunder shall continue to be payable in all events in the manner and at the times provided in the Schedule and this Agreement.

Time is of the essence in the performance of the Borrower's obligations under this Agreement and each Schedule.  If any periodic installment payment or other payment is more than five (5) days late, Lender may, at its election, and subject to prior exercise of its right of acceleration, accept the payment in arrears and Borrower shall pay, as liquidated damages: (i) a late charge on, and in addition to such periodic installment or other payment, equal to five (5) percent of such defaulted payment plus, (ii) interest on such defaulted payment from one (1) month after the due date until paid at the lower of one and one-half percent (1.5%) per month or the maximum rate permitted by law.  Any amount received by Lender determined to be in excess of the highest rate of interest permitted by applicable law shall be refunded to Borrower.  A returned check fee or a non-sufficient funds charge of $25.00 will be charged to Borrower for each check that is returned for any reason including non-sufficient funds or uncollected funds.

**6.  REPRESENTATIONS AND WARRANTIES.**  Borrower warrants, represents and agrees as follows as of the date hereof and as of the date of execution of each Schedule: (i) unless it is an individual or sole proprietorship, Borrower is duly organized, validly existing and in good standing in the state in which it was organized (as indicated in the introductory paragraph of this agreement) and is duly qualified to do business wherever necessary to carry on its business and operations; (ii) Borrower has the authority to carry on its business as presently conducted; (iii) the Agreement is and each Schedule will be a legal, valid and binding obligation of the Borrower in accordance with its terms; (iv) Borrower has full power and authority to execute, deliver and perform its obligations under this Agreement and the Schedules; (v) the execution and delivery of this Agreement and the Schedules has been authorized by all requisite corporate (or partnership or limited liability company) action; (vi) the execution, delivery and performance of this Agreement and the Schedules does not and will not constitute a breach, default or violation of or under Borrower's articles of incorporation or organization, by laws,

2

partnership or limited liability company agreement or any other agreement, law, order, judgment or injunction to which it is a party or may be bound; (vii) the Equipment is (or, on the Commencement Date, will be) lawfully owned by Borrower, free and clear of all liens, encumbrances and security interests and Borrower will warrant and defend title thereto against all claims; (viii) Borrower has not granted and will not grant to any one other than Lender a security interest in the Equipment and no Financing Statement or other instrument affecting the Equipment nor rights therein, bearing the signature of, or otherwise authorized by, Borrower is on file in any public office; (ix) the Equipment shall at all times remain personal property and be retained in Borrower's possession at its principal address set forth above (or, if so indicated in a Schedule, at the Equipment location set forth in such Schedule); (x) the Equipment shall be used solely for business purposes and not for any consumer purposes; (xi) if the Equipment is attached to real estate or if it is or may become subject to a prior interest in favor of a party having any interest in the real estate, Borrower will, on Lender's demand, furnish Lender with a writing by which any and all parties having such prior interest waive or subordinate their rights and priorities to, or in favor of, Lender's security interest provided herein; (xii) all financial statements and other credit information delivered by Borrower to Lender are true and correct in all respects and there has been no material adverse change in the financial condition of the Borrower since their date; (xiii) there are no pending or threatened actions or proceedings before any court or administrative agency that are likely to have a material adverse effect on Borrower, nor is Borrower in default under any loan, lease or purchase obligation; (xiv) Borrower has filed all tax returns required to be filed prior to the date of this Agreement and each Schedule taking into account any extension of time granted or permitted by the taxing authority and has paid or adequately provided for all taxes payable by the Borrower and  (xv) Borrower's exact legal name and State of incorporation (or if not a corporation, State of organization) and chief executive office are accurately set forth in the first paragraph of this Agreement and that the organizational number (if applicable) assigned to Borrower in the State in which it was organized is as specified below Borrower's signature.

.

7.     **INSURANCE.**  Borrower shall, at its sole cost and expense, procure and maintain, so long as Borrower is indebted to Lender on any Loan or on any other liability:

(i)     property insurance insuring the Equipment against all risks of physical loss, theft, damage and destruction (including specific coverage for loss by flood and earthquake, if requested by Lender) in an amount equal to the greater of (a) the amount of the Loan under the applicable Schedule or (b) the full replacement value of the Equipment and Lender and its assigns shall be named by endorsement with "lender's loss payable provisions" under such policy, and;

(ii)     primary commercial general liability insurance and/or commercial auto liability with respect to the use and maintenance of the Equipment in such amounts as may be reasonably acceptable to Lender.

All insurers and coverages must be reasonably satisfactory to Lender.  Borrower shall deliver to Lender Evidence of Commercial Property Insurance on ACORD form 28 ("Evidence") (or equivalent) with ISO special form (or its equivalent), including flood and earthquake coverage (if requested by Lender) and Certificate of Liability Insurance on ACORD form 25 (or equivalent) or other proof of insurance indicating that Borrower has obtained appropriate liability coverage for its operations. Evidence shall provide that the policy may not be canceled or altered without at least thirty (30) days prior written notice to Lender and that the coverage shall not

be invalidated against Lender because of any violation of any condition or warranty contained in any policy or application therefor by Borrower or by reason of any action or inaction of Borrower. If requested by Lender, Borrower shall provide Lender with a copy of its commercial property insurance policy and an endorsement to the policy indicating Lender's interest in the policy. Borrower hereby irrevocably appoints Lender as Borrower's attorney-in-fact to file, settle or adjust and receive payment of claims under any insurance policy on the Equipment and to endorse Borrower's name on any checks, drafts or other instruments of payment on such claims.

**8.  USE, REPAIRS, LOSS AND DAMAGE.**  Borrower agrees to maintain the Equipment in good condition and repair and in accordance with the manufacturer's instructions, manuals and warranties (if any), and the requirements of any applicable insurance and any governmental authority having jurisdiction, provided, however, that Borrower shall not make any changes or alterations in or to the Equipment except as necessary for compliance with this section. Borrower shall pay for all fuel, service, inspection, overhaul, replacements, substitutions, materials and labor necessary or desirable for the proper use, repair, operation and maintenance of the Equipment.  All risks of loss, theft, damage or destruction of the Equipment shall be borne by Borrower and Borrower shall promptly notify Lender in writing of any such loss, theft, damage or destruction.  In the event of any damage to the Equipment (unless the same is damaged beyond repair) Borrower shall, at its expense, place the same in good repair, condition and working order.  If the Equipment set forth in a Schedule or Schedules is determined by Lender to be lost, stolen or damaged beyond repair, or should said Equipment be confiscated, seized or the use and title thereof requisitioned to someone other than Borrower, Borrower shall immediately pay to Lender, in addition to unpaid past due periodic installment payments on the Loan, other unpaid sums then due hereunder and late charges then past due, an amount equal to the then remaining periodic installment payments due on the Loan discounted to present value at the rate of  two percent (2%) per annum, less the net amount of the recovery, if any, actually received by Lender from insurance on the Equipment.

**9.  TAXES AND OTHER CHARGES.**  Borrower agrees to pay promptly when due all registration, title, license and other fees, assessments and sales, use, gross receipts, ad valorum, property and any and all other taxes imposed by any State, Federal, local or foreign government upon this Agreement and the Schedules or upon the ownership, shipment, delivery, use or operation of the Equipment or any Collateral or upon or measured by any payments due hereunder (other than taxes on or measured solely by the net income of Lender) and any fines, penalties and interest thereon.

**10. BORROWER'S ADDITIONAL COVENANTS.**  Borrower hereby agrees and covenants as follows: (i) except for the security interest granted hereby, Borrower shall keep the Equipment free and clear of any security interest, lien or encumbrance and shall not sell, lease, assign (by operation of law or otherwise), exchange or otherwise dispose of any of the Equipment, (ii) Borrower authorizes Lender to file a financing statement and amendments thereto describing the Collateral, which may be filed either before or after Borrower's execution of any related Schedule, and Borrower agrees to pay any filing fees and/or costs with respect thereto and for lien searches and articles of incorporation; (iii) if any part of the Collateral is subject to certificate of title law, Borrower will cause Lender's security interest to be noted on such certificate of title and promptly deliver such

4

certificate to Lender; (iv) Borrower agrees that it will not change the State where it was incorporated or otherwise, nor change its name or address, without providing Lender with thirty (30) days prior written notice; (v) Borrower will allow Lender and its representatives free access to the Collateral at all times during normal business hours, for purposes of inspection and repair and, following an Event of Default, Lender shall have the right to demonstrate and show the Collateral to others and (vi) Borrower will furnish or cause to be furnished to Lender (a) its interim Financial Statements to include both a balance sheet and income statement within sixty (60) days after the end of its first three quarters in each fiscal year, (b) its compiled audited annual Financial Statements and corporate tax returns prepared by an independent certified public accountant within one hundred twenty (120) days after the close of its fiscal year which shall be prepared in accordance with generally accepted accounting principles, (c) the financial statements or other financial information which any guarantor of Borrower's obligations hereunder ("Guarantor") is required to provide to Lender as set forth in the applicable guaranty, and (d) all other financial information and reports that Lender may from time to time reasonably request, including debt schedule and income tax returns of Borrower and any Guarantor; (vii) Borrower and any Guarantor agrees that any financial statements or other nonpublic information which Borrower or any Guarantor provides to Lender may be disclosed by Lender for legitimate business purposes to Lender's affiliates, attorneys, advisors, recourse providers, prospective Equipment remarketers, assignees or participants, auditors or other parties pursuant to law, and (viii) Borrower will comply with all applicable federal, state and local laws, rules, ordinances, regulations and orders applicable to it and Borrower will execute and deliver to Lender such further documents and take such further action as Lender may require in order to more effectively carry out the intent and purpose of this Agreement.

**11. BORROWER'S FAILURE TO PAY TAXES, INSURANCE, ETC.** Should Borrower fail to make any payment or do any act as herein provided (including, but not limited to, payment of taxes or for insurance), Lender shall have the right, but not the obligation, and without releasing Borrower from any obligation hereunder, to make or do the same, and to pay any sum due in connection therewith or to contest or compromise any encumbrance, charge or lien and in exercising any such rights, incur any liability and expend whatever amounts in its absolute discretion it may deem necessary therefor. If any of the foregoing shall be paid by Lender, Borrower shall promptly reimburse Lender therefor on demand together with interest thereon at the lower of one and one-half percent (1.5%) per month or the maximum rate permitted by law.

**12. CROSS COLLATERALIZATION.** Without in any way limiting the provisions of Section 3, as additional security for the Borrower's obligations under any Schedule, Borrower grants to Lender a security interest in all equipment and other personal property (collectively the "additional collateral") set forth in every other Schedule, lease, security agreement, loan and security agreement or other agreement (collectively, the "other agreements") between the Borrower and the Lender whether now or hereafter in existence (including agreements assigned to Lender), and Borrower assigns to the Lender as security for its obligations under each Schedule all of its right, title and interest in and to any surplus money to which Borrower may be entitled upon the sale or other disposition of the additional collateral. Such additional collateral shall continue to secure the Borrower's obligations under each Schedule even after the obligations under the applicable other agreement have been satisfied in full. Anything above to the contrary notwithstanding, the benefit of the foregoing

additional security provisions shall apply to the benefit of the Lender and any assignee holding a Schedule only to the extent that the Lender or such assignee is also the holder of one or more other agreements.

**13. INDEMNITY.** Borrower assumes liability for and agrees to indemnify, defend, protect, save and keep harmless Lender from and against costs, expenses and disbursements, including court costs and legal expenses, of whatever kind and nature, imposed on, incurred by or asserted against Lender (whether or not also indemnified against by any other person) in any way relating to or arising out of this Agreement or the Schedules or the manufacture, financing, ownership, delivery, possession, use, operation, condition or disposition of the Equipment by Borrower, including, without limitation, any claim alleging latent and other defects, whether or not discoverable by Lender or Borrower, and any other claim arising out of strict liability in tort, whether or not in either instance relating to an event occurring while Borrower remains obligated under this Agreement, and any claim for patent, trademark or copyright infringement. Each party agrees to give the other notice of any claim or liability hereby indemnified against promptly following learning thereof. The fact that a claim for which Lender is entitled to indemnity under this Section is asserted after the termination of this Agreement shall not release Borrower from its indemnity obligations and this covenant of indemnity shall survive the termination of this Agreement.

**14. DEFAULT.** The occurrence of any one of the following shall constitute an "Event of Default" hereunder and under each Schedule: (i) Borrower fails to pay any periodic installment payment, or other amount due hereunder or under any Schedule on or before the fifth (5th) day following the date when the same becomes due and payable; (ii) Borrower removes, sells, transfers, encumbers, or parts with possession of the Equipment or any items of Equipment or attempts to do any of the foregoing; (iii) Borrower fails to maintain in force the required insurance on any Equipment in compliance herewith or fails to provide loss payable protection to Lender in form satisfactory to Lender; (iv) any representation or warranty made by Borrower herein or in any other agreement between the parties or in any statement given to Lender shall be materially untrue; (v) Borrower shall fail to observe or perform any of the other obligations required to be observed or performed by Borrower hereunder or under any Schedule or Borrower or any Guarantor shall fail to observe any other obligation or indebtedness of Borrower or such Guarantor to Lender otherwise owing or due by Borrower or such Guarantor to Lender in any other agreement now or hereafter executed between the parties hereto, and such failure shall continue uncured for twenty (20) days after written notice thereof to Borrower or such Guarantor; (vi) Borrower or any Guarantor shall (a) fail to pay any indebtedness for borrowed money (other than the Loan) of the Borrower or such Guarantor, or any interest or premium thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) or (b) fail to perform or observe any term, covenant, or condition on its part to be performed or observed under any agreement or instrument relating to such indebtedness, or if any such indebtedness shall be declared to be due or payable or required to be prepaid (other than by a regularly scheduled required prepayment) prior to the stated maturity thereof; (vii) if Borrower leases the premises where the Equipment is located, a breach of such lease by Borrower and the commencement of an action by the landlord to evict Borrower or to repossess the premises; (viii) if Borrower or any Guarantor sells, leases or disposes of any of its assets except in the ordinary course of its business and except for the disposition of any obsolete property not useful to Borrower or such Guarantor; (ix) Borrower or any Guarantor ceases doing business as a going concern, makes an assignment for the benefit of creditors,

admits in writing its inability to pay its debts as they become due, files a voluntary petition in bankruptcy, is adjudicated a bankrupt or an insolvent, files a petition seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any present or future statute, law or regulation or files an answer admitting the material allegations of a petition filed against it in any such proceeding, consents to or acquiesces in the appointment of a trustee, custodian, receiver or liquidator of it or of all or any substantial part of its assets or properties, or if Borrower or any Guarantor takes any action looking to its dissolution or liquidation, or an order for relief is entered under the Bankruptcy Code against Borrower or any Guarantor; (x) if within sixty (60) days after the commencement of any proceedings against Borrower or any Guarantor seeking reorganization, arrangement, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such proceedings, shall not have been dismissed or if within sixty (60) days after the appointment, without Borrower's or Guarantor's acquiescence, of any trustee, custodian, receiver or liquidator of it or of all or any substantial part of its assets and properties, such appointment shall not be vacated; (xi) Borrower or any Guarantor terminates its existence, sells all or substantially all of its assets or consolidates with or merges into any other entity or its stockholders, partners or members sell all or substantially all of their stock or partnership or membership interests; or (xii) the entry of any judgment, order, award or decree against Borrower or a Guarantor which has not been discharged or execution thereof not stayed within sixty (60) days after entry and which is not fully covered by applicable insurance, and a determination by Lender, in good faith but in its sole discretion, that the same could have a material adverse effect on the Borrower or the Guarantor or the Lender's rights with respect to the Collateral or the prospect for full and punctual payment of the payments due hereunder; (xiii) the death of an individual Guarantor; or (xiv) Lender shall determine that there has been a material adverse change in the financial condition or business operations of the Borrower or any Guarantor since the date of the execution of this agreement or that the Borrower's ability to perform its obligations hereunder has been materially impaired.

**15. REMEDIES.**  Upon the occurrence of an Event of Default, Lender shall have the right to recover from Borrower, as liquidated damages for loss of a bargain and not as a penalty, a sum equal to the aggregate of the following with respect to any and all Schedules: (a) all unpaid periodic installment payments and other sums due under the Schedule to the date of default plus late charges, if any, (b) the present value (using a two percent per annum (2%) discount rate) of all unmatured installments to become due under the Schedule and (c) interest on the total of (a) plus (b) from the date of default at the rate of one and one-half percent (1.5%) per month, if not prohibited by law, otherwise at the highest lawful rate.  In addition, Lender shall have the right to recover from Borrower any expenses paid or incurred by Lender in connection with the enforcement of its rights under each Schedule and the repossession, transporting, holding, insuring, repairing, refurbishing, preparing for sale and subsequent sale, lease or other disposition of the Collateral including reasonable attorney fees and legal expenses (collectively, "Repossession Expenses").  **BORROWER WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON THIS AGREEMENT, ANY SCHEDULE OR ANY COLLATERAL.**

If the Equipment is mobile equipment and/or normally or actually used in more than one location, whether self-propelled or transported by other equipment, including but not limited to trucks, tractors, trailers, other motor vehicles, cranes, lifts, digging equipment, cement mixers, rolling stock and all other construction, transportation, and mining equipment and all attachments and accessions to any of the foregoing, then Lender

shall have the right on five (5) days notice to require Borrower at Borrower's expense to deliver the Equipment fully assembled to a single location for possession by Lender.

The Lender shall have all of the rights and remedies of a Secured Party under the Uniform Commercial Code and all other rights and remedies available to creditors at law or in equity. Without limiting the generality of the foregoing, Lender is hereby authorized and empowered, with the aid and assistance of any person or persons, to enter any premises where the Collateral or any part thereof is, or may be, placed, and to assemble and/or remove same and/or to render it unusable and sell, lease or otherwise dispose of such Collateral and any such sale may be at one or more public or private sales upon at least ten (10) days written notice to Borrower for such sale. The proceeds of each such sale, lease, or other disposition of the Collateral shall be applied first, to the Repossession Expenses, second to the liquidated damages specified above and any other indebtedness secured hereby, third, to the holder of any subordinate interest or other lien on the Collateral if such holder is legally entitled to such proceeds and fourth, any surplus to Borrower. Borrower shall remain liable for any deficiency on demand. IF LENDER EMPLOYS COUNSEL FOR THE PURPOSE OF EFFECTING COLLECTION OF ANY MONIES DUE HEREUNDER (WHETHER OR NOT LENDER HAS RETAKEN THE COLLATERAL OR ANY PART HEREOF) OR FOR THE PURPOSE OF RECOVERING THE COLLATERAL, BORROWER AGREES TO PAY REASONABLE ATTORNEY'S FEES, COSTS AND EXPENSES INCLUSIVE OF THOSE INCURRED IN BANKRUPTCY PROCEEDINGS, INCLUDING RELIEF FROM STAY MOTIONS, CASH COLLATERAL MOTIONS AND DISPUTES CONCERNING ANY DISCLOSURE STATEMENT AND/OR BANKRUPTCY PLAN. The Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender which is reasonably convenient to both parties. Borrower acknowledges and agrees that (i) Lender shall have no obligation to clean-up or otherwise prepare the Equipment or other collateral for sale; (ii) Lender may comply with any state or federal law requirements in connection with the disposition of the Equipment or other collateral and such compliance shall not be considered adversely to affect the commercial reasonableness of the sale; (iii) Lender may sell the Equipment or other Collateral without giving any warranties with respect thereto and may specifically disclaim any warranties and such procedure shall not be considered adversely to affect the commercial reasonableness of the sale; and (iv) if Lender sells any of the Equipment or other Collateral on credit, Borrower shall be credited only with the payments actually made by the purchaser, received by the Lender and applied to the indebtedness of the purchaser and if the purchaser fails to pay for the Equipment or other collateral, Lender may resell the Equipment or other collateral and Borrower will be credited with the proceeds of the sale. All rights and remedies hereunder are cumulative and not exclusive and a waiver by Lender of any breach by Borrower of the terms, covenants, and conditions hereof shall not constitute a waiver of future breaches or defaults, and no failure or delay on the part of Lender in exercising any of its options, powers, rights or remedies, or partial or single exercise thereof, shall constitute a waiver thereof.

If any court of competent jurisdiction determines that any provision of this Section 15 is invalid or unenforceable in such jurisdiction, in whole or in part, such determination shall not prohibit Lender from enforcing all other provisions in such jurisdiction.

**16. ASSIGNMENT.** Lender may grant security interests in or otherwise assign or transfer (or grant participations in) all or any part of this Agreement or any Loan or Schedule or any installments or other sums due or to become due, without Borrower's consent. Borrower waives and agrees not to assert against any

8

assignee any claim, defense or set-off that Borrower could assert against Lender except defenses that cannot be legally waived.  In the event Lender assigns any Schedule, (i) a copy of this Agreement together with the manually executed (ink-signed) original Schedule shall constitute the original chattel paper under the Uniform Commercial Code and (ii) the assignee holding the assigned Schedule shall be the Lender of the Loan set forth in such assigned Schedule secured by the Collateral described therein and may exercise its rights and remedies with respect thereto separately and independently of the holder of any other Schedule.  Upon Lender's giving written notice to Borrower of any such assignment, Borrower shall promptly acknowledge its obligations under the Schedule assigned and shall comply with the written directions of such assignee, shall make all installment payments and other payments due with respect to the assigned Schedule as such assignee may direct in writing and shall send all notices provided for or permitted under this Agreement with respect to such Schedule to such assignee.  Following any such assignment the term "Lender" shall, as to the assigned Schedule, be deemed to refer to Lender's assignee, but no such assignee shall be deemed to assume any obligation or duty imposed upon Lender hereunder arising prior to such assignment and Borrower shall look only to Lender for performance thereof.  As used in this Section 16, "assign" shall be deemed to include a pledge, sale of, or grant of a security interest in, any of the Collateral or a Schedule by Lender and the term "assignee" shall be deemed to refer to the recipient of such pledge, hypothecation, sale, mortgage, or security interest.  This Agreement and any Schedule shall not be transferable or assignable by Borrower without the Lender's express prior written consent and any such purported assignment by Borrower other than in compliance with the provisions of this Section 16 shall be null and void ab initio.

**17. SECURITY DEPOSIT.**  If a Security Deposit is indicated in a Schedule then such Security Deposit shall secure all of Borrower's obligations to Lender now or hereafter in existence.  Lender may, at its option, apply the Security Deposit to cure any default of Borrower, whereupon Borrower shall promptly restore such Security Deposit to its original amount.  Lender shall return to Borrower any unapplied Security Deposit without interest upon full payment and performance of all of Borrower's obligations to Lender.

**18. PREJUDGMENT REMEDY WAIVER**.  THE BORROWER ACKNOWLEDGES AND AGREES THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION AND NOT A CONSUMER TRANSACTION AND WAIVES ANY RIGHT TO A NOTICE AND HEARING UNDER CHAPTER 903a OF THE CONNECTICUT STATUTES, AS AMENDED, OR ANY OTHER STATUTE OR STATUTES IN CONNECTICUT OR OTHER JURISDICTIONS AFFECTING PREJUDGMENT REMEDIES.  THE BORROWER AUTHORIZES THE LENDER'S COUNSEL TO ISSUE A WRIT FOR A PREJUDGMENT REMEDY WITHOUT COURT ORDER, PROVIDED THE COMPLAINT SHALL SET FORTH A COPY OF THIS WAIVER AND WAIVES ANY CLAIM IN TORT, CONTRACT OR OTHERWISE AGAINST LENDER'S COUNSEL WHICH MAY ARISE OUT OF SUCH ISSUANCE OF THE WRIT FOR A PREJUDGMENT REMEDY WITHOUT COURT ORDER.   THE  BORROWER  ACKNOWLEDGES  AND  STIPULATES  THAT  THE  WAIVERS  AND AUTHORIZATIONS  GRANTED  HEREIN  ARE  MADE  KNOWINGLY  AND  FREELY  AFTER  FULL CONSULTATION WITH COUNSEL. SPECIFICALLY, THE BORROWER RECOGNIZES AND UNDERSTANDS THAT THE EXCERCISE OF LENDER'S RIGHTS DESCRIBED ABOVE MAY RESULT IN THE ATTACHMENT OF OR LEVY AGAINST BORROWER'S PROPERTY, AND SUCH WRIT FOR A PREJUDGMENT REMEDY WILL NOT HAVE THE PRIOR WRITTEN APPROVAL OR SCRUTINY OF A COURT OF LAW OR OTHER

OFFICIAL OFFICER NOR WILL BORROWER HAVE THE RIGHT TO ANY NOTICE OR PRIOR HEARING WHERE BORROWER MIGHT CONTEST SUCH A PROCEDURE. THE INTENT OF BORROWER IS TO GRANT LENDER FOR GOOD AND VALUABLE CONSIDERATION THE RIGHT TO OBTAIN SUCH PREJUDGMENT REMEDY AND TO ASSURE THAT ANY SUCH PREJUDGMENT REMEDY IS VALID AND CONSTITUTIONAL.

**19. GENERAL PROVISIONS. THIS AGREEMENT AND ALL RELATED DOCUMENTS AND AGREEMENTS, INCLUDING BUT NOT LIMITED TO ALL SCHEDULES, RIDERS, AMENDMENTS AND SUPPLEMENTAL DOCUMENTS (COLLECTIVELY, "THE LOAN DOCUMENTS") AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CONNECTICUT.** BORROWER HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CONNECTICUT AND THE FEDERAL DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY. BORROWER WAIVES ANY OBJECTIONS BASED UPON VENUE OR "FORUM NON CONVENIENS" IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING. BORROWER CONSENTS THAT PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE SERVED UPON IT BY REGISTERED MAIL DIRECTED TO BORROWER AT ITS ADDRESS SET FORTH AT THE HEAD OF THIS AGREEMENT OR IN ANY MANNER PERMITTED BY APPLICABLE LAW OR RULES OF COURT. BORROWER HEREBY IRREVOCABLY APPOINTS THE SECRETARY OF STATE OF CONNECTICUT AS ITS AGENT TO RECEIVE SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING. The Loan Documents may not be changed, modified or discharged on behalf of Lender, in whole or part, and no right of Lender may be waived except by a writing signed by a duly authorized officer of Lender. The Lender is authorized and empowered to date the Loan Documents and to fill in blank spaces in accordance with the terms of the transaction, including, but not limited to inserting serial numbers and Equipment descriptions in any Schedule, the insertion of the Commencement Date in the Schedule and the assignment of an account number. Notices hereunder shall be in writing and shall be deemed given when personally delivered or when sent by facsimile to a party's facsimile number or three days after having been mailed to the other party at the address specified above or such new address as to which a party may advise the other. Forbearance or indulgence by Lender in any regard shall not constitute a waiver of the covenant or condition to be performed by Borrower to which the same may apply. Borrower hereby waives demand, presentment, dishonor, protest, and notice of protest, notice of dishonor, notice of nonpayment and any and all notices of like nature. The section captions are for convenience and are not a part of this Agreement. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the Lender and shall bind all persons who become bound as debtor to this Master Loan and Security Agreement. If executed by more than one Borrower, then the obligations of each Borrower shall be joint and several. Any provision of the Loan Documents which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof. THE LOAN DOCUMENTS EXCLUSIVELY REPRESENT THE AGREEMENTS BETWEEN THE PARTIES AND THE INTENT OF THE PARTIES THERETO AND SUPERSEDE ANY PRIOR PROPOSAL LETTERS, COMMITMENT LETTERS, ORAL COVENANTS, ORAL AGREEMENTS OR NEGOTIATIONS. The Loan Documents shall not be binding

on Lender until accepted and executed on behalf of Lender at its Bridgeport, Connecticut office.  Unless otherwise expressly provided, only one original of each of the Loan Documents shall be executed, which execution may be by separate counterparts which together shall constitute a single document.  The parties agree that any copy of an executed Loan Document, including any photocopy, telecopy or facsimile thereof, shall have the same force and effect as though it were an original for all purposes, including but not limited to the enforcement of any of the terms and conditions thereof and the admissibility of such Loan Document in any legal or equitable proceeding, but except as provided below and in Section 16, such copy shall not be used to determine the original chattel paper.  In the event that Borrower or any Guarantor provides Lender with a copy of any Loan Document, then Borrower and Guarantor agree to immediately thereafter provide Lender with the original.  Borrower agrees that if Borrower delivers a copy but not the manually executed original of a Schedule to Lender, then Lender may execute, designate and mark such copy as the "Original" Schedule for purposes of determining the original chattel paper pursuant to Section 16 of this Agreement.  Lender shall have no obligation to disburse the proceeds of any Loan if a material adverse change occurs in the financial condition or business operations of Borrower or Guarantor, if an Event of Default exists or would exist with the giving of notice and/or passage of time, or if any credit or documentation requirement remains outstanding.

| | The undersigned signatory affirms that he/she has read the terms and conditions printed above, that he/she is a duly authorized officer, partner, member, manager or proprietor of the Borrower, and has authority to execute this Master Loan and Security Agreement on its behalf. |
|---|---|
| Accepted at Lender's Office at 850 Main Street, BC-03, Bridgeport, CT 06604 | |
| LENDER:<br>**PEOPLE'S CAPITAL AND LEASING CORP.** | BORROWER:<br>**LOS PAISANOS AUTOBUSES, INC.** |
| AUTHORIZED OFFICER:<br><br>BY: _Melissa A Curtis_<br>TITLE: _Vice President_<br><br>Master Loan 2009 | AUTHORIZED OFFICER, PARTNER, MEMBER, MANAGER, OR PROPRIETOR:<br>BY: _____<br>TITLE: _President_<br><br>FEDERAL IDENTIFICATION NO. ███████ |

## CERTIFICATE OF SECRETARY

The undersigned does hereby certify that he/she is Secretary of **Los Paisanos Autobuses, Inc.** (hereafter called the "Corporation") and the following is a true, complete and correct copy of resolutions duly adopted by the Board of Directors of the Corporation and that such resolutions are in full force and effect:

"RESOLVED, that the Corporation enter into a Master Loan and Security Agreement No. 4075 dated December 14, 2015 and various Schedules thereto from time to time (the "Schedules") with People's Capital and Leasing Corp. (hereafter called "PCLC"), substantially in the form presented to this meeting providing for Loans by the Corporation from PCLC of the amounts reflected in the Schedules to be secured by the property described in the Schedules (the "Collateral"); and it is further;

RESOLVED, that the officers of the Corporation, and each of them singly hereby are authorized (a) to execute and deliver said Agreement and the Schedules thereto in the name and on behalf of the Corporation, either in the form presented or with such changes therein as the officer executing the same may approve, his approval and authority to be conclusively evidenced by his execution thereof, such execution to be valid and binding on the Corporation with or without the corporate seal of the Corporation, (b) to carry out the obligations and enforce the rights of the Corporation under said Agreement and Schedules, (c) to execute and deliver in the name and on behalf of the Corporation such amendments and other documents as may be requested or required by PCLC in connection with said Agreement and Schedules including (without limiting the generality of the foregoing) promissory notes, security agreements and additional agreements with respect to any interim financing in connection with the acquisition of any Collateral, agreements with assignees of PCLC, and an Acceptance or Delivery Certificate in respect of any Collateral, and (d) to take all other action deemed by them necessary or advisable in connection with the foregoing; and it is further;

RESOLVED, that the officers of the Corporation, and each of them singly, hereby are authorized from time to time on behalf of the Corporation to enter into additional loan, lease or other financing transaction with PCLC upon such terms and conditions as the officers, or any one of them, shall determine, and in that connection to execute and deliver in the name and on behalf of the Corporation such documents as PCLC requires; and it is further

RESOLVED, that all acts authorized in the foregoing resolutions, but performed prior to the adoption of these resolutions, are hereby amended and ratified and affirmed."

The undersigned further certifies that the persons whose names, titles and signatures appear below are duly elected (or appointed), qualified and acting officers of the Corporation and hold on the date of this Certificate the offices set forth opposite their respective names, and the signatures appearing opposite their respective names are the genuine signatures of such persons:

| NAME OF OFFICER | TITLE OF OFFICER | SIGNATURE OF OFFICER |
|---|---|---|
| *Uriel Chavira* | *President & Secretary* | |
| | | |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said corporation this 14th Day of December, 2015.

_____
Secretary

(Corporate Seal)

1

(In the case where the Secretary will execute transactional documents by this resolution, a second officer of the Corporation must sign the below Additional Certificate.)

### ADDITIONAL CERTIFICATE

The undersigned does hereby certify that he is _____President_____ (Title) of the above Corporation and certifies that the foregoing is a true, complete and correct copy of resolutions duly adopted by the Board of Directors and that the above are the names, titles and genuine signatures of presently elected and acting officers of the Corporation.

_____

---

(In the case where the Secretary is the sole officer of the Corporation, the below Sole Officer Certificate must also be signed and notarized)

### SOLE OFFICER CERTIFICATE

I, _____Uriel Chavira_____ am the sole officer of the corporation and my signature on the Master Loan and Security Agreement, Schedules and all related documents is my true and genuine signature.

Very Truly Yours,

_____

Subscribed and sworn to before me this __14th__ day of __December__ 20 15

_____
Notary Public

residing at: __El Paso, Texas__

my commission expires: __June 14 2016__

SANDRA MOLINA
Notary Public, State of Texas
My Commission Expires
June 14, 2016

# EXHIBIT B

## SCHEDULE TO MASTER LOAN AND SECURITY AGREEMENT

**SCHEDULE NO. 001 DATED DECEMBER 14, 2015 TO MASTER LOAN AND SECURITY AGREEMENT NO. 4075 DATED DECEMBER 14, 2015**

**Lender:**
PEOPLE'S CAPITAL AND LEASING CORP.
850 MAIN STREET, BC-03
BRIDGEPORT, CT 06604

**Borrower:**
LOS PAISANOS AUTOBUSES, INC.
6767 GATEWAY WEST BLVD.
EL PASO, TX 79925

Lender and Borrower have entered into a Master Loan and Security Agreement No. 4075 dated December 14, 2015 (the "Master Loan Agreement") which is incorporated herein and this is a Schedule to the Master Loan Agreement. All terms used herein which are defined in the Master Loan Agreement and not otherwise specifically defined herein shall have the same meanings as set forth in the Master Loan Agreement.

    **1. THE LOAN AND LOAN REPAYMENT.** Pursuant to the Master Loan Agreement, Lender agrees to lend to Borrower the sum of Nine Hundred Seventy-four Thousand Four Hundred Eight and 72/100 ($974,408.72) Dollars. Borrower agrees to repay the Loan in successive installments (which installment payments are inclusive of interest) as set forth in the following payment schedule:

**PAYMENT SCHEDULE**

| ADVANCE PAYMENT | NUMBER OF PERIODIC INSTALLMENT(exclusive of Advance Payment) PAYMENTS AND PAYMENT PERIOD | INSTALLMENT AMOUNT PER PERIODIC PAYMENT PERIOD |
|---|---|---|
| N/A | Seventy-two (72) Monthly | $ 16,319.50 |

Loan Commencement Date: <u>December 21, 2015</u>
Payment Commencement Date: <u>January 21, 2016</u>       Security Deposit (if any): _____
Equipment Location: <u>6767 Gateway West Blvd., El Paso, TX 79925</u>
Special Provisions: (if any):_____

    **2. EQUIPMENT AND SECURITY INTEREST.** As provided in the Master Loan Agreement, Borrower gives and grants to the Lender a security interest in the Equipment described in the attached Schedule A as security for its obligations under this Schedule and the Master Loan Agreement.

    **3. DISBURSEMENT OF PROCEEDS.** Borrower hereby authorizes Lender to disburse the Loan proceeds as follows:

        <u>$974,408.72</u>    To: ABC Bus Leasing, Inc.
        **$974,408.72**    **TOTAL PROCEEDS**

    **4. SEE PAYMENT ADJUSTMENT RIDER ATTACHED AND INCORPORATED BY REFERENCE.**

    **5. LOAN COMMENCEMENT.** Upon Borrower's execution of this Loan Schedule and Lender's acceptance of same, the Loan shall be in effect as of the above Loan Commencement Date and the first Loan installment (exclusive of the advance payment if any) shall be due on the above Payment Commencement Date. The funding of the Loan proceeds is subject to satisfaction of all documentation and credit requirements of Lender. Borrower agrees that its obligation to pay the full installments (subject to adjustment pursuant to the Payment Adjustment Rider) under the Loan when due is absolute and unconditional notwithstanding that the proceeds of the Loan may not be fully disbursed until after the Loan Commencement Date. Anything in the foregoing to the contrary notwithstanding, if Lender determines that its funding requirements are not timely met on or before the Loan Commencement Date, then in Lender's discretion, Lender shall not be required to proceed with the transaction except upon terms acceptable to Lender.

The Loan consisting of this Schedule (including the provisions of the Master Loan Agreement incorporated herein) and all riders and supplements to this Schedule constitutes a separate and distinct Loan from any other Schedule to the Master Loan Agreement.  Unless otherwise expressly provided, only one original of this Schedule shall be executed and such original together with a copy of the Master Loan Agreement shall constitute the original loan chattel paper. By its execution and delivery of this Schedule, Borrower hereby reaffirms all of the warranties and representations contained in the Master Loan Agreement as of the date hereof and further warrants and represents to the Lender that no Event of Default has occurred and is continuing as of the date hereof.  This Schedule shall not be in effect until accepted by Lender at its Bridgeport, CT office.

**ACCEPTED AT LENDER'S BRIDGEPORT, CT OFFICE**

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____

**MASTER LOAN AND SECURITY AGREEMENT NO. 4075**
**SCHEDULE NO. 001**
**SCHEDULE A**

The following description of property supplements, and is part of Schedule No. 001 dated December 14, 2015 to the Master Loan and Security Agreement No. 4075 dated December 14, 2015 between Los Paisanos Autobuses, Inc. as Borrower and People's Capital and Leasing Corp. as Lender and may be attached to said Schedule and any related UCC Financing Statements, Acceptance or Delivery Certificate or other document describing the property:

**Equipment Location:   6767 Gateway West Blvd., El Paso, TX  79925**

**Vendor:      ABC Bus Leasing, Inc.**

| QUANTITY | DESCRIPTION | SERIAL NUMBER |
|----------|-------------|---------------|
| Two (2) | 2015 Van Hool TX45 56 Passenger<br>Motor Coaches with Wheel Chair Lifts | YE2YC22B3F2041374<br>YE2YC22B5F2041375 |

All property listed above together with all related software (embedded therein or otherwise), all parts, repairs, additions, attachments, replacements, replacement parts, accessions and accessories incorporated therein or affixed thereto, modifications and substitutions thereto and all proceeds thereof including insurance proceeds.

**PEOPLE'S CAPITAL AND LEASING CORP.**            **LOS PAISANOS AUTOBUSES, INC.**

BY: _Michaela a Curtis_                          BY: _____

TITLE: _Vice President_                          TITLE: _President_

## PAYMENT ADJUSTMENT RIDER

**RIDER TO SCHEDULE NO. 001 DATED DECEMBER 14, 2015 TO MASTER LOAN AND SECURITY AGREEMENT NO. 4075 DATED DECEMBER 14, 2015 (COLLECTIVELY, THE "CONTRACT") BETWEEN LOS PAISANOS AUTOBUSES, INC. AS BORROWER (THE "OBLIGOR") AND PEOPLE'S CAPITAL AND LEASING CORP. AS LENDER ("PCLC")**

1. <u>Purpose</u>.  This Rider sets forth the terms of adjustment to the payments set forth in the Contract. Terms defined in the Contract and not otherwise defined herein shall have the meanings defined in the Contract.

2. <u>Definitions</u>.  The following terms shall have the following meanings herein:

(a)  "Adjustment Date" shall mean the date PCLC first disburses any portion of the proceeds of the Contract, provided however, if PCLC makes vendor progress payments or other interim advances pursuant to a demand note or other interim financing document, then the Adjustment Date shall mean the date on which such interim financing "converts" to the term transaction evidenced by the Contract, which date shall be the date Obligor accepts the Equipment following delivery or other earlier date which the parties select in writing.  The parties may by a separate writing select a different manner of determining the Adjustment Date.

(b)  "Final Base Rate" shall mean the Six (6) year cost of funds rate as provided internally by PCLC's parent, on the Adjustment Date, and posted by PCLC in the ordinary course of business.

(c)  "Preliminary Payments" shall mean the payments set forth in the Contract, consisting of $N/A due upon execution (the "Advance Payment") followed by Seventy-two (72) consecutive monthly payments in the amount of $16,319.50 commencing one (1) month following the Adjustment Date.

(d)  "Preliminary Base Rate" shall mean 1.68%.

3. <u>Adjustment of Payments.</u>  The Preliminary Payments were calculated based on a spread over the Preliminary Base Rate.  If the Adjustment Date occurs after December 14, 2015, and the Final Base Rate is greater or less than the Preliminary Base Rate, then the Preliminary payments shall be revised.  For each increase or decrease of one (1) basis point (i.e., 1/100 of 1%) in the Final Base Rate above or below the Preliminary Base Rate, the Preliminary Payments shall be revised as follows:

- The Advance Payment shall remain unchanged.
- Each of the seventy-two (72) payments in the amount of $16,319.50 shall increase or decrease by $4.67.

Immediately after the determination of the revised payments due under the Contract, Obligor shall, at the request of PCLC, execute an acknowledgment reflecting the revised payment schedule, but the failure of PCLC to make such a request or the failure of Obligor to execute the acknowledgment shall in no way diminish Obligor's obligations hereunder.

4. <u>PCLC's Requirements</u>.  The commencement of the Contract is subject to satisfaction of all documentation and credit requirements of PCLC.  If such requirements are not satisfied by the Adjustment Date, then at PCLC's option, the Adjustment Date shall be the date when such requirements are satisfied.  The calculation of the Contract payments under this Rider will supersede any prior proposal or quotation.

IN WITNESS WHEREOF, the parties have executed this Rider simultaneously with the Contract.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _Melissa a Custis_

TITLE: _Vice President_

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____

# EXHIBIT C

## SCHEDULE TO MASTER LOAN AND SECURITY AGREEMENT

**SCHEDULE NO. 002 DATED MARCH 3, 2016 TO MASTER LOAN AND SECURITY AGREEMENT NO. 4075 DATED DECEMBER 14, 2015**

**Lender:**
PEOPLE'S CAPITAL AND LEASING CORP.
850 MAIN STREET, BC-03
BRIDGEPORT, CT 06604

**Borrower:**
LOS PAISANOS AUTOBUSES, INC.
6767 GATEWAY WEST BLVD.
EL PASO, TX  79925

Lender and Borrower have entered into a Master Loan and Security Agreement No. 4075 dated December 14, 2015 (the "Master Loan Agreement") which is incorporated herein and this is a Schedule to the Master Loan Agreement.   All terms used herein which are defined in the Master Loan Agreement and not otherwise specifically defined herein shall have the same meanings as set forth in the Master Loan Agreement.

　　　　**1.   THE LOAN AND LOAN REPAYMENT.**  Pursuant to the Master Loan Agreement, Lender agrees to lend to Borrower the sum of Four Hundred Seventy-five Thousand and 00/100 ($475,000.00) Dollars.  Borrower agrees to repay the Loan in successive installments (which installment payments are inclusive of interest) as set forth in the following payment schedule:

### PAYMENT SCHEDULE

| ADVANCE PAYMENT | NUMBER OF PERIODIC INSTALLMENT(exclusive of Advance Payment) PAYMENTS AND PAYMENT PERIOD | INSTALLMENT AMOUNT PER PERIODIC PAYMENT PERIOD |
|---|---|---|
| N/A | Seventy-two (72) Monthly | $ 7,922.65 |

Loan Commencement Date: <u>March 7, 2016</u>
Payment Commencement Date: <u>April 7, 2016</u>　　　Security Deposit (if any): _____
Equipment Location:   <u>6767 Gateway West Blvd., El Paso, TX  79925</u>
Special Provisions: (if any):_____

　　　　**2.   EQUIPMENT AND SECURITY INTEREST**.  As provided in the Master Loan Agreement, Borrower gives and grants to the Lender a security interest in the Equipment described in the attached Schedule A as security for its obligations under this Schedule and the Master Loan Agreement.

　　　　**3.   DISBURSEMENT OF PROCEEDS.**   Borrower hereby authorizes Lender to disburse the Loan proceeds as follows:

　　　　　　　　　$475,000.00　　　To: ABC Bus, Inc.
　　　　　　　　　**$475,000.00　　　TOTAL PROCEEDS**

　　　　**4.   SEE PAYMENT ADJUSTMENT RIDER ATTACHED AND INCORPORATED BY REFERENCE.**

　　　　**5.   LOAN COMMENCEMENT.**  Upon Borrower's execution of this Loan Schedule and Lender's acceptance of same, the Loan shall be in effect as of the above Loan Commencement Date and the first Loan installment (exclusive of the advance payment if any) shall be due on the above Payment Commencement Date.  The funding of the Loan proceeds is subject to satisfaction of all documentation and credit requirements of Lender.  Borrower agrees that its obligation to pay the full installments (subject to adjustment pursuant to the Payment Adjustment Rider) under the Loan when due is absolute and unconditional notwithstanding that the proceeds of the Loan may not be fully disbursed until after the Loan Commencement Date.  Anything in the foregoing to the contrary notwithstanding, if Lender determines that its funding requirements are not timely met on or before the Loan Commencement Date, then in Lender's discretion, Lender shall not be required to proceed with the transaction except upon terms acceptable to Lender.

The Loan consisting of this Schedule (including the provisions of the Master Loan Agreement incorporated herein) and all riders and supplements to this Schedule constitutes a separate and distinct Loan from any other Schedule to the Master Loan Agreement.  Unless otherwise expressly provided, only one original of this Schedule shall be executed and such original together with a copy of the Master Loan Agreement shall constitute the original loan chattel paper. By its execution and delivery of this Schedule, Borrower hereby reaffirms all of the warranties and representations contained in the Master Loan Agreement as of the date hereof and further warrants and represents to the Lender that no Event of Default has occurred and is continuing as of the date hereof.  This Schedule shall not be in effect until accepted by Lender at its Bridgeport, CT office.

**ACCEPTED AT LENDER'S BRIDGEPORT, CT OFFICE**

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____

# MASTER LOAN AND SECURITY AGREEMENT NO. 4075
## SCHEDULE NO. 002
## SCHEDULE A

The following description of property supplements, and is part of Schedule No. 002 dated March 3, 2016 to the Master Loan and Security Agreement No. 4075 dated December 14, 2015 between Los Paisanos Autobuses, Inc. as Borrower and People's Capital and Leasing Corp. as Lender and may be attached to said Schedule and any related UCC Financing Statements, Acceptance or Delivery Certificate or other document describing the property:

**Equipment Location:  6767 Gateway West Blvd., El Paso, TX  79925**

**Vendor:        ABC Bus, Inc.**

| QUANTITY | DESCRIPTION | SERIAL NUMBER |
|----------|-------------|---------------|
| One (1) New | 2016 Van Hool TX45 56 Passenger Motor Coach with Braun Wheel Chair Lift | YE2XC81B7G3048954 |

All property listed above together with all related software (embedded therein or otherwise), all parts, repairs, additions, attachments, replacements, replacement parts, accessions and accessories incorporated therein or affixed thereto, modifications and substitutions thereto and all proceeds thereof including insurance proceeds.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _Melissa A Curtis_

TITLE: _Vice President_

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _President_

**PAYMENT ADJUSTMENT RIDER**

**RIDER TO SCHEDULE NO. 002 DATED MARCH 3, 2016 TO MASTER LOAN AND SECURITY AGREEMENT NO. 4075 DATED DECEMBER 14, 2015 (COLLECTIVELY, THE "CONTRACT") BETWEEN LOS PAISANOS AUTOBUSES, INC. AS BORROWER (THE "OBLIGOR") AND PEOPLE'S CAPITAL AND LEASING CORP. AS LENDER ("PCLC")**

　　1. <u>Purpose</u>. This Rider sets forth the terms of adjustment to the payments set forth in the Contract. Terms defined in the Contract and not otherwise defined herein shall have the meanings defined in the Contract.

　　2. <u>Definitions</u>. The following terms shall have the following meanings herein:

　　(a) "Adjustment Date" shall mean the date PCLC first disburses any portion of the proceeds of the Contract, provided however, if PCLC makes vendor progress payments or other interim advances pursuant to a demand note or other interim financing document, then the Adjustment Date shall mean the date on which such interim financing "converts" to the term transaction evidenced by the Contract, which date shall be the date Obligor accepts the Equipment following delivery or other earlier date which the parties select in writing. The parties may by a separate writing select a different manner of determining the Adjustment Date.

　　(b) "Final Base Rate" shall mean the Six (6) year cost of funds rate as provided internally by PCLC's parent, on the Adjustment Date, and posted by PCLC in the ordinary course of business.

　　(c) "Preliminary Payments" shall mean the payments set forth in the Contract, consisting of Seventy-two (72) consecutive monthly payments in the amount of $7,922.65 commencing one (1) month following the Adjustment Date.

　　(d) "Preliminary Base Rate" shall mean 1.36%.

　　3. <u>Adjustment of Payments</u>. The Preliminary Payments were calculated based on a spread over the Preliminary Base Rate. If the Adjustment Date occurs after March 3, 2016, and the Final Base Rate is greater or less than the Preliminary Base Rate, then the Preliminary payments shall be revised. For each increase or decrease of one (1) basis point (i.e., 1/100 of 1%) in the Final Base Rate above or below the Preliminary Base Rate, the Preliminary Payments shall be revised as follows:

- Each of the seventy-two (72) payments in the amount of $7,922.65 shall increase or decrease by $2.25.

Immediately after the determination of the revised payments due under the Contract, Obligor shall, at the request of PCLC, execute an acknowledgment reflecting the revised payment schedule, but the failure of PCLC to make such a request or the failure of Obligor to execute the acknowledgment shall in no way diminish Obligor's obligations hereunder.

　　4. <u>PCLC's Requirements</u>. The commencement of the Contract is subject to satisfaction of all documentation and credit requirements of PCLC. If such requirements are not satisfied by the Adjustment Date, then at PCLC's option, the Adjustment Date shall be the date when such requirements are satisfied. The calculation of the Contract payments under this Rider will supersede any prior proposal or quotation.

　　IN WITNESS WHEREOF, the parties have executed this Rider simultaneously with the Contract.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _Melissa Curtis_

TITLE: _Vice President_

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _President_

# EXHIBIT D

## SCHEDULE TO MASTER LOAN AND SECURITY AGREEMENT

**SCHEDULE NO. 003 DATED FEBRUARY 24, 2017 TO MASTER LOAN AND SECURITY AGREEMENT NO. 4075 DATED DECEMBER 14, 2015**

**Lender:**
PEOPLE'S CAPITAL AND LEASING CORP.
850 MAIN STREET, BC-03
BRIDGEPORT, CT 06604

**Borrower:**
LOS PAISANOS AUTOBUSES, INC.
6767 GATEWAY WEST BLVD.
EL PASO, TX 79925

Lender and Borrower have entered into a Master Loan and Security Agreement No. 4075 dated December 14, 2015 (the "Master Loan Agreement') which is incorporated herein and this is a Schedule to the Master Loan Agreement. All terms used herein which are defined in the Master Loan Agreement and not otherwise specifically defined herein shall have the same meanings as set forth in the Master Loan Agreement.

    **1. THE LOAN AND LOAN REPAYMENT.** Pursuant to the Master Loan Agreement, Lender agrees to lend to Borrower the sum of One Million Forty Nine Thousand Two Hundred Seventy Four and 00/100 ($1,049,274.00) Dollars. Borrower agrees to repay the Loan in successive installments (which installment payments are inclusive of interest) as set forth in the following payment schedule:

**PAYMENT SCHEDULE**

| ADVANCE PAYMENT | NUMBER OF PERIODIC INSTALLMENT(exclusive of Advance Payment) PAYMENTS AND PAYMENT PERIOD | INSTALLMENT AMOUNT PER PERIODIC PAYMENT PERIOD |
|---|---|---|
| N/A | Seventy-two (72) Monthly | $ 17,364.75 |

Loan Commencement Date: <u>February 28, 2017</u>
Payment Commencement Date: <u>March 28, 2017</u>      Security Deposit (if any): _____
Equipment Location:   <u>6767 Gateway West Blvd., El Paso, TX  79925</u>
Special Provisions: (if any):_____

    **2. EQUIPMENT AND SECURITY INTEREST.** As provided in the Master Loan Agreement, Borrower gives and grants to the Lender a security interest in the Equipment described in the attached Schedule A as security for its obligations under this Schedule and the Master Loan Agreement.

    **3. DISBURSEMENT OF PROCEEDS.** Borrower hereby authorizes Lender to disburse the Loan proceeds as follows:

            <u>$1,049,274.00</u>       To: ABC Bus, Inc.
            **$1,049,274.00**       **TOTAL PROCEEDS**

    **4. SEE PAYMENT ADJUSTMENT RIDER ATTACHED AND INCORPORATED BY REFERENCE.**

    **5. LOAN COMMENCEMENT.** Upon Borrower's execution of this Loan Schedule and Lender's acceptance of same, the Loan shall be in effect as of the above Loan Commencement Date and the first Loan installment (exclusive of the advance payment if any) shall be due on the above Payment Commencement Date. The funding of the Loan proceeds is subject to satisfaction of all documentation and credit requirements of Lender. Borrower agrees that its obligation to pay the full installments (subject to adjustment pursuant to the Payment Adjustment Rider) under the Loan when due is absolute and unconditional notwithstanding that the proceeds of the Loan may not be fully disbursed until after the Loan Commencement Date. Anything in the foregoing to the contrary notwithstanding, if Lender determines that its funding requirements are not timely met on or before the Loan Commencement Date, then in Lender's discretion, Lender shall not be required to proceed with the transaction except upon terms acceptable to Lender.

The Loan consisting of this Schedule (including the provisions of the Master Loan Agreement incorporated herein) and all riders and supplements to this Schedule constitutes a separate and distinct Loan from any other Schedule to the Master Loan Agreement.  Unless otherwise expressly provided, only one original of this Schedule shall be executed and such original together with a copy of the Master Loan Agreement shall constitute the original loan chattel paper.  By its execution and delivery of this Schedule, Borrower hereby reaffirms all of the warranties and representations contained in the Master Loan Agreement as of the date hereof and further warrants and represents to the Lender that no Event of Default has occurred and is continuing as of the date hereof.  This Schedule shall not be in effect until accepted by Lender at its Bridgeport, CT office.

**ACCEPTED AT LENDER'S BRIDGEPORT, CT OFFICE**

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____

**MASTER LOAN AND SECURITY AGREEMENT NO. 4075**
**SCHEDULE NO. 003**
**SCHEDULE A**

The following description of property supplements, and is part of Schedule No. 003 dated February 24, 2017 to the Master Loan and Security Agreement No. 4075 dated December 14, 2015 between Los Paisanos Autobuses, Inc. as Borrower and People's Capital and Leasing Corp. as Lender and may be attached to said Schedule and any related UCC Financing Statements, Acceptance or Delivery Certificate or other document describing the property:

**Equipment Location:   6767 Gateway West Blvd., El Paso, TX  79925**

**Vendor:        ABC Bus, Inc.**

| **QUANTITY** | **DESCRIPTION** | **VIN NUMBER** |
|---|---|---|
| Two (2) | 2017 CX45L Van Hool Buses<br>With Braun Wheel Chair Lifts | YE2XC81B2H3049222<br>YE2XC81B9H3049220 |

All property listed above together with all related software (embedded therein or otherwise), all parts, repairs, additions, attachments, replacements, replacement parts, accessions and accessories incorporated therein or affixed thereto, modifications and substitutions thereto and all proceeds thereof including insurance proceeds.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _Melissa Curtis_

TITLE: _Vice President_

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _Pinolet_ _____

**PAYMENT ADJUSTMENT RIDER**

**RIDER TO SCHEDULE NO. 003 DATED FEBRUARY 24, 2017 TO MASTER LOAN AND SECURITY AGREEMENT NO. 4075 DATED DECEMBER 14, 2015 (COLLECTIVELY, THE "CONTRACT") BETWEEN LOS PAISANOS AUTOBUSES, INC. AS BORROWER (THE "OBLIGOR") AND PEOPLE'S CAPITAL AND LEASING CORP. AS LENDER ("PCLC")**

1. <u>Purpose</u>.  This Rider sets forth the terms of adjustment to the payments set forth in the Contract. Terms defined in the Contract and not otherwise defined herein shall have the meanings defined in the Contract.

2. <u>Definitions</u>.  The following terms shall have the following meanings herein:

(a)  "Adjustment Date" shall mean the date PCLC first disburses any portion of the proceeds of the Contract, provided however, if PCLC makes vendor progress payments or other interim advances pursuant to a demand note or other interim financing document, then the Adjustment Date shall mean the date on which such interim financing "converts" to the term transaction evidenced by the Contract, which date shall be the date Obligor accepts the Equipment following delivery or other earlier date which the parties select in writing.  The parties may by a separate writing select a different manner of determining the Adjustment Date.

(b)  "Final Base Rate" shall mean the Six (6) year cost of funds rate as provided internally by PCLC's parent, on the Adjustment Date, and posted by PCLC in the ordinary course of business.

(c)  "Preliminary Payments" shall mean the payments set forth in the Contract, consisting of Seventy-two (72) consecutive monthly payments in the amount of $17,364.75 commencing one (1) month following the Adjustment Date.

(d)  "Preliminary Base Rate" shall mean 2.19%.

3. <u>Adjustment of Payments.</u>  The Preliminary Payments were calculated based on a spread over the Preliminary Base Rate.  If the Adjustment Date occurs after February 24, 2017, and the Final Base Rate is greater or less than the Preliminary Base Rate, then the Preliminary payments shall be revised.  For each increase or decrease of one (1) basis point (i.e., 1/100 of 1%) in the Final Base Rate above or below the Preliminary Base Rate, the Preliminary Payments shall be revised as follows:

- Each of the seventy-two (72) payments in the amount of $17,364.75 shall increase or decrease by $4.95.

Immediately after the determination of the revised payments due under the Contract, Obligor shall, at the request of PCLC, execute an acknowledgment reflecting the revised payment schedule, but the failure of PCLC to make such a request or the failure of Obligor to execute the acknowledgment shall in no way diminish Obligor's obligations hereunder.

4. <u>PCLC's Requirements</u>.  The commencement of the Contract is subject to satisfaction of all documentation and credit requirements of PCLC.  If such requirements are not satisfied by the Adjustment Date, then at PCLC's option, the Adjustment Date shall be the date when such requirements are satisfied.  The calculation of the Contract payments under this Rider will supersede any prior proposal or quotation.

IN WITNESS WHEREOF, the parties have executed this Rider simultaneously with the Contract.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____

# EXHIBIT E

**SCHEDULE TO MASTER LOAN AND SECURITY AGREEMENT**

**SCHEDULE NO. 004 DATED SEPTEMBER 19, 2017 TO MASTER LOAN AND SECURITY AGREEMENT NO. 4075 DATED DECEMBER 14, 2015**

**Lender:**
PEOPLE'S CAPITAL AND LEASING CORP.
850 MAIN STREET, BC-03
BRIDGEPORT, CT 06604

**Borrower:**
LOS PAISANOS AUTOBUSES, INC.
6767 GATEWAY WEST BLVD.
EL PASO, TX 79925

Lender and Borrower have entered into a Master Loan and Security Agreement No. 4075 dated December 14, 2015 (the "Master Loan Agreement") which is incorporated herein and this is a Schedule to the Master Loan Agreement. All terms used herein which are defined in the Master Loan Agreement and not otherwise specifically defined herein shall have the same meanings as set forth in the Master Loan Agreement.

**1. THE LOAN AND LOAN REPAYMENT.** Pursuant to the Master Loan Agreement, Lender agrees to lend to Borrower the sum of One Million Fifty-six Thousand Seven Hundred Twenty-eight and 00/100 ($1,056,728.00) Dollars. Borrower agrees to repay the Loan in successive installments (which installment payments are inclusive of interest) as set forth in the following payment schedule:

**PAYMENT SCHEDULE**

| ADVANCE PAYMENT | NUMBER OF PERIODIC INSTALLMENT(exclusive of Advance Payment) PAYMENTS AND PAYMENT PERIOD | INSTALLMENT AMOUNT PER PERIODIC PAYMENT PERIOD |
|---|---|---|
| N/A | Seventy-two (72) Monthly | $ 17,488.10 |

Loan Commencement Date: <u>September 20, 2017</u>
Payment Commencement Date: <u>October 20, 2017</u>         Security Deposit (if any): _____
Equipment Location: <u>6767 Gateway West Blvd., El Paso, TX 79925</u>
Special Provisions: (if any):_____

**2. EQUIPMENT AND SECURITY INTEREST.** As provided in the Master Loan Agreement, Borrower gives and grants to the Lender a security interest in the Equipment described in the attached Schedule A as security for its obligations under this Schedule and the Master Loan Agreement.

**3. DISBURSEMENT OF PROCEEDS.** Borrower hereby authorizes Lender to disburse the Loan proceeds as follows:

$1,056,728.00    To: ABC Bus, Inc.
**$1,056,728.00    TOTAL PROCEEDS**

**4. SEE PAYMENT ADJUSTMENT RIDER ATTACHED AND INCORPORATED BY REFERENCE.**

**5. LOAN COMMENCEMENT.** Upon Borrower's execution of this Loan Schedule and Lender's acceptance of same, the Loan shall be in effect as of the above Loan Commencement Date and the first Loan installment (exclusive of the advance payment if any) shall be due on the above Payment Commencement Date. The funding of the Loan proceeds is subject to satisfaction of all documentation and credit requirements of Lender. Borrower agrees that its obligation to pay the full installments (subject to adjustment pursuant to the Payment Adjustment Rider) under the Loan when due is absolute and unconditional notwithstanding that the proceeds of the Loan may not be fully disbursed until after the Loan Commencement Date. Anything in the foregoing to the contrary notwithstanding, if Lender determines that its funding requirements are not timely met on or before the Loan Commencement Date, then in Lender's discretion, Lender shall not be required to proceed with the transaction except upon terms acceptable to Lender.

The Loan consisting of this Schedule (including the provisions of the Master Loan Agreement incorporated herein) and all riders and supplements to this Schedule constitutes a separate and distinct Loan from any other Schedule to the Master Loan Agreement.  Unless otherwise expressly provided, only one original of this Schedule shall be executed and such original together with a copy of the Master Loan Agreement shall constitute the original loan chattel paper. By its execution and delivery of this Schedule, Borrower hereby reaffirms all of the warranties and representations contained in the Master Loan Agreement as of the date hereof and further warrants and represents to the Lender that no Event of Default has occurred and is continuing as of the date hereof.  This Schedule shall not be in effect until accepted by Lender at its Bridgeport, CT office.

**ACCEPTED AT LENDER'S BRIDGEPORT, CT OFFICE**

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____

**MASTER LOAN AND SECURITY AGREEMENT NO. 4075**
**SCHEDULE NO. 004**
**SCHEDULE A**

The following description of property supplements, and is part of Schedule No. 004 dated September 19, 2017 to the Master Loan and Security Agreement No. 4075 dated December 14, 2015 between Los Paisanos Autobuses, Inc. as Borrower and People's Capital and Leasing Corp. as Lender and may be attached to said Schedule and any related UCC Financing Statements, Acceptance or Delivery Certificate or other document describing the property:

**Equipment Location:   6767 Gateway West Blvd., El Paso, TX  79925**

**Vendor:        ABC Bus, Inc.**

| QUANTITY | DESCRIPTION | VIN NUMBER |
|----------|-------------|------------|
| Two (2)  | 2017 CX45L Van Hool Buses<br>With Braun Wheel Chair Lifts | YE2XC81B5H3049537<br>YE2XC81B7H3049538 |

All property listed above together with all related software (embedded therein or otherwise), all parts, repairs, additions, attachments, replacements, replacement parts, accessions and accessories incorporated therein or affixed thereto, modifications and substitutions thereto and all proceeds thereof including insurance proceeds.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _Melissa a Curtis_

TITLE: _Vice President_

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____ _President_ _____

## PAYMENT ADJUSTMENT RIDER

**RIDER TO SCHEDULE NO. 004 DATED SEPTEMBER 19, 2017 TO MASTER LOAN AND SECURITY AGREEMENT NO. 4075 DATED DECEMBER 14, 2015 (COLLECTIVELY, THE "CONTRACT") BETWEEN LOS PAISANOS AUTOBUSES, INC. AS BORROWER (THE "OBLIGOR") AND PEOPLE'S CAPITAL AND LEASING CORP. AS LENDER ("PCLC")**

1. <u>Purpose</u>. This Rider sets forth the terms of adjustment to the payments set forth in the Contract. Terms defined in the Contract and not otherwise defined herein shall have the meanings defined in the Contract.

2. <u>Definitions</u>. The following terms shall have the following meanings herein:

(a) "Adjustment Date" shall mean the date PCLC first disburses any portion of the proceeds of the Contract, provided however, if PCLC makes vendor progress payments or other interim advances pursuant to a demand note or other interim financing document, then the Adjustment Date shall mean the date on which such interim financing "converts" to the term transaction evidenced by the Contract, which date shall be the date Obligor accepts the Equipment following delivery or other earlier date which the parties select in writing. The parties may by a separate writing select a different manner of determining the Adjustment Date.

(b) "Final Base Rate" shall mean the Six (6) year cost of funds rate as provided internally by PCLC's parent, on the Adjustment Date, and posted by PCLC in the ordinary course of business.

(c) "Preliminary Payments" shall mean the payments set forth in the Contract, consisting of Seventy-two (72) consecutive monthly payments in the amount of $17,488.10 commencing one (1) month following the Adjustment Date.

(d) "Preliminary Base Rate" shall mean 2.05%.

3. <u>Adjustment of Payments.</u> The Preliminary Payments were calculated based on a spread over the Preliminary Base Rate. If the Adjustment Date occurs after September 19, 2017, and the Final Base Rate is greater or less than the Preliminary Base Rate, then the Preliminary payments shall be revised. For each increase or decrease of one (1) basis point (i.e., 1/100 of 1%) in the Final Base Rate above or below the Preliminary Base Rate, the Preliminary Payments shall be revised as follows:

- Each of the seventy-two (72) payments in the amount of $17,488.10 shall increase or decrease by $5.02.

Immediately after the determination of the revised payments due under the Contract, Obligor shall, at the request of PCLC, execute an acknowledgment reflecting the revised payment schedule, but the failure of PCLC to make such a request or the failure of Obligor to execute the acknowledgment shall in no way diminish Obligor's obligations hereunder.

4. <u>PCLC's Requirements</u>. The commencement of the Contract is subject to satisfaction of all documentation and credit requirements of PCLC. If such requirements are not satisfied by the Adjustment Date, then at PCLC's option, the Adjustment Date shall be the date when such requirements are satisfied. The calculation of the Contract payments under this Rider will supersede any prior proposal or quotation.

IN WITNESS WHEREOF, the parties have executed this Rider simultaneously with the Contract.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _Melissa a Custer_

TITLE: _Vice President_

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____President_____

# EXHIBIT F

## INDIVIDUAL GUARANTY

1.    To induce People's Capital and Leasing Corp. (hereinafter: "PCLC") to accept and enter into a Master Loan and Security Agreement No. 4075 dated December 14, 2015, all Schedules thereunder whether now existing or hereafter delivered  and other related documents (herein collectively called the "Agreements", which term shall include any modifications, amendments, renewals or extensions thereof) with Los Paisanos Autobuses, Inc. (hereinafter: "Obligor"), the undersigned, **Uriel J. Chavira** (hereinafter: "Guarantor")    unconditionally and irrevocably:

> (a)  Guarantees to PCLC the prompt payment in full of all indebtedness and obligations of every kind and nature now and hereafter owing by the Obligor to PCLC under the Agreements as well as any other obligations and indebtedness which the Obligor now owes or may hereafter incur to PCLC under any other agreements or by reason of any financial accommodation including, without limitation, leases of personal property, notes and security agreements and loan and security agreements between PCLC and the Obligor now existing or made after the date hereof, whether or not presently contemplated;
> (b)  Guarantees to PCLC the prompt, full and faithful performance and discharge by the Obligor of each and every term, condition and warranty to be performed by the Obligor under the Agreements or under any other documents or instruments evidencing any other financial accommodation between PCLC and the Obligor; and
> (c)  Agrees to reimburse PCLC for all expenses, costs and reasonable attorney's fees incurred by it in enforcing any of its rights and remedies against the Obligor and/or Guarantor or any other person or concern liable thereon.

2.    Guarantor agrees to pay all of the foregoing amounts and perform all of the foregoing obligations notwithstanding that any part or all of the Agreements or any other agreements or financial accommodation shall be void or voidable or unenforceable as against the Obligor or any of the Obligor's creditors, including a trustee in bankruptcy or receiver of Obligor, by reason of any fact or circumstance, including, without limitation, failure of any person to file any document or to take any other action to make any of the Agreements or any financial accommodation enforceable in accordance with their respective terms.  The liability of Guarantor shall be an absolute and primary obligation of payment and PCLC shall not be required to first (i) proceed against the Obligor; (ii) proceed against or exhaust any security held from the Obligor or any guarantor; or (iii) pursue any other remedies it may have, including remedies against other guarantors.

3.    Guarantor waives notice of acceptance hereof, and of all notices and demands of any kind to which Guarantor may be entitled, including, without limitation, demands of payment and notices of nonpayment, default, protest and dishonor to Guarantor or the Obligor or to the makers or endorsers of any notes or other instruments for which Guarantor may be liable hereunder.  Guarantor further waives notice of and hereby consents to any agreement or arrangement for payment, extension, subordination, moratoria, composition, discharge or release of the whole or any part of the Obligor's obligations under the Agreements or any other agreement or financial accommodation, the modification or amendment of any of the terms of the Agreements, the forbearance by PCLC in the exercise of any of its rights against the Obligor, the release of other guarantors or the compromise of their obligations and the change in location or release of any equipment or collateral or the taking of a security interest in any additional or substituted equipment or collateral; and none of the same shall in any way impair Guarantor's liability hereunder.  PCLC shall be under no obligation to insure, protect or otherwise preserve the equipment or any other collateral, which may secure any indebtedness, guaranteed hereunder.

4.    All sums at any time to Guarantor's credit and any of Guarantor's property at any time in PCLC's possession may be held by PCLC as security for all of undersigned's obligations hereunder.

5.    This Guaranty will continue to be effective or will be reinstated, as the case may be, if at any time any payment made to PCLC is rescinded or must be returned upon the insolvency, bankruptcy, or reorganization of the Obligor, or otherwise, as if such payment had not been made.  Guarantor expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration or any other claim which Guarantor may now or hereafter have against the Obligor for the obligations guaranteed hereunder or against or with respect to the property of the Obligor arising from the existence or performance of this Guaranty.

6.    This Guaranty shall not be discharged or otherwise affected by the death, incompetence or insolvency of Guarantor and shall be binding on Guarantor's heirs, executors and administrators.

7.    This Guaranty is a continuing guaranty and shall continue in full force and effect until terminated by the actual receipt by PCLC or its assignee of written notice of termination from Guarantor.  Such termination shall be

applicable only to transactions having their inception thereafter, and rights and obligations arising out of transactions having their inception prior to receipt of such termination shall not be affected.

8.  **GUARANTOR WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED HEREON**. This Guaranty is assignable by PCLC, in whole or part, and may be subsequently further assigned by such assignees, all without notice to Guarantor.  Any assignee of PCLC and all subsequent assignees shall have all of the rights of PCLC hereunder and may enforce this Guaranty with the same force and effect as if such Guaranty were given to such assignee in the first instance.  The invalidity, illegality or unenforceability of any provision of this Guaranty shall not affect the validity, legality or enforceability of any of its other provisions. **LEGAL RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CONNECTICUT**.  This Guaranty shall be binding upon Guarantor and Guarantor's heirs, administrators, successors and assigns.

9.  GUARANTOR ACKNOWLEDGES AND AGREES THAT THE TRANSACTION OF WHICH THIS GUARANTY IS A PART IS A COMMERCIAL TRANSACTION AND NOT A CONSUMER TRANSACTION AND UNDERSIGNED WAIVES ANY RIGHT TO A NOTICE AND HEARING UNDER CHAPTER 903A OF THE CONNECTICUT STATUTES, AS AMENDED, OR ANY OTHER STATUTE OR STATUTES IN CONNECTICUT OR OTHER JURISDICTIONS AFFECTING THE PREJUDGMENT REMEDIES.  GUARANTOR AUTHORIZES PCLC's COUNSEL TO ISSUE A WRIT FOR PREJUDGMENT REMEDY WITHOUT COURT ORDER, PROVIDED THE COMPLAINT SHALL SET FORTH A COPY OF THIS WAIVER AND WAIVES ANY CLAIM IN TORT, CONTRACT OR OTHERWISE AGAINST PCLC's COUNSEL WHICH MAY ARISE OUT OF SUCH ISSUANCE OF THE WRIT FOR A PREJUDGMENT REMEDY WITHOUT COURT ORDER.  GUARANTOR ACKNOWLEDGES AND STIPULATES THAT THE WAIVERS AND AUTHORIZATIONS GRANTED HEREIN ARE MADE KNOWINGLY AND FREELY AFTER FULL CONSULTATION WITH COUNSEL.  SPECIFICALLY, GUARANTOR RECOGNIZES AND UNDERSTANDS THAT THE EXERCISE OF PCLC's RIGHTS DESCRIBED ABOVE MAY RESULT IN THE ATTACHMENT OF OR LEVY AGAINST GUARANTOR'S PROPERTY, AND SUCH WRIT FOR A PREJUDGMENT REMEDY WILL NOT HAVE THE PRIOR WRITTEN APPROVAL OR SCRUTINY OF A COURT OF LAW OR OTHER OFFICIAL OFFICER NOR WILL GUARANTOR HAVE THE RIGHT TO ANY NOTICE OR PRIOR HEARING WHERE GUARANTOR MIGHT CONTEST SUCH A PROCEDURE.  THE INTENT OF UNDERSIGNED IS TO GRANT PCLC FOR GOOD AND VALUABLE CONSIDERATION THE RIGHT TO OBTAIN SUCH PREJUDGMENT REMEDY AND TO ASSURE THAT ANY SUCH PREJUDGMENT REMEDY IS VALID AND CONSTITUTIONAL.

10. GUARANTOR HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CONNECTICUT AND THE FEDERAL DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY, UNDERSIGNED WAIVES ANY OBJECTIONS BASED UPON VENUE OR "FORUM NON CONVENIENS" IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING.  UNDERSIGNED CONSENTS THAT PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE SERVED UPON HIM/HER BY REGISTERED MAIL DIRECTED TO UNDERSIGNED AT HIS/HER ADDRESS SET FORTH BELOW OR IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW OR RULES OF COURT.  UNDERSIGNED HEREBY IRREVOCABLY APPOINTS THE SECRETARY OF STATE OF CONNECTICUT AS HIS/HER AGENT TO RECEIVE SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING.

11. Guarantor shall provide PCLC with an updated annual personal financial statement within sixty (60) days after each calendar year end. PCLC may disclose such financial and other information as provided in the Agreements.

A copy of this Guaranty shall be effective as an original, as provided in the Agreements.

Dated December 14, 2015

_____
SIGNATURE OF GUARANTOR

_____                    URIEL J. CHAVIRA
WITNESS SIGNATURE                                    NAME OF GUARANTOR
                                                     HOME ADDRESS: 1082 EagleRidge DR
_____                    El PASO TX 79912
WITNESS NAME                                         SSN: ████████████

(FOR IDENTIFICATION PURPOSES, I HAVE ATTACHED A COPY OF MY DRIVER'S LICENSE TO THIS GUARANTY)

2

# EXHIBIT G

## DELIVERY CERTIFICATE

**MASTER LOAN AND SECURITY AGREEMENT NO.: 4075**      **DATED: DECEMBER 14, 2015**
**SCHEDULE NO.  001**      **DATED: DECEMBER 14, 2015**

**TO: PEOPLE'S CAPITAL AND LEASING CORP.**

The undersigned Borrower hereby acknowledges that all of the Equipment described below and in the Schedule to the Master Loan and Security Agreement referred to above (collectively, including any prior amendments and related documents, the "Loan Agreement") has been delivered to Borrower, is of the manufacture, design and specifications selected by Borrower, is suitable for Borrower's purposes, fully complies with said Loan Agreement and has been unconditionally accepted by Borrower thereunder.

Borrower hereby represents to People's Capital and Leasing Corp. ("PCLC") and any assignee that the Loan Agreement at the date hereof is free from any defense, off-set or counterclaim and hereby waives, as to any assignee, all such defenses, off-sets and counterclaims.

    Equipment Description:

| QUANTITY | DESCRIPTION | SERIAL NUMBER |
|----------|-------------|---------------|
| Two (2)  | 2015 Van Hool TX45 56 Passenger Motor Coaches with Wheel Chair Lifts | YE2YC22B3F2041374 YE2YC22B5F2041375 |

Borrower hereby authorizes and requests PCLC to disburse the proceeds of the Loan (or the balance of the proceeds if a portion was previously advanced by PCLC) when all of PCLC's funding conditions are met. Borrower agrees that unless a loan commencement date is specified in the Loan, the Loan will commence automatically upon PCLC's first disbursement of funds after Borrower's execution of this Delivery Certificate and that no further authorization from Borrower will be required prior to such disbursement.  Borrower further agrees that unless a loan payment commencement date is specified in the Loan, the due date of the first payment under the Loan (excluding any advance payment) will be one month after the commencement of the Loan and that PCLC may insert such payment commencement date in the Loan.  The amount of the monthly payments due under the Loan shall be adjusted as provided in the Payment Adjustment Rider if applicable.

        **LOS PAISANOS AUTOBUSES, INC.**

        BY: _____

        TITLE: _____*President*_____

ACCEPTANCE DATE: __*12/14/15*__

# EXHIBIT H

## DELIVERY CERTIFICATE

**MASTER LOAN AND SECURITY AGREEMENT NO.: 4075**          **DATED: DECEMBER 14, 2015**
**SCHEDULE NO.  002**          **DATED: MARCH 3, 2016**

**TO: PEOPLE'S CAPITAL AND LEASING CORP.**

The undersigned Borrower hereby acknowledges that all of the Equipment described below and in the Schedule to the Master Loan and Security Agreement referred to above (collectively, including any prior amendments and related documents, the "Loan Agreement") has been delivered to Borrower, is of the manufacture, design and specifications selected by Borrower, is suitable for Borrower's purposes, fully complies with said Loan Agreement and has been unconditionally accepted by Borrower thereunder.

Borrower hereby represents to People's Capital and Leasing Corp. ("PCLC") and any assignee that the Loan Agreement at the date hereof is free from any defense, off-set or counterclaim and hereby waives, as to any assignee, all such defenses, off-sets and counterclaims.

Equipment Description:

| QUANTITY | DESCRIPTION | SERIAL NUMBER |
|---|---|---|
| One (1) New | 2016 Van Hool TX45 56 Passenger Motor Coach with Braun Wheel Chair Lift | YE2XC81B7G3048954 |

Borrower hereby authorizes and requests PCLC to disburse the proceeds of the Loan (or the balance of the proceeds if a portion was previously advanced by PCLC) when all of PCLC's funding conditions are met. Borrower agrees that unless a loan commencement date is specified in the Loan, the Loan will commence automatically upon PCLC's first disbursement of funds after Borrower's execution of this Delivery Certificate and that no further authorization from Borrower will be required prior to such disbursement.  Borrower further agrees that unless a loan payment commencement date is specified in the Loan, the due date of the first payment under the Loan (excluding any advance payment) will be one month after the commencement of the Loan and that PCLC may insert such payment commencement date in the Loan.  The amount of the monthly payments due under the Loan shall be adjusted as provided in the Payment Adjustment Rider if applicable.

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____

ACCEPTANCE DATE: ___3/09/16___

1

# EXHIBIT I

## DELIVERY CERTIFICATE

**MASTER LOAN AND SECURITY AGREEMENT NO.: 4075**     **DATED: DECEMBER 14, 2015**
**SCHEDULE NO.  003**     **DATED: FEBRUARY 24, 2017**

**TO: PEOPLE'S CAPITAL AND LEASING CORP.**

The undersigned Borrower hereby acknowledges that all of the Equipment described below and in the Schedule to the Master Loan and Security Agreement referred to above (collectively, including any prior amendments and related documents, the "Loan Agreement") has been delivered to Borrower, is of the manufacture, design and specifications selected by Borrower, is suitable for Borrower's purposes, fully complies with said Loan Agreement and has been unconditionally accepted by Borrower thereunder.

Borrower hereby represents to People's Capital and Leasing Corp. ("PCLC") and any assignee that the Loan Agreement at the date hereof is free from any defense, off-set or counterclaim and hereby waives, as to any assignee, all such defenses, off-sets and counterclaims.

Equipment Description:

| QUANTITY | DESCRIPTION | VIN NUMBER |
|---|---|---|
| Two (2) | 2017 CX45L Van Hool Buses | YE2XC81B2H3049222 |
|  | With Braun Wheel Chair Lifts | YE2XC81B9H3049220 |

Borrower hereby authorizes and requests PCLC to disburse the proceeds of the Loan (or the balance of the proceeds if a portion was previously advanced by PCLC) when all of PCLC's funding conditions are met. Borrower agrees that unless a loan commencement date is specified in the Loan, the Loan will commence automatically upon PCLC's first disbursement of funds after Borrower's execution of this Delivery Certificate and that no further authorization from Borrower will be required prior to such disbursement.  Borrower further agrees that unless a loan payment commencement date is specified in the Loan, the due date of the first payment under the Loan (excluding any advance payment) will be one month after the commencement of the Loan and that PCLC may insert such payment commencement date in the Loan.  The amount of the monthly payments due under the Loan shall be adjusted as provided in the Payment Adjustment Rider if applicable.

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____

ACCEPTANCE DATE: _____

1

# EXHIBIT J

## DELIVERY CERTIFICATE

**MASTER LOAN AND SECURITY AGREEMENT NO.: 4075**          **DATED: DECEMBER 14, 2015**
**SCHEDULE NO.  004**          **DATED: SEPTEMBER 19, 2017**

**TO: PEOPLE'S CAPITAL AND LEASING CORP.**

The undersigned Borrower hereby acknowledges that all of the Equipment described below and in the Schedule to the Master Loan and Security Agreement referred to above (collectively, including any prior amendments and related documents, the "Loan Agreement") has been delivered to Borrower, is of the manufacture, design and specifications selected by Borrower, is suitable for Borrower's purposes, fully complies with said Loan Agreement and has been unconditionally accepted by Borrower thereunder.

Borrower hereby represents to People's Capital and Leasing Corp. ("PCLC") and any assignee that the Loan Agreement at the date hereof is free from any defense, off-set or counterclaim and hereby waives, as to any assignee, all such defenses, off-sets and counterclaims.

Equipment Description:

| QUANTITY | DESCRIPTION | VIN NUMBER |
|----------|-------------|------------|
| Two (2) | 2017 CX45L Van Hool Buses | YE2XC81B5H3049537 |
|  | With Braun Wheel Chair Lifts | YE2XC81B7H3049538 |

Borrower hereby authorizes and requests PCLC to disburse the proceeds of the Loan (or the balance of the proceeds if a portion was previously advanced by PCLC) when all of PCLC's funding conditions are met. Borrower agrees that unless a loan commencement date is specified in the Loan, the Loan will commence automatically upon PCLC's first disbursement of funds after Borrower's execution of this Delivery Certificate and that no further authorization from Borrower will be required prior to such disbursement. Borrower further agrees that unless a loan payment commencement date is specified in the Loan, the due date of the first payment under the Loan (excluding any advance payment) will be one month after the commencement of the Loan and that PCLC may insert such payment commencement date in the Loan. The amount of the monthly payments due under the Loan shall be adjusted as provided in the Payment Adjustment Rider if applicable.

**LOS PAISANOS AUTOBUSES, INC.**

BY: _____

TITLE: _____*President*_____

ACCEPTANCE DATE: _____*Sept. 19, 2017*_____

1

# EXHIBIT K

Upon sale of this vehicle, the purchaser must apply for a new title within 30 days unless the vehicle is purchased by a dealer. Until a new title is issued, the vehicle record will continue to reflect the owner's name listed on the current title. SEE BACK OF TAB FOR ADDITIONAL INFORMATION.

22 of 22510

PEOPLE'S CAPITAL AND, LEASING CORP
850 MAIN ST
BRIDGEPORT, CT 06604-4917

**DETACH HERE**

# TEXAS CERTIFICATE OF TITLE

TxDMV

TEXAS DEPARTMENT OF MOTOR VEHICLES

125734768

| VEHICLE IDENTIFICATION NUMBER | YEAR MODEL | MAKE OF VEHICLE | BODY STYLE |
|---|---|---|---|
| YE2YC22B3F2041374 | 2015 | VANH | BU |

| | TITLE/DOCUMENT NUMBER | DATE TITLE ISSUED |
|---|---|---|
| | 07130642366100044 | 01/07/2016 |

| MODEL | MFG. CAPACITY IN TONS | WEIGHT | LICENSE NUMBER | |
|---|---|---|---|---|
| | | 38900 | K045450 | |

PREVIOUS OWNER

ODOMETER READING
EXEMPT

ABC BUS INC

OWNER

REMARK(S)

LOS PAISANOS AUTOBUSES INC
6767 GATEWAY WEST BLVD
0000000000000000000-
EL PASO, TX 79925

DIESEL

X _____
SIGNATURE OF OWNER OR AGENT MUST BE IN INK

UNLESS OTHERWISE AUTHORIZED BY LAW, IT IS A VIOLATION OF STATE LAW TO SIGN THE NAME OF ANOTHER PERSON ON A CERTIFICATE OF TITLE OR OTHERWISE GIVE FALSE INFORMATION ON A CERTIFICATE OF TITLE.

| DATE OF LIEN | 1ST LIENHOLDER | 1ST LIEN RELEASED | DATE |
|---|---|---|---|
| 12/21/2015 | PEOPLE'S CAPITAL AND LEASING CORP 850 MAIN STREET BC03/RC871 BRIDGEPORT, CT 06604 | BY _____ AUTHORIZED AGENT | |

| DATE OF LIEN | 2ND LIENHOLDER | 2ND LIEN RELEASED | DATE |
|---|---|---|---|
| | | BY _____ AUTHORIZED AGENT | |

| DATE OF LIEN | 3RD LIENHOLDER | 3RD LIEN RELEASED | DATE |
|---|---|---|---|
| | | BY _____ AUTHORIZED AGENT | |

IT IS HEREBY CERTIFIED THAT THE PERSON HEREIN NAMED IS THE OWNER OF THE VEHICLE DESCRIBED ABOVE WHICH IS SUBJECT TO THE ABOVE LIENS.

R I G H T S  O F  S U R V I V O R S H I P  A G R E E M E N T
WE, THE MARRIED PERSONS WHOSE SIGNATURES APPEAR HEREIN, HEREBY AGREE THAT THE OWNERSHIP OF THE VEHICLE DESCRIBED ON THIS CERTIFICATE OF TITLE SHALL FROM THIS DAY FORWARD BE HELD JOINTLY; AND IN THE EVENT OF DEATH OF ANY OF THE PERSONS NAMED IN THE AGREEMENT, THE OWNERSHIP OF THE VEHICLE SHALL VEST IN THE SURVIVOR(S).

| SIGNATURE | DATE |
|---|---|
| SIGNATURE | DATE |
| SIGNATURE | DATE |

FORM 30-C REV -03/2015      DO NOT ACCEPT TITLE SHOWING ERASURE, ALTERATION, OR MUTILATION.

Whenever you trade in a vehicle or sell it, protect yourself by filing the **Vehicle Transfer Notification** online at www.TxDMV.gov. The notification removes your responsibility for anything the buyer might do with the vehicle. It's free!

**You ONLY have 30 days to submit the Vehicle Transfer Notification from the date you sell or trade in the vehicle to remove your liability.**

Before you buy, do a Title Check. For more information, go to www.TxDMV.gov and click on the "Title Check" icon.

---

**WHEN VEHICLE IS SOLD, TITLE HOLDER MUST ASSIGN AND FURNISH THIS TITLE INDICATING A DATE OF SALE TO THE PURCHASER WHO MUST FILE APPLICATION WITH COUNTY TAX ASSESSOR-COLLECTOR WITHIN 30 DAYS TO AVOID PENALTY.**

▶ **FEDERAL AND STATE LAW REQUIRES THAT YOU STATE THE MILEAGE IN CONNECTION WITH THE TRANSFER OF OWNERSHIP. FAILURE TO COMPLETE OR PROVIDING A FALSE STATEMENT MAY RESULT IN FINES AND/OR IMPRISONMENT.**

**ASSIGNMENT OF TITLE**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser | Street | City | State | Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale

Signature of Seller/Agent | Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent | Printed Name (same as signature)

**FIRST REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser | Street | City | State | Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale | Dealer No.

Dealer's Name

Agent's Signature | Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent | Printed Name (same as signature)

**SECOND REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser | Street | City | State | Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☑ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale | Dealer No.

Dealer's Name

Agent's Signature | Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent | Printed Name (same as signature)

**THIRD REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser | Street | City | State | Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale | Dealer No.

Dealer's Name

Agent's Signature | Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent | Printed Name (same as signature)

**LIEN**

LIENHOLDER TO BE RECORDED AND SHOWN ON NEW TITLE:
1ST LIEN IN FAVOR OF (NAME & ADDRESS)

Upon sale of this vehicle, the purchaser must apply for a new title within 30 days unless the vehicle is purchased by a dealer. Until a new title is issued, the vehicle record will continue to reflect the owner's name listed on the current title. SEE BACK OF TAB FOR ADDITIONAL INFORMATION.

22 of 22510

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

**PEOPLE'S CAPITAL AND, LEASING CORP**
**850 MAIN ST**
**BRIDGEPORT, CT 06604-4917**

↓ DETACH HERE ↓                                    ---      ---

## TEXAS CERTIFICATE OF TITLE

**TxDMV**

TEXAS DEPARTMENT OF MOTOR VEHICLES

1 25714767

| VEHICLE IDENTIFICATION NUMBER | YEAR MODEL | MAKE OF VEHICLE | BODY STYLE |
|---|---|---|---|
| YE2YC22B5F2041375 | 2015 | VANH | BU |

| | TITLE/DOCUMENT NUMBER | DATE TITLE ISSUED |
|---|---|---|
| | 07130642366100627 | 01/07/2016 |

| MODEL | MFG. CAPACITY IN TONS | WEIGHT | LICENSE NUMBER | ODOMETER READING |
|---|---|---|---|---|
| | | 38900 | K045451 | EXEMPT |

PREVIOUS OWNER

**ABC BUS INC**

OWNER

REMARK(S)

**LOS PAISANOS AUTOBUSES INC**
**6767 GATEWAY WEST BLVD**
**00000000000000000-**
**EL PASO, TX 79925**

**DIESEL**

X _____
SIGNATURE OF OWNER OR AGENT MUST BE IN INK

UNLESS OTHERWISE AUTHORIZED BY LAW, IT IS A VIOLATION OF STATE LAW TO SIGN THE NAME OF ANOTHER PERSON ON A CERTIFICATE OF TITLE OR OTHERWISE GIVE FALSE INFORMATION ON A CERTIFICATE OF TITLE.

| DATE OF LIEN | 1ST LIENHOLDER | 1ST LIEN RELEASED | DATE |
|---|---|---|---|
| 12/21/2015 | PEOPLE'S CAPITAL AND LEASING CORP. 850 MAIN STREET BC03/RC871 BRIDGEPORT, CT 06604 | BY _____ AUTHORIZED AGENT | |

| DATE OF LIEN | 2ND LIENHOLDER | 2ND LIEN RELEASED | DATE |
|---|---|---|---|
| | | BY _____ AUTHORIZED AGENT | |

| DATE OF LIEN | 3RD LIENHOLDER | 3RD LIEN RELEASED | DATE |
|---|---|---|---|
| | | BY _____ AUTHORIZED AGENT | |

IT IS HEREBY CERTIFIED THAT THE PERSON HEREIN NAMED IS THE OWNER OF THE VEHICLE DESCRIBED ABOVE WHICH IS SUBJECT TO THE ABOVE LIENS.

**R I G H T S   O F   S U R V I V O R S H I P   A G R E E M E N T**
WE, THE MARRIED PERSONS WHOSE SIGNATURES APPEAR HEREIN, HEREBY AGREE THAT THE OWNERSHIP OF THE VEHICLE DESCRIBED ON THIS CERTIFICATE OF TITLE SHALL FROM THIS DAY FORWARD BE HELD JOINTLY AND IN THE EVENT OF DEATH OF ANY OF THE PERSONS NAMED IN THIS AGREEMENT, THE OWNERSHIP OF THE VEHICLE SHALL VEST IN THE SURVIVOR(S).

| SIGNATURE | DATE |
|---|---|
| | |
| SIGNATURE | DATE |
| | |
| SIGNATURE | DATE |
| | |

FORM 30-C REV. 03/2015                    DO NOT ACCEPT TITLE SHOWING ERASURE, ALTERATION, OR MUTILATION.

Whenever you sell or trade in a vehicle, be sure to protect yourself by filing a **Vehicle Transfer Notification online** at www.TxDMV.gov. The notification removes your responsibility for anything the buyer might do with the vehicle. It's free!

**You ONLY have 30 days to submit the Vehicle Transfer Notification from the date you sell or trade in the vehicle to remove your liability.**

Before you buy, do a Title Check. For more information, go to www.TxDMV.gov and click on the "Title Check" icon.

---

**WHEN VEHICLE IS SOLD, TITLE HOLDER MUST ASSIGN AND FURNISH THIS TITLE INDICATING A DATE OF SALE TO THE PURCHASER WHO MUST FILE APPLICATION WITH COUNTY TAX ASSESSOR-COLLECTOR WITHIN 30 DAYS TO AVOID PENALTY.**

▶ **FEDERAL AND STATE LAW REQUIRES THAT YOU STATE THE MILEAGE IN CONNECTION WITH THE TRANSFER OF OWNERSHIP. FAILURE TO COMPLETE OR PROVIDING A FALSE STATEMENT MAY RESULT IN FINES AND/OR IMPRISONMENT.**

## ASSIGNMENT OF TITLE

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser | Street | City | State | Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY

ODOMETER READING (No Tenths)

Date of Sale

Signature of Seller/Agent | Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent | Printed Name (same as signature)

## FIRST REASSIGNMENT DEALER ONLY

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser | Street | City | State | Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY

ODOMETER READING (No Tenths)

Date of Sale | Dealer No.

Dealer's Name

Agent's Signature | Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent | Printed Name (same as signature)

## SECOND REASSIGNMENT DEALER ONLY

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser | Street | City | State | Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY

ODOMETER READING (No Tenths)

Date of Sale | Dealer No.

Dealer's Name

Agent's Signature | Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent | Printed Name (same as signature)

## THIRD REASSIGNMENT DEALER ONLY

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser | Street | City | State | Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY

ODOMETER READING (No Tenths)

Date of Sale | Dealer No.

Dealer's Name

Agent's Signature | Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent | Printed Name (same as signature)

## LIEN

LIENHOLDER TO BE RECORDED AND SHOWN ON NEW TITLE:
1ST LIEN IN FAVOR OF (NAME & ADDRESS)

Upon sale of this vehicle, purchaser must apply for a new title within 30 days unless the vehicle is purchased by a dealer. Until a new title is issued, the vehicle record will continue to reflect the owner's name listed on the current title. SEE BACK OF TAB FOR ADDITIONAL INFORMATION.

14 of 24066

PEOPLES CAPITAL
AND LEASING CORP
850 MAIN STREET BC03/RC871
BRIDGEPORT, CT 06604

DETACH HERE



# TEXAS CERTIFICATE OF TITLE

Each undersigned seller certifies to the best of his knowledge, information and belief under penalty of law that the vehicle is new and has not been registered in this or any state at the time of delivery and the vehicle is not subject to any security interests other than those disclosed herein and warrants title to this vehicle.

**FOR VALUE RECEIVED I TRANSFER THE VEHICLE DESCRIBED ON THE FACE OF THIS CERTIFICATE TO:**

**DISTRIBUTION-DEALER ASSIGNMENT NUMBER 1**

NAME OF PURCHASER(S) Los Paisanos Autobuses, Inc

ADDRESS 6767 Gateway West Blvd. El Paso, Tx 79925

I certify to the best of my knowledge that the odometer reading is _____ No Tenths

DEALER ABC Bus Inc. VF10008LS1

NAME OF DEALERSHIP    DEALER'S LICENSE NUMBER

BY: _____

Being duly sworn upon oath says that the statements set forth are true and correct. Subscribed and sworn to me

State of Minnesota

County of Rice

before this _____ day of _____ Year _____

_____ Notary Public

USE NOTARIZATION ONLY IF REQUIRED IN TITLING JURISDICTION

**DISTRIBUTION-DEALER ASSIGNMENT NUMBER 2**

NAME OF PURCHASER(S) _____

ADDRESS _____

I certify to the best of my knowledge that the odometer reading is _____ No Tenths

DEALER _____

NAME OF DEALERSHIP    DEALER'S LICENSE NUMBER

BY: _____

Being duly sworn upon oath says that the statements set forth are true and correct. Subscribed and sworn to me

State of _____

County of _____

before this _____ day of _____ Year _____

_____ Notary Public

USE NOTARIZATION ONLY IF REQUIRED IN TITLING JURISDICTION

**DISTRIBUTION-DEALER ASSIGNMENT NUMBER 3**

NAME OF PURCHASER(S) _____

ADDRESS _____

I certify to the best of my knowledge that the odometer reading is _____ No Tenths

DEALER _____

NAME OF DEALERSHIP    DEALER'S LICENSE NUMBER

BY: _____

Being duly sworn upon oath says that the statements set forth are true and correct. Subscribed and sworn to me

State of _____

County of _____

before this _____ day of _____ Year _____

_____ Notary Public

USE NOTARIZATION ONLY IF REQUIRED IN TITLING JURISDICTION

**DISTRIBUTION-DEALER ASSIGNMENT NUMBER 4**

NAME OF PURCHASER(S) _____

ADDRESS _____

I certify to the best of my knowledge that the odometer reading is _____ No Tenths

DEALER _____

NAME OF DEALERSHIP    DEALER'S LICENSE NUMBER

BY: _____

Being duly sworn upon oath says that the statements set forth are true and correct. Subscribed and sworn to me

State of _____

County of _____

before this _____ day of _____ Year _____

_____ Notary Public

USE NOTARIZATION ONLY IF REQUIRED IN TITLING JURISDICTION

**ODOMETER DISCLOSURE FOR RETAIL SALE**

Federal Law requires you to state the odometer mileage in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

I certify to the best of my knowledge that the actual mileage of the vehicle unless one of the following statements is checked. Odometer Reading _____ No Tenths. ☐ The mileage stated is in excess of its mechanical limits. ☐ The odometer reading is not the actual mileage.

**WARNING ODOMETER DISCREPANCY**

Signature(s) of Seller(s) _____

Printed Name(s) of Seller(s) _____

Signature(s) of Purchaser(s) _____  0V00B13 I

Printed Name(s) of Purchaser(s) _____

Company Name (if Applicable) _____

Address of Purchaser(s) _____

Date of Statement _____ Date of Sale _____

Being duly sworn upon oath says that the statements set forth are true and correct. Subscribed and sworn to me

before this _____ day of _____ Year _____

_____ Notary Public

State of _____

County of _____

USE NOTARIZATION ONLY IF REQUIRED IN TITLING JURISDICTION

**LIENHOLDER**

1st lien in favor of Peoples Capital and Leasing Corp

whose address is 855 Main Street BC03/RC871 Bridgeport, CT 06604

2nd lien in favor of _____

whose address is _____

Upon sale of this vehicle, the purchaser must apply for a new title within 30 days unless the vehicle is purchased by a dealer. Until a new title is issued, the vehicle record will continue to reflect the owner's name listed on the current title. SEE BACK OF TAB FOR ADDITIONAL INFORMATION.

```
6080090100001170102
```

```
0
0
0
0
2
1
```

PEOPLE'S CAPITAL&LEASING CORP
850 MAIN STREET BC03/RC871
BRIDGEPORT, CT 06604

↓ DETACH HERE ↓                                                    - - -

# TEXAS CERTIFICATE OF TITLE

TxDMV

TEXAS DEPARTMENT OF MOTOR VEHICLES

b33096566

| VEHICLE IDENTIFICATION NUMBER | YEAR MODEL | MAKE OF VEHICLE | BODY STYLE |
|---|---|---|---|
| YE2XC81B2H3049222 | 2017 | VANH | BU |

TITLE/DOCUMENT NUMBER          DATE TITLE ISSUED
0713064281515520 2          03/31/2017

| MODEL | MFG. CAPACITY IN TONS | WEIGHT | LICENSE NUMBER |
|---|---|---|---|
| | | 39100 | K056569 |

PREVIOUS OWNER
ABC BUS INC WINTERGARDE FL

ODOMETER READING
EXEMPT

OWNER
LOS PAISANOS AUTOBUSES INC
6767 GATEWAY WEST BLVD
00000000000000000-
EL PASO, TX 79925

REMARK(S)
DIESEL

X _____
SIGNATURE OF OWNER OR AGENT MUST BE IN INK

UNLESS OTHERWISE AUTHORIZED BY LAW, IT IS A VIOLATION OF STATE LAW TO SIGN THE NAME OF ANOTHER PERSON ON A CERTIFICATE OF TITLE OR OTHERWISE GIVE FALSE INFORMATION ON A CERTIFICATE OF TITLE.

DATE OF LIEN                    1ST LIENHOLDER
02/28/2017  PEOPLE'S CAPITAL&LEASING CORP
            850 MAIN STREET BC03/RC871
            BRIDGEPORT, CT 06604

1ST LIEN RELEASED _____ DATE _____
BY _____ AUTHORIZED AGENT

DATE OF LIEN                    2ND LIENHOLDER

2ND LIEN RELEASED _____ DATE _____
BY _____ AUTHORIZED AGENT

DATE OF LIEN                    3RD LIENHOLDER

3RD LIEN RELEASED _____ DATE _____
BY _____ AUTHORIZED AGENT

IT IS HEREBY CERTIFIED THAT THE PERSON HEREIN NAMED IS THE OWNER OF THE VEHICLE DESCRIBED ABOVE WHICH IS SUBJECT TO THE ABOVE LIENS.

RIGHTS OF SURVIVORSHIP AGREEMENT
WE, THE MARRIED PERSONS WHOSE SIGNATURES APPEAR HEREIN, HEREBY AGREE THAT THE OWNERSHIP OF THE VEHICLE DESCRIBED ON THIS CERTIFICATE OF TITLE SHALL FROM THIS DAY FORWARD BE HELD JOINTLY, AND IN THE EVENT OF DEATH OF ANY OF THE PERSONS NAMED IN THE AGREEMENT, THE OWNERSHIP OF THE VEHICLE SHALL VEST IN THE SURVIVOR(S).

SIGNATURE _____ DATE _____
SIGNATURE _____ DATE _____
SIGNATURE _____ DATE _____

FORM 30-C REV. 05/2016        DO NOT ACCEPT TITLE SHOWING ERASURE, ALTERATION, OR MUTILATION.

Upon sale of this vehicle, the purchaser must apply for a new title within 30 days unless the vehicle is purchased by a dealer. Until a new title is issued, the vehicle record will continue to reflect the owner's name listed on the current title. SEE BACK OF TAB FOR ADDITIONAL INFORMATION.

PEOPLE'S CAPITAL&LEASING CORP
850 MAIN STREET BC03/RC871
BRIDGEPORT, CT 06604

▼ DETACH HERE ▼

# TEXAS CERTIFICATE OF TITLE

TxDMV

TEXAS DEPARTMENT OF MOTOR VEHICLES

133096567

| VEHICLE IDENTIFICATION NUMBER | YEAR MODEL | MAKE OF VEHICLE | BODY STYLE |
|---|---|---|---|
| YE2XC81B9H3049220 | 2017 | VANH | BU |

| TITLE/DOCUMENT NUMBER | DATE TITLE ISSUED |
|---|---|
| 07130642815154131 | 03/31/2017 |

| MODEL | MFG. CAPACITY IN TONS | WEIGHT | LICENSE NUMBER |
|---|---|---|---|
| | 40300 | | K056566 |

PREVIOUS OWNER
ABC BUS INC WINTERGARDE FL

ODOMETER READING
EXEMPT

OWNER
LOS PAISANOS AUTOBUSES INC
6767 GATEWAY WEST BLVD
00000000000000000-
EL PASO, TX 79925

REMARK(S)
DIESEL

X _____
SIGNATURE OF OWNER OR AGENT MUST BE IN INK

UNLESS OTHERWISE AUTHORIZED BY LAW, IT IS A VIOLATION OF STATE LAW TO SIGN THE NAME OF ANOTHER PERSON ON A CERTIFICATE OF TITLE OR OTHERWISE GIVE FALSE INFORMATION ON A CERTIFICATE OF TITLE

DATE OF LIEN          1ST LIENHOLDER
02/28/2017 PEOPLE'S CAPITAL&LEASING CORP
           850 MAIN STREET BC03/RC871
           BRIDGEPORT, CT 06604

1ST LIEN RELEASED _____ DATE _____
BY _____ AUTHORIZED AGENT

DATE OF LIEN          2ND LIENHOLDER

2ND LIEN RELEASED _____ DATE _____
BY _____ AUTHORIZED AGENT

DATE OF LIEN          3RD LIENHOLDER

3RD LIEN RELEASED _____ DATE _____
BY _____ AUTHORIZED AGENT

IT IS HEREBY CERTIFIED THAT THE PERSON HEREIN NAMED IS THE OWNER OF THE VEHICLE DESCRIBED ABOVE WHICH IS SUBJECT TO THE ABOVE LIENS.

R I G H T S   O F   S U R V I V O R S H I P   A G R E E M E N T
WE, THE MARRIED PERSONS WHOSE SIGNATURES APPEAR HEREIN, HEREBY AGREE THAT THE OWNERSHIP OF THE VEHICLE DESCRIBED ON THIS CERTIFICATE OF TITLE SHALL FROM THIS DAY FORWARD BE HELD JOINTLY, AND IN THE EVENT OF DEATH OF ANY OF THE PERSONS NAMED IN THE AGREEMENT, THE OWNERSHIP OF THE VEHICLE SHALL VEST IN THE SURIVOR(S).

SIGNATURE _____ DATE _____
SIGNATURE _____ DATE _____
SIGNATURE _____ DATE _____

FORM 30-C REV. 05/2016          DO NOT ACCEPT TITLE SHOWING ERASURE, ALTERATION, OR MUTILATION.

Upon sale of this vehicle, the purch    er must apply for a new title within 30 day    less the vehicle is purchased by a dealer. Until a new title is issued, the vehicle record will continue to reflect the owner's name listed on the current title. SEE BACK OF TAB FOR ADDITIONAL INFORMATION.

PEOPLES CAPITAL AND, LEASING CORP
850 MAIN ST
BRIDGEPORT, CT 06604-4917

0 0 0 0 3 1

▼ DETACH HERE ▼                                    - - -

## TEXAS CERTIFICATE OF TITLE

TEXAS DEPARTMENT OF MOTOR VEHICLES

**TxDMV**

136699958

| VEHICLE IDENTIFICATION NUMBER | YEAR MODEL | MAKE OF VEHICLE | BODY STYLE |
|---|---|---|---|
| YE2XC81B5H3049537 | 2017 | VANH | BU |

TITLE/DOCUMENT NUMBER          DATE TITLE ISSUED

07130643025153220 10/27/2017

| MODEL | MFG. CAPACITY IN TONS | WEIGHT | LICENSE NUMBER | |
|---|---|---|---|---|
| | | 38600 | TONLY01 | |

PREVIOUS OWNER                                    ODOMETER READING

ABC BUS INC WINTERGARDE FL                        EXEMPT

OWNER                                             REMARK(S)

LOS PAISANOS AUTOBUSES, INC                       DIESEL
6767 GATEWAY WEST BLVD
EL PASO, TX 79925

X _____
        SIGNATURE OF OWNER OR AGENT MUST BE IN INK

UNLESS OTHERWISE AUTHORIZED BY LAW, IT IS A VIOLATION OF STATE LAW TO SIGN THE NAME OF ANOTHER PERSON ON A CERTIFICATE OF TITLE OR OTHERWISE GIVE FALSE INFORMATION ON A CERTIFICATE OF TITLE.

DATE OF LIEN          1ST LIENHOLDER                    1ST LIEN RELEASED _____ DATE _____

09/22/2017 PEOPLES CAPITAL AND
           LEASING CORP
           850 MAIN STREET BC03/RC871          BY _____
           BRIDGEPORT, CT 06604                  AUTHORIZED AGENT

DATE OF LIEN          2ND LIENHOLDER                    2ND LIEN RELEASED _____ DATE _____

                                                 BY _____
                                                   AUTHORIZED AGENT

DATE OF LIEN          3RD LIENHOLDER                    3RD LIEN RELEASED _____ DATE _____

                                                 BY _____
                                                   AUTHORIZED AGENT

IT IS HEREBY CERTIFIED THAT THE PERSON HEREIN NAMED IS THE OWNER OF THE VEHICLE DESCRIBED ABOVE WHICH IS SUBJECT TO THE ABOVE LIENS.

R I G H T S   O F   S U R V I V O R S H I P   A G R E E M E N T
WE, THE MARRIED PERSONS WHOSE SIGNATURES APPEAR HEREIN, HEREBY AGREE THAT THE OWNERSHIP OF THE VEHICLE DESCRIBED ON THIS CERTIFICATE OF TITLE SHALL FROM THIS DAY FORWARD BE HELD JOINTLY, AND IN THE EVENT OF DEATH OF ANY OF THE PERSONS NAMED IN THE AGREEMENT, THE OWNERSHIP OF THE VEHICLE SHALL VEST IN THE SURVIVOR(S).

SIGNATURE _____ DATE _____

SIGNATURE _____ DATE _____

SIGNATURE _____ DATE _____

FORM 30-C REV. 05/2016          DO NOT ACCEPT TITLE SHOWING ERASURE, ALTERATION, OR MUTILATION.

Whenever you sell or trade a vehicle, be sure to protect yourself by filing a Vehicle Transfer Notification online at www.TxDMV.gov. The notification removes your responsibility for anything the buyer might do with the vehicle. It's free!

**You ONLY have 30 days to submit the Vehicle Transfer Notification from the date you sell or trade in the vehicle to remove your liability.**

Before you buy, do a Title Check. For more information, go to www.TxDMV.gov and click on the "Title Check" icon.

---

| WHEN VEHICLE IS SOLD, TITLE HOLDER MUST ASSIGN AND FURNISH THIS TITLE INDICATING A DATE OF SALE TO THE PURCHASER WHO MUST FILE APPLICATION WITH COUNTY TAX ASSESSOR-COLLECTOR WITHIN 30 DAYS TO AVOID PENALTY. | 1 3 6 6 9 9 9 5 7 |
|---|---|

▶ **FEDERAL AND STATE LAW REQUIRES THAT YOU STATE THE MILEAGE IN CONNECTION WITH THE TRANSFER OF OWNERSHIP. FAILURE TO COMPLETE OR PROVIDING A FALSE STATEMENT MAY RESULT IN FINES AND/OR IMPRISONMENT.**

**ASSIGNMENT OF TITLE**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser    Street    City    State    Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale

Signature of Seller/Agent    Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent    Printed Name (same as signature)

**FIRST REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser    Street    City    State    Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale    Dealer No.

Dealer's Name

Agent's Signature    Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent    Printed Name (same as signature)

**SECOND REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser    Street    City    State    Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale    Dealer No.

Dealer's Name

Agent's Signature    Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent    Printed Name (same as signature)

**THIRD REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser    Street    City    State    Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale    Dealer No.

Dealer's Name

Agent's Signature    Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent    Printed Name (same as signature)

**LIEN**

LIENHOLDER TO BE RECORDED AND SHOWN ON NEW TITLE:
1ST LIEN IN FAVOR OF (NAME & ADDRESS)

Upon sale of this vehicle, the purch___ must apply for a new title within 30 days of ___ss the vehicle is purchased by a dealer. Until a new title is issued, the vehicle record will continue to reflect the owner's name listed on the current title. SEE BACK OF TAB FOR ADDITIONAL INFORMATION.

PEOPLES CAPITAL AND, LEASING CORP
850 MAIN ST
BRIDGEPORT, CT 06604-4917

0
0
0
3
0

▼ DETACH HERE ▼

--- | ---

# TEXAS CERTIFICATE OF TITLE

TEXAS DEPARTMENT OF MOTOR VEHICLES

**TxDMV**

136699957

| VEHICLE IDENTIFICATION NUMBER | YEAR MODEL | MAKE OF VEHICLE | BODY STYLE |
| --- | --- | --- | --- |
| YE2XC81B7H3049538 | 2017 | VANH | BU |

TITLE/DOCUMENT NUMBER    DATE TITLE ISSUED
07130643025154504  10/27/2017

| MODEL | MFG. CAPACITY IN TONS | WEIGHT | LICENSE NUMBER | ODOMETER READING |
| --- | --- | --- | --- | --- |
| | | 38400 | TONLY01 | EXEMPT |

PREVIOUS OWNER
ABC BUS INC EL PASO TX

REMARK(S)

OWNER
LOS PAISANOS AUTOBUSES, INC
6767 GATEWAY WEST BLVD
EL PASO, TX 79925

DIESEL

X _____
SIGNATURE OF OWNER OR AGENT MUST BE IN INK

UNLESS OTHERWISE AUTHORIZED BY LAW, IT IS A VIOLATION OF STATE LAW TO SIGN THE NAME OF ANOTHER PERSON ON A CERTIFICATE OF TITLE OR OTHERWISE GIVE FALSE INFORMATION ON A CERTIFICATE OF TITLE.

| DATE OF LIEN | 1ST LIENHOLDER | |
| --- | --- | --- |
| 09/29/2017 | PEOPLES CAPITAL AND LEASING CORP 850 MAIN STREET BC03/RC871 BRIDGEPORT, CT 06604 | 1ST LIEN RELEASED _____ DATE _____ BY _____ AUTHORIZED AGENT |

| DATE OF LIEN | 2ND LIENHOLDER | 2ND LIEN RELEASED _____ DATE _____ BY _____ AUTHORIZED AGENT |
| --- | --- | --- |

| DATE OF LIEN | 3RD LIENHOLDER | 3RD LIEN RELEASED _____ DATE _____ BY _____ AUTHORIZED AGENT |
| --- | --- | --- |

IT IS HEREBY CERTIFIED THAT THE PERSON HEREIN NAMED IS THE OWNER OF THE VEHICLE DESCRIBED ABOVE WHICH IS SUBJECT TO THE ABOVE LIENS.

R I G H T S   O F   S U R V I V O R S H I P   A G R E E M E N T
WE, THE MARRIED PERSONS WHOSE SIGNATURES APPEAR HEREIN, HEREBY AGREE THAT THE OWNERSHIP OF THE VEHICLE DESCRIBED ON THIS CERTIFICATE OF TITLE SHALL FROM THIS DAY FORWARD BE HELD JOINTLY, AND IN THE EVENT OF DEATH OF ANY OF THE PERSONS NAMED IN THE AGREEMENT, THE OWNERSHIP OF THE VEHICLE SHALL VEST IN THE SURVIVOR(S).

SIGNATURE _____ DATE _____
SIGNATURE _____ DATE _____
SIGNATURE _____ DATE _____

FORM 30-C REV. 05/2016        DO NOT ACCEPT TITLE SHOWING ERASURE, ALTERATION, OR MUTILATION.

Whenever you sell or trade in a vehicle, be sure to **protect yourself by filing a Vehicle Transfer Notification** online at www.TxDMV.gov. The notification removes your responsibility for anything the buyer might do with the vehicle. It's free!

**You ONLY have 30 days to submit the Vehicle Transfer Notification from the date you sell or trade in the vehicle to remove your liability.**

Before you buy, do a Title Check. For more information, go to www.TxDMV.gov and click on the "Title Check" icon.

---

**WHEN VEHICLE IS SOLD, TITLE HOLDER MUST ASSIGN AND FURNISH THIS TITLE INDICATING A DATE OF SALE TO THE PURCHASER WHO MUST FILE APPLICATION WITH COUNTY TAX ASSESSOR-COLLECTOR WITHIN 30 DAYS TO AVOID PENALTY.**          `136699958`

**FEDERAL AND STATE LAW REQUIRES THAT YOU STATE THE MILEAGE IN CONNECTION WITH THE TRANSFER OF OWNERSHIP. FAILURE TO COMPLETE OR PROVIDING A FALSE STATEMENT MAY RESULT IN FINES AND/OR IMPRISONMENT.**

**ASSIGNMENT OF TITLE**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser          Street          City          State          Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale

Signature of Seller/Agent          Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent          Printed Name (same as signature)

**FIRST REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser          Street          City          State          Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale          Dealer No.

Dealer's Name

Agent's Signature          Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent          Printed Name (same as signature)

**SECOND REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser          Street          City          State          Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale          Dealer No.

Dealer's Name

Agent's Signature          Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent          Printed Name (same as signature)

**THIRD REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser          Street          City          State          Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

ODOMETER READING (No Tenths)

Date of Sale          Dealer No.

Dealer's Name

Agent's Signature          Printed Name (same as signature)

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent          Printed Name (same as signature)

**LIEN**

LIENHOLDER TO BE RECORDED AND SHOWN ON NEW TITLE:
1ST LIEN IN FAVOR OF (NAME & ADDRESS)

# EXHIBIT L

**MASTER LEASE AGREEMENT**
**NO. 2665**

ORIGINAL

This Master Lease Agreement ("**Master Lease Agreement**") is entered into February 24, 2017, between Summit Funding Group, Inc., a Delaware corporation with its principal place of business at 4680 Parkway Drive, Suite 300, Mason, Ohio 45040 ("**Lessor**"), and Los Paisanos Autobuses, Inc., a Texas corporation with its principal place of business at 6767 Gateway Boulevard West, El Paso, TX 79925 ("**Lessee**").

The parties agree as follows:

**1. DEFINITIONS.**

"**Acceptance Certificate**" means a certificate evidencing Lessee's absolute, irrevocable, and unconditional acceptance of the Equipment.

"**Addition**" means a part, piece, component, accessory, accession, adjustment, modification, alteration, addition, replacement, substitution, exchange, improvement, upgrade, or enhancement.

"**Base Rent**" means the periodic payment set forth in a Lease.

"**Base Rent Commencement Date**" means the Delivery Date (if it falls on the first day of a month) or the first day of the month immediately following the Delivery Date (if it does not fall on the first day of a month).

"**Casualty Value**" means the applicable stipulated loss value or casualty value of the Equipment specified in a Lease, together with all accrued and unpaid amounts due and owing when Lessee pays the same.

"**Delivery Date**" means the date the Equipment is delivered to Lessee.

"**Document**" means a credit application, tax return, financial statement, purchase order, invoice, bill of sale, agreement, contract, lease, assignment, guaranty, warranty, renewal, amendment, attachment, addendum, supplement, exhibit, schedule, rider, certificate, notice, table, record, document, resolution, appraisal, form, filing, policy, instrument, note, draft, check, waiver, approval, authorization, or consent.

"**Eligible Condition**" means Equipment that is in its original condition (ordinary wear and tear from proper use excepted), that is in good working order, that is capable of performing all functions that it could perform when delivered to Lessee, that can be placed in immediate use for its intended purposes, that is free from latent and patent damage, flaws, and defects, that is merchantable, that is free from all Encumbrances except those created by Lessor and Lessor's Assignee, that is free from all Additions except those required by applicable law or for service and maintenance eligibility, that is free from all personal, business, classified, proprietary, privileged, nonpublic, and confidential records, data, and information, that is certified as eligible for a service and maintenance contract by the Manufacturer or a third party reasonably acceptable to Lessor, and that meets all other return conditions and requirements specified herein.

"**Encumbrance**" means a charge, claim, community property interest, condition, lien, option, encumbrance, equitable interest, pledge, security interest, mortgage, easement, imposition, encroachment, infringement, restriction, or third-party interest.

"**Equipment**" means equipment, goods, assets, hardware, software, personal property, and other items subject to a Lease, together with all Additions thereto if the context requires.

"**Event of Default**" means the occurrence of a Lessee default or other event set forth in Section 19.

"**Event of Loss**" means the loss of use of some or all of the Equipment for its intended purposes, including, but not limited to, loss resulting from physical damage, spoilage, decay, corrosion, exposure to harsh or unsafe conditions, erasure, inoperability, incapacity, latent or patent defects, theft, confiscation, seizure, condemnation, government taking, requisition, appropriation, act of war, terrorist attack, fire, flood, earthquake, tsunami, or other act of god or natural phenomenon.

"**Fair Market Value**" has the meaning given to it in Section 17.

"**Firm Term**" means the period of time beginning on the Delivery Date and ending upon the expiration of the full number of consecutive calendar months specified in the Lease from and after the Base Rent Commencement Date.

"**GAAP**" means United States generally accepted accounting principles applied on a consistent basis.

"**Guarantor**" means a guarantor, endorser, surety, or other person or entity responsible in whole or part for the payment, performance, discharge, or observance of Lessee's promises, agreements, covenants, or obligations.

"**Lease**" means a distinctively numbered equipment schedule that incorporates the terms and conditions of this Master Lease Agreement and lists the Equipment to be leased, the Base Rent, and other terms agreed upon by the parties, together with all Documents relating thereto.

"**Lessor's Assignee**" means a person or entity to whom or which Lessor assigns, sells, grants a security interest in, or otherwise transfers some or all of Lessor's right, title, or interest in or to a Lease or the Equipment.

"**Manufacturer**" means the manufacturer, vendor, or seller of the Equipment or the person or entity from whom or which Lessor acquired the Equipment, as applicable and as the context requires.

"**Notice of Assignment**" means a notice evidencing Lessor's assignment, sale, grant of a security interest in, or other transfer of some or all of Lessor's right, title, or interest in or to a Lease or the Equipment.

"**Renewal Term**" has the meaning given to it in Section 17.

"**Risk Period**" means the period of time beginning on the date Lessor acquires title to the Equipment or the date the Manufacturer ships the Equipment for delivery to Lessee, whichever comes first, and ending at the expiration of the Lease term.

"**Tax**" means a tax, fee, assessment, levy, toll, tariff, charge, penalty, or duty of any kind or nature, including, but not limited to, income, license, title, registration, personal property, sales, use, transfer, value-added, and alternative taxes, together with interest, penalties, fines, and additional amounts relating thereto, imposed, assessed, charged, levied, or collected by or under the authority of any governmental body, excepting only taxes assessed on Lessor's net income.

"**UCC**" means the Uniform Commercial Code as adopted in the jurisdiction set forth in Section 22(M).

**2. LEASE.** Lessor will lease to Lessee, and Lessee will lease from Lessor, the Equipment listed on each Lease. Except as specifically set forth therein, each Lease will incorporate the terms of this Master Lease Agreement. If there is a conflict between the terms of this Master Lease Agreement and the terms of a Lease, the terms of the Lease will control. Each Lease is an independent lease between Lessor and Lessee and is separate and distinct from all other leases, equipment schedules, agreements, arrangements, and understandings between them, whether now existing or hereafter arising, and whether or not incorporating this Master Lease Agreement.

**3. TERM.** The term of a Lease is the Firm Term plus any renewal as provided for herein. A Lease may not be canceled or terminated except as specifically provided for by, and subject to the terms and conditions of, Section 14, Section 17, or Section 20.

**4. RENT, TAXES, AND EXPENSES.** Unless otherwise directed by Lessor or Lessor's Assignee, Lessee will pay Base Rent (i) to Lessor at the address first set forth above, (ii) from the Base Rent Commencement Date until the expiration of the Lease term, and (iii) in advance on the first day of each calendar period specified in the Lease. In addition to Base Rent, Lessee will pay to Lessor an amount equal to 1/30 of Base Rent (or 1/90 of Base Rent if it is payable quarterly) as additional, pro rata rent for each day from the Delivery Date to the Base Rent Commencement Date. Lessee assumes liability for, and will indemnify

and hold Lessor harmless from, all Taxes relating to a Lease or the Equipment. If applicable law requires Lessee to report and remit personal property Taxes relating to a Lease or the Equipment, Lessee will report and remit them to the applicable Tax jurisdiction when and as required, and Lessee will provide Lessor with proof of payment, invoices, and all other Documents relating thereto no later than five days after Lessor's written request. If applicable law requires Lessor to report and remit personal property Taxes relating to a Lease or the Equipment, Lessor will report and remit them to the applicable Tax jurisdiction when and as required, and, upon receipt of an invoice from Lessor, Lessee will reimburse Lessor for all amounts relating thereto on demand. Upon receipt of an invoice from Lessor, Lessee will pay or reimburse Lessor on demand for all other Taxes remitted by Lessor. Lessor may invoice Lessee for Base Rent, Taxes, and other amounts, but Lessor's failure to do so will not in any way relieve or defer Lessee's obligations. LESSEE'S OBLIGATIONS, INCLUDING, BUT NOT LIMITED TO, ITS OBLIGATION TO PAY BASE RENT, TAXES, AND ALL OTHER AMOUNTS, ARE ABSOLUTE, IRREVOCABLE, AND UNCONDITIONAL AND ARE NOT SUBJECT TO DEFENSE, ACTION, SUIT, CLAIM, COUNTERCLAIM, CROSSCLAIM, EXCUSE, FORGIVENESS, ABATEMENT, DEFERMENT, REDUCTION, INTERRUPTION, RECOUPMENT, OR SETOFF FOR ANY REASON, INCLUDING, BUT NOT LIMITED TO, (I) ANY ACTUAL OR ALLEGED OBSOLESCENCE, DAMAGE, DEFECT, FAULT, FLAW, MALFUNCTION, DEFICIENCY, INADEQUACY, INOPERABILITY, OR INFRINGEMENT RELATING TO THE EQUIPMENT, (II) ANY CLAIMS LESSEE HAS OR MIGHT HAVE RELATING TO THE MANUFACTURER'S ACTIONS, DESCRIPTIONS, GUARANTEES, REPRESENTATIONS, OR WARRANTIES, OR (III) ANY BREACH, DEFAULT, TERMINATION, CANCELLATION, OR EXPIRATION UNDER OR OF ANY LICENSE AGREEMENT, SERVICE OR MAINTENANCE CONTRACT, OR OTHER AGREEMENT BETWEEN LESSEE AND ONE OR MORE THIRD PARTIES, WHETHER OR NOT RELATING TO THE EQUIPMENT. Interest on past-due payments and other amounts will accrue at a rate equal to the lesser of 1.5% per month and the highest rate allowed under applicable law and will be payable by Lessee on demand. Each Lease is a net lease. All charges, expenses, and liabilities relating to a Lease and the Equipment will be borne solely by Lessee.

**5. REPRESENTATIONS AND WARRANTIES.** Lessee represents and warrants to Lessor that (i) Lessee's legal name, principal place of business, jurisdiction of organization, jurisdictionally issued identification number, and form of organization are completely and accurately set forth herein, (ii) Lessee is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization, (iii) Lessee is duly qualified to do business as a foreign entity and is in good standing under the laws of each jurisdiction in which the nature of its business requires qualification, including, but not limited to, the jurisdictions in which the Equipment is or will be located, (iv) Lessee has full power and authority to conduct its business as it is now being conducted and to own or use the properties and assets that it purports to own or use, including, but not limited to, the properties at which the Equipment is or will be located, (v) this Master Lease Agreement and each Lease constitutes the legal, valid, and binding obligation of Lessee, enforceable against Lessee in accordance with its terms, (vi) Lessee has the absolute and unrestricted right, power, and authority to execute and deliver this Master Lease Agreement and each Lease and to pay, perform, discharge, and observe all of its promises, agreements, covenants, and obligations, (vii) each individual executing this Master Lease Agreement and each Lease on Lessee's behalf is duly authorized to do so, (viii) Lessee's execution and delivery of this Master Lease Agreement and each Lease, and Lessee's payment, performance, discharge, and observance of its promises, agreements, covenants, and obligations does not and will not breach or violate any provision of applicable law, Lessee's governing documents, or Lessee's existing contracts or authorizations, and (ix) there is no pending or, to Lessee's knowledge, threatened litigation or other proceeding materially affecting Lessee, its assets, or its operations.

**6. FINANCE LEASE.** Lessee acknowledges and agrees that each Lease is a finance lease, that Lessor is not the manufacturer, distributor, supplier, vendor, seller, or licensor of the Equipment (or an agent, partner, or affiliate of these entities), that Lessee selected the Equipment without any assistance or input from Lessor, that Lessor purchased the Equipment to lease it to Lessee, that Lessee has received and approved any supply contract covering the Equipment, that Lessor has informed Lessee of the identity of the supplier, that Lessee is entitled under Article 2A of the UCC to the promises and warranties, including those of any

third party, provided to Lessor by the supplier under any supply contract covering the Equipment, and that Lessee may communicate with the supplier and receive an accurate and complete statement of those promises and warranties, including any disclaimers, limitations, and remedies relating thereto. As used in this paragraph, "finance lease," "supplier," and "supply contract" shall be given the meanings ascribed to them in Article 2A of the UCC.

**7. DISCLAIMER OF LESSOR WARRANTIES.** Lessee represents and warrants to Lessor that the Equipment is suitable for Lessee's purposes. EXCEPT AS SPECIFICALLY SET FORTH HEREIN, LESSOR MAKES NO OPINION, REPRESENTATION, WARRANTY, PROMISE, OR GUARANTEE OF ANY KIND OR NATURE, WHETHER WRITTEN OR ORAL, EXPRESS OR IMPLIED, RELATING TO A LEASE OR THE EQUIPMENT, INCLUDING, BUT NOT LIMITED TO, ANY OPINION, REPRESENTATION, WARRANTY, PROMISE, OR GUARANTEE OF QUALITY, WORKMANSHIP, DESIGN, CONFIGURATION, STYLE, CONDITION, FUNCTIONALITY, PERFORMANCE, OPERATION, CAPABILITY, CAPACITY, POWER, SIZE, RANGE, DURABILITY, USEFUL LIFE, ECONOMIC LIFE, EXISTENCE, DELIVERY, INSURABILITY, UTILITY, SUITABILITY, VALUE, NEWNESS, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INTERFERENCE BY THIRD PARTIES, NON-INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS, LICENSE OR CERTIFICATION REQUIREMENTS, TAX OR ACCOUNTING IMPLICATIONS, OR LEGAL OR REGULATORY COMPLIANCE, AND LESSEE ACKNOWLEDGES AND AGREES THAT LESSOR HAS NOT MADE THE SAME. Lessee further acknowledges and agrees that Lessor has not provided or offered to provide any model or sample of the Equipment to Lessee. Lessor disclaims, and Lessee waives the enforceability and effectiveness of, all existing and hereafter arising laws and regulations (as the same may be amended, supplemented, or interpreted from time to time) that impose or purport to impose warranties that are not specifically provided for herein, including, but not limited to, Sections 211-213 of Article 2A of the UCC, and Lessee agrees that it will not pursue claims relating thereto or attempt to enforce the same. LESSOR LEASES THE EQUIPMENT TO LESSEE "AS IS" AND "WITH ALL FAULTS." If Lessee pursues or attempts to pursue claims relating to the Equipment or the Manufacturer, including, but not limited to, claims that the equipment is obsolete, damaged, defective, faulty, flawed, malfunctioning, deficient, incomplete, inadequate, substandard, unsatisfactory, inoperable, or infringes any intellectual property rights, or claims relating to the Manufacturer's actions, descriptions, guarantees, representations, or warranties, Lessee agrees that it will pursue the claims solely and directly against the Manufacturer. Under no circumstances will Lessor be liable to Lessee for lost profits or special, indirect, incidental, consequential, or punitive damages.

**8. MANUFACTURER WARRANTIES.** Provided no Event of Default has occurred and is occurring, and subject to applicable law and the Manufacturer's restrictions on transfer, Lessee will be the beneficiary of, and entitled to, all opinions, representations, warranties, promises, and guarantees provided by the Manufacturer relating to the Equipment.

**9. USE, MAINTENANCE, ADDITIONS, AND INSPECTIONS.** Except for laptops, Lessee may not move the Equipment from the location set forth in the Lease without Lessor's prior written consent. Lessee may not move any Equipment outside the continental United States. Only authorized employees of Lessee may use the Equipment, and Lessee agrees that these employees are and will be qualified, licensed, and certified to use the Equipment pursuant to applicable law, insurance policy requirements, Lessee's internal policies, and the Manufacturer's recommendations and requirements. Lessee will use the Equipment only for its intended purposes in the course of Lessee's business operations, and not for consumer, family, household, or personal purposes. Lessee will use the Equipment in compliance with applicable law, all insurance policies, and the Manufacturer's recommendations and requirements. Lessee will keep and maintain the Equipment in its original condition (ordinary wear and tear from proper use excepted), in good working order, capable of performing all functions that it was intended to and could perform when delivered to Lessee, and free from latent and patent damage, flaws, and defects. Lessee will not neglect or abandon the Equipment, and Lessee will not expose the Equipment to harsh, abrasive, inclement, severe, hazardous, or unsafe conditions. Lessee will, directly or indirectly, service, repair, overhaul, tune, fix, restore, refurbish, refit, rebuild, recondition, reinstall, and reconstruct the Equipment as needed to comply with the terms hereof. Lessee will obtain and maintain from the Manufacturer or a third party reasonably

acceptable to Lessor extended warranty coverage and a service and maintenance contract covering the Equipment, each in form and substance satisfactory to Lessor in its sole and absolute discretion. Lessee will provide copies of these coverages to Lessor on demand. Lessee will maintain clear, understandable, and up-to-date use and maintenance records on the Equipment. Lessee may not make or allow any Addition to be made to the Equipment unless the Addition does not and will not cause the quality, condition, functionality, performance, capacity, power, size, range, durability, expected life, utility, or value of the Equipment to decrease or decline and either the Equipment can be restored to its original condition (ordinary wear and tear from proper use excepted) with minimal time and expense or the Addition is required by applicable law or by the Manufacturer or a third party reasonably acceptable to Lessor for service and maintenance eligibility and is free of all Encumbrances except those created by Lessor or Lessor's Assignee. Lessee will provide Lessor with prior written notice of any proposed Addition, and Lessor's receipt or acknowledgement of this notice is not and will not be deemed to be a waiver of Lessor's rights or an acknowledgement or agreement that the proposed Addition is a permitted Addition. Upon Lessor's request, Lessee will provide Lessor with information relating to the condition, performance, location, use, and maintenance of the Equipment. Subject to Lessee's reasonable security requirements, and upon not less than 24 hours prior notice to Lessee, Lessor or any person or entity designated by Lessor may enter upon the premises where the Equipment is located and inspect the Equipment and review and copy all Documents relating thereto.

**10. QUIET ENJOYMENT.** Provided no Event of Default has occurred and is occurring, Lessor will not interfere with Lessee's use, possession, or quiet enjoyment of the Equipment.

**11. TITLE.** Lessee acknowledges and agrees that it has no right, title, or interest in or to the Equipment except the limited right to use the Equipment pursuant to the terms and conditions set forth herein. The Equipment is and at all times will remain the personal property of Lessor. Lessee may not attach, affix, fasten, connect, append, join, install, incorporate, or secure the Equipment to real property or otherwise cause or allow the Equipment to become a fixture or an accession under applicable law. At Lessor's request, Lessee will obtain an executed landlord waiver or other written acknowledgement from the owner, landlord, or mortgagee of the premises where the Equipment is located, each in form and substance satisfactory to Lessor in its sole and absolute discretion. Lessee will protect and defend Lessor's right, title, and interest in and to the Equipment, and Lessee will immediately notify Lessor in writing of any pending or threatened claim relating thereto. Lessee will keep the Equipment free of all Encumbrances except those created by Lessor or Lessor's Assignee. Lessee will prominently affix and maintain on the Equipment all labels, plates, tags, decals, stickers, and other markings requested by Lessor, including, but not limited to, those indicating that Lessor is the owner of the Equipment. Lessee acknowledges and agrees that it has no right, title, or interest in or to any software included in the Equipment except the limited right to use the software pursuant to the terms of a license agreement or other arrangement between Lessee and the licensor, which Lessee will obtain and maintain at its sole cost and expense. Lessee may not encumber, assign, transfer, sell, amend, supplement, or terminate any license agreement or other arrangement covering software included in the Equipment without Lessor's prior written consent.

**12. UCC FILINGS.** To secure the payment, performance, discharge, and observance of Lessee's promises, agreements, covenants, and obligations, Lessee grants to Lessor a first-priority security interest in and to the Equipment and the proceeds thereof. Lessee absolutely, irrevocably, and unconditionally authorizes Lessor to prepare, execute, endorse, file, and record, on its own behalf and as Lessee's agent and attorney-in-fact, all UCC financing statements and other Documents deemed necessary or desirable by Lessor to protect its right, title, and interest in and to a Lease and the Equipment. Lessee ratifies, confirms, and approves all actions taken by Lessor in furtherance of the foregoing before the date of a Lease. Lessee may not prepare, execute, endorse, file, or record any correction or termination statement relating to any UCC financing statement or other Document covering a Lease or the Equipment. Lessee may not change its legal name, principal place of business, jurisdiction of organization, jurisdictionally issued organization number, or form of organization unless it has provided Lessor with at least one month prior written notice. Notwithstanding the foregoing provisions of this paragraph, Lessor and Lessee agree that each Lease is a true lease and not a lease intended as security. The security interest

granted herein, together with the rights and obligations relating thereto, is made on a precautionary basis only.

**13. DOCUMENTATION.** Lessor may insert and revise dates, serial numbers, and other information in any Document it deems necessary or desirable to complete or correct Lease documentation. Lessee will, promptly after Lessor's request, obtain, execute, and deliver to Lessor an incumbency certificate, good standing certificate, secretary's certificate, insurance certificate, Acceptance Certificate, and other Documents relating to a Lease or the Equipment that Lessor deems necessary or desirable, each in form and substance satisfactory to Lessor in its sole and absolute discretion. Lessee acknowledges and agrees that Lessor's receipt of these items is a condition precedent to Lessor's payment of the Equipment purchase price to the Manufacturer.

**14. RISK OF LOSS.** Lessee assumes all risks of loss and damage to the Equipment during the Risk Period. If some or all of the Equipment incurs an Event of Loss during the Risk Period then Lessee will immediately notify Lessor in writing. On the next-scheduled Base Rent payment date, Lessee will, at Lessor's option, (i) replace the Equipment with like-kind Equipment of equal or greater quality, condition, functionality, performance, capacity, power, size, range, durability, expected life, utility, and value that is acceptable to Lessor in its sole and absolute discretion, free of all Encumbrances except those created by Lessor or Lessor's Assignee, and continue to pay Base Rent, Taxes, and all other amounts without interruption, or (ii) pay to Lessor the Casualty Value. Upon Lessor's receipt of the Casualty Value, Base Rent, Taxes, and all other amounts will cease accruing, the Lease will terminate automatically, and Lessee will own and be responsible for the Equipment, in each case only with respect to the Equipment subject to the Event of Loss. Insurance proceeds received by Lessor relating to an Event of Loss will be applied to reimburse Lessee for the purchase of replacement Equipment or reduce Lessee's obligation to pay the Casualty Value, with the balance, if any, being retained by Lessor.

**15. INSURANCE.** Lessee will obtain and maintain during the Risk Period (i) all risk property insurance covering the Equipment in an amount acceptable to Lessor and Lessor's Assignee, but in no event less than the Casualty Value, and naming Lessor and Lessor's Assignee as lender's loss payees, and (ii) comprehensive public liability insurance relating to the Lease and the Equipment in an amount acceptable to Lessor and Lessor's Assignee, but in no event less than $2,000,000 per occurrence, and naming Lessor and Lessor's Assignee as additional insureds. Lessee will obtain and maintain these coverages from one or more nationally recognized, reputable insurance companies acceptable to Lessor and Lessor's Assignee in their absolute discretion. Each policy will provide that it may not be cancelled or materially modified without one month prior written notice to Lessor and Lessor's Assignee and that it may not be cancelled or invalidated by any Lessee action or inaction. Lessee will deliver or cause to be delivered to Lessor and Lessor's Assignee certificates evidencing the coverages required herein and, before the expiration thereof, each renewal and replacement relating thereto. Lessee absolutely, irrevocably, and unconditionally authorizes each of Lessor and Lessor's Assignee to prepare, execute, endorse, file, and record, on its own behalf and as Lessee's agent and attorney-in-fact, all Documents deemed necessary or desirable by such parties or the insurance providers to make claim for, receive, and collect payments under the policies obtained and maintained pursuant to this paragraph.

**16. ASSIGNMENT BY LESSOR.** Lessor may assign, sell, grant a security interest in, and otherwise transfer some or all of its right, title, and interest in and to a Lease and the Equipment without notice to or the consent of Lessee. Lessee will, promptly after the request of Lessor or Lessor's Assignee, obtain, execute, and deliver to such parties a Notice of Assignment and all other Documents that Lessor and Lessor's Assignee deem necessary or desirable, each in form and substance satisfactory to Lessor and Lessor's Assignee in their absolute discretion. Lessee acknowledges and agrees that Lessor's Assignee will not assume any of Lessor's obligations except those specifically set forth in the Notice of Assignment. Lessee agrees that it will not assert against Lessor's Assignee any defense or claim that Lessee has against Lessor. **LESSEE WILL PAY ALL ASSIGNED, SOLD, ENCUMBERED, AND OTHERWISE TRANSFERRED AMOUNTS AS DIRECTED BY LESSOR OR LESSOR'S ASSIGNEE, AND LESSEE ACKNOWLEDGES AND AGREES THAT ITS OBLIGATION TO DO SO IS ABSOLUTE, IRREVOCABLE, AND UNCONDITIONAL AND IS NOT SUBJECT TO DEFENSE, ACTION, SUIT, CLAIM, COUNTERCLAIM, CROSSCLAIM, EXCUSE, FORGIVENESS, ABATEMENT, DEFERMENT, REDUCTION,**

INTERRUPTION, RECOUPMENT, OR SETOFF FOR ANY REASON, INCLUDING, BUT NOT LIMITED TO, (I) ANY ACTUAL OR ALLEGED OBSOLESCENCE, DAMAGE, DEFECT, FAULT, FLAW, MALFUNCTION, DEFICIENCY, INADEQUACY, INOPERABILITY, OR INFRINGEMENT RELATING TO THE EQUIPMENT, (II) ANY CLAIMS LESSEE HAS OR MIGHT HAVE RELATING TO THE MANUFACTURER'S ACTIONS, DESCRIPTIONS, GUARANTEES, REPRESENTATIONS, OR WARRANTIES, OR (III) ANY BREACH, DEFAULT, TERMINATION, CANCELLATION, OR EXPIRATION UNDER OR OF ANY LICENSE AGREEMENT, SERVICE OR MAINTENANCE CONTRACT, OR OTHER AGREEMENT BETWEEN LESSEE AND ONE OR MORE THIRD PARTIES, WHETHER OR NOT RELATING TO THE EQUIPMENT.

**17. END-OF-TERM OPTIONS AND REQUIREMENTS.**

**(A) RETURN.** Lessee may return all, but not less than all, of the Equipment at the expiration of the Firm Term, provided that (i) no Event of Default has occurred and is occurring on the required return date, (ii) Lessee has provided at least three months, but not more than four months, written notice to Lessor of Lessee's intent to return the Equipment pursuant to this paragraph, and (iii) all the other terms and conditions in this paragraph are performed as required. Upon Lessor's receipt of the notice referred to in this paragraph, Lessor or any person or entity designated by Lessor may, upon not less than 24 hours prior notice to Lessee, enter upon the premises where the Equipment is located and inspect, audit, appraise, test, and demonstrate the Equipment. At or before the expiration of the Firm Term, Lessee will cease all use of the Equipment and return all, but not less than all, of the Equipment, together with all Documents originally furnished therewith and otherwise relating thereto, to a location within the continental United States designated by Lessor. Upon receipt of the Equipment, Lessor or any person or entity designated by Lessor may inspect, audit, appraise, and test the Equipment. Lessee must return the Equipment in Eligible Condition and in compliance with the terms of the Manufacturer's recommendations and Lessor's general and asset-specific return instructions. If the Equipment is timely received by Lessor but is not in Eligible Condition, Lessee will pay the Lessor the lesser of the Casualty Value applicable at the expiration of the Firm Term and the amount determined by Lessor as necessary to bring the Equipment to Eligible Condition.

**(B) PURCHASE.** Lessee may purchase all, but not less than all, of the Equipment from Lessor at the expiration of the Firm Term, provided that (i) no Event of Default has occurred and is occurring on the required purchase date, and (ii) Lessee has provided at least three months, but not more than four months, written notice to Lessor of Lessee's intent to purchase the Equipment pursuant to this paragraph. The purchase price will be Fair Market Value and will be paid by Lessee to Lessor concurrently with the expiration of the Firm Term. As used in this paragraph, "**Fair Market Value**" means the value obtained in an arm's-length transaction between an informed and willing end-user buyer and an informed and willing seller under no compulsion to sell, valued as if the Equipment is in Eligible Condition and fully installed, without reduction for its actual condition or delivery, removal, storage, or other expenses, plus applicable Taxes; provided that, regardless of the condition of the Equipment or any other circumstance, "**Fair Market Value**" may not be less than the Casualty Value applicable at the expiration of the Firm Term. **THE PURCHASE AND SALE WILL BE "AS IS," "WHERE IS," AND WITHOUT OPINION, REPRESENTATION, WARRANTY, PROMISE, OR GUARANTEE OF ANY KIND OR NATURE, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY OPINION, REPRESENTATION, WARRANTY, PROMISE, OR GUARANTEE OF QUALITY, WORKMANSHIP, DESIGN, CONFIGURATION, STYLE, CONDITION, FUNCTIONALITY, PERFORMANCE, OPERATION, CAPABILITY, CAPACITY, POWER, SIZE, RANGE, DURABILITY, USEFUL LIFE, ECONOMIC LIFE, EXISTENCE, DELIVERY, INSURABILITY, UTILITY, SUITABILITY, VALUE, NEWNESS, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INTERFERENCE BY THIRD PARTIES, NON-INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS, LICENSE OR CERTIFICATION REQUIREMENTS, TAX OR ACCOUNTING IMPLICATIONS, OR LEGAL OR REGULATORY COMPLIANCE.** Title will pass to Lessee immediately upon Lessee's payment of all amounts due hereunder and without any other action required of Lessee or Lessor.

**(C) RENEWAL TERMS.** If Lessee does not properly elect an option set forth in subsection (A) or (B) above, or if Lessee does not timely perform any obligation required of it after any proper election, the Firm Term will renew automatically, without any action required of Lessor or Lessee, in successive three-month periods (each a "**Renewal Term**"). Base Rent, Taxes, and all other amounts due or payable during a Renewal Term will be the same as were effective during the Firm Term, and all other terms and conditions set forth herein will continue to apply without change, except that references to the expiration of the Firm Term in Lessee's return and purchase options in subsections (A) and (B) above will mean the expiration of each Renewal Term.

**18. FURTHER ASSURANCES; FINANCIAL STATEMENTS.** Lessee will take additional actions and obtain, execute, and deliver all Documents deemed necessary or desirable by Lessor or Lessor's Assignee to complete and evidence the transactions contemplated hereby, to facilitate, assure, and confirm the payment, performance, discharge, and observance of Lessee's promises, agreements, covenants, and obligations, and to protect and defend the right, title, and interest of Lessor and Lessor's Assignee in and to a Lease and the Equipment. Lessee represents, warrants, and certifies to Lessor that Lessee has delivered to Lessor audited financial statements for Lessee's two most recent fiscal years and the most recent stub or interim periods, all of which have been prepared in accordance with GAAP and are complete and accurate in all material respects. Lessee will deliver to Lessor copies of (i) audited annual financial statements of Lessee no later than four months after the end of each of Lessee's fiscal years and (ii) internally prepared quarterly financial statements of Lessee no later than two months after the end of each of Lessee's fiscal quarters. Lessee agrees that the foregoing will be prepared in accordance with GAAP and will be complete and accurate in all material respects.

**19. DEFAULT.** The occurrence of any of the following is an Event of Default: (i) Lessee fails to pay Base Rent, Taxes, or other amount when due and the failure continues for five days, (ii) Lessee fails to obtain and maintain the insurance coverages required herein, or Lessee fails to provide Lessor or Lessor's Assignee with evidence of the insurance coverages required herein within five days of a request therefor, (iii) Lessee fails to perform, discharge, or observe any other promise, agreement, covenant, or obligation and the failure continues for ten days, (iv) any Document, information, representation, or warranty provided by Lessee proves to be inaccurate or incomplete in any material respect, (v) Lessee assigns, sells, grants a security interest in, or otherwise transfers, or attempts to assign, sell, grant a security interest in, or otherwise transfer, some or all of its interest in or to a Lease or the Equipment, (vi) any license agreement or other arrangement relating to software included in the Equipment is terminated, (vii) Lessee dissolves, cancels, or terminates, or attempts to dissolve, cancel, or terminate, its existence under its jurisdiction of organization, (viii) Lessee becomes a party to or the subject of any liquidation, asset sale, merger, consolidation, business combination, equity sale, equity issuance, convertible debt issuance, recapitalization, buyout, change in ownership, or change in control without Lessor's prior written consent, (ix) Lessee fails to timely replace, at least one month before its expiration, any letter of credit or other collateral relating to a Lease or the Equipment, (x) a material adverse change occurs in the business, prospects, operations, assets, liabilities, or financial condition of Lessee, (xi) Lessee admits in writing its inability or unwillingness to pay its debts as they become due, Lessee makes an assignment for the benefit of its creditors, or Lessee files a petition or takes action under any bankruptcy, insolvency, reorganization, moratorium, or similar law relating to or limiting creditors' rights, (xii) Lessee becomes a party to or the subject of an involuntary action under any bankruptcy, insolvency, reorganization, moratorium, or similar law relating to or limiting creditors' rights that is not dismissed within 60 days of its commencement, or (xiii) the death or permanent disability of Lessee, if Lessee is an individual. It is also an Event of Default if a Guarantor becomes a party to or the subject of any event or occurrence described in subsections (vii) through (xiii) above.

**20. REMEDIES.** Lessor may exercise one or more of the following remedies upon an Event of Default: (i) cure the Event of Default on Lessee's behalf and recover from Lessee all amounts incurred by Lessor relating thereto, (ii) enforce specific performance of Lessee's promises, agreements, covenants, and obligations in an action in equity or recover damages relating to Lessee's breach thereof in an action at law, (iii) terminate or cancel a Lease and Lessee's rights, but not its obligations, relating thereto, (iv) recover from Lessee all accrued and unpaid amounts, (v) recover from Lessee, as liquidated damages for loss of

bargain and not as a penalty, the present value of all amounts to be paid by Lessee for the remainder of the Firm Term, or any successive period then in effect, discounted at the rate of 2% per annum, which amount will become immediately due and payable, (vi) demand that Lessee return the Equipment in strict compliance with the terms hereof, (vii) directly or indirectly enter upon the premises where the Equipment is located and take possession of the Equipment free from all Encumbrances except those created by Lessor or Lessor's Assignee, all without judicial process or liability to Lessor and its agents, (viii) assign, sell, grant a security interest in, or otherwise transfer the Equipment at public or private sale, (ix) hold, use, lease, or dispose of the Equipment, (x) recover from Lessee the present value of the amount attributable in Lessor's sole and absolute discretion to its residual interest in the Equipment at the expiration of the Firm Term, or any successive period then in effect, discounted at the rate of 2% per annum, which amount will become immediately due and payable, if Lessor does not receive or repossess the Equipment in Eligible Condition, (xi) recover from Lessee all amounts incurred by Lessor in enforcing its rights and remedies hereunder, including, but not limited to, Lessor's repossession costs, transportation costs, storage costs, insurance costs, repair and maintenance costs, appraisal costs, remarketing costs and commissions, disposal costs, filing fees, reasonable attorneys' fees, and reasonable internal costs, and (xii) exercise all other rights and remedies available under applicable law. Interest on unpaid amounts recoverable under this paragraph will accrue at a rate equal to the lesser of 1.5% per month and the highest rate allowed under applicable law until paid in full. Lessor will use commercially reasonable efforts to mitigate its damages. Lessor will apply cash proceeds from the sale or lease of repossessed Equipment, net of the amount calculated in subsection (x) above, to Lessee's obligations under the Lease. Notwithstanding the foregoing sentence, Lessee will continue to be liable to Lessor for any deficiency and Lessor will retain any surplus. Lessor is not obligated to give preference to the sale or lease of repossessed Equipment over the sale or lease of similar equipment owned or leased by Lessor. Lessor's rights and remedies are cumulative and not exclusive or alternative. Lessee acknowledges and agrees that no failure to exercise, delay in exercising, or partial exercise of any right, remedy, or power by Lessor under a Lease will operate as a waiver of that right, remedy, or power, or will preclude further or subsequent exercise of that or another right, remedy, or power. Lessee further acknowledges and agrees that, notwithstanding industry practice or Lessor's oral communications, actions, inactions, course of performance, or course of dealing, no waiver given by Lessor will be effective unless it is in writing and executed by an authorized representative of Lessor and no eligible waiver will be effective except for the specific instance for which it is given.

**21. INDEMNIFICATION.** Lessee assumes liability for, will indemnify, defend, and hold Lessor harmless from, and will reimburse Lessor for all claims, losses, liabilities, damages, and expenses (including, but not limited to, reasonable attorneys' fees) of any kind or nature, whenever and however arising, and whether or not involving a third-party claim, relating to a Lease or the Equipment, including, but not limited to, losses and claims relating to (i) an Event of Default, (ii) an Event of Loss, (iii) Lessor's ownership of the Equipment, (iv) the selection, ordering, manufacturing, configuration, design, quality, condition, functionality, licensing, lease, delivery, assembly, installation, acceptance, rejection, purchase, acquisition, use, operation, performance, possession, storage, repair, service, maintenance, deinstallation, return, repossession, remarketing, or disposal of the Equipment, (v) the terms of all purchase orders, invoices, terms and conditions, supply contracts, bills of sale, subordination letters, landlord waivers, or other Documents relating to a Lease or the Equipment that impose or purport to impose obligations or liabilities on Lessor, (vi) patent, trademark, copyright, or other intellectual property infringement, (vii) the effectiveness or enforceability of a Lease or any provision herein, (viii) Taxes, or (ix) the tax, accounting, or legal benefits Lessor is or might be entitled to as the owner of the Equipment, in each case excepting loss caused directly by Lessor's gross negligence and willful misconduct. As used in this paragraph "Lessor" means Lessor, Lessor's Assignee, and their respective stockholders, members, partners, directors, managers, officers, employees, and agents.

**22. MISCELLANEOUS.**

**(A)** Except as specifically provided for herein, each party will bear its own expenses relating to the payment, performance, discharge, and observance of its promises, agreements, covenants, and obligations.

**(B)** Lessee will comply with applicable law during the term of each Lease. Lessee's representations and warranties will be reaffirmed with Lessee's execution of each Lease and Acceptance Certificate. Lessee acknowledges and agrees that its representations and warranties are a material inducement to Lessor and that Lessor would not enter into a Lease without them.

**(C)** Lessee assigns, transfers, and delegates to Lessor, and Lessor accepts and assumes from Lessee, (i) all of Lessee's rights under the Documents between Lessee and the Manufacturer relating to the Equipment, including, but not limited to, the warranties and indemnities provided by the Manufacturer, and (ii) Lessee's obligation to pay the purchase price for the Equipment set forth in these Documents, subject to Lessor's receipt of a duly executed Lease, Acceptance Certificate, and other Documents deemed necessary or desirable by Lessor. Notwithstanding any other provision of this paragraph, Lessee will remain liable to the Manufacturer for the full payment, performance, discharge, and observance of all other promises, agreements, covenants, and obligations set forth in these Documents.

**(D)** Lessee's representations, warranties, indemnities, and unperformed obligations will survive the expiration of the Lease term.

**(E)** Time is of the essence relating to all dates and time periods herein.

**(F)** The captions and headings of sections, subsections, paragraphs, and subparagraphs are provided for convenience only and will not affect the construction or interpretation of the provisions herein.

**(G)** Each Lease supersedes all prior discussions, negotiations, agreements, and understandings, whether written or oral, between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.

**(H)** The parties and their respective counsel have had the opportunity to review and negotiate the terms hereof. Neither party will be deemed to be the drafting party if any part or provision hereof is found to be ambiguous by a court of competent jurisdiction.

**(I)** If any part or provision of a Lease is found to be invalid or unenforceable by a court of competent jurisdiction then the remaining parts and provisions will remain in full force and effect and the court will interpret and construe the Lease to give maximum effect to the parties' original intent.

**(J) LESSEE WAIVES THE ENFORCEABILITY AND EFFECTIVENESS OF ALL EXISTING AND HEREAFTER ARISING LAWS AND REGULATIONS (AS THE SAME MAY BE AMENDED, SUPPLEMENTED, OR INTERPRETED FROM TIME TO TIME) THAT RENDER OR PURPORT TO RENDER SOME OR ALL OF A LEASE VOID OR UNENFORCEABLE OR THAT GRANT OR PURPORT TO GRANT LESSEE RIGHTS, REMEDIES, OR CLAIMS RELATING TO A LEASE OR THE EQUIPMENT THAT ARE NOT SPECIFICALLY PROVIDED FOR HEREIN, INCLUDING, BUT NOT LIMITED TO, SECTIONS 508-522 OF ARTICLE 2A OF THE UCC AND ALL LAWS AND REGULATIONS REGULATING OR PURPORTING TO REGULATE AUTOMATIC RENEWAL, NOTICE OF TERMINATION, EVERGREEN, AND NEGATIVE OPTION PROVISIONS, AND LESSEE AGREES THAT IT WILL NOT PURSUE CLAIMS RELATING THERETO OR ATTEMPT TO ENFORCE THE SAME.**

**(K)** Notwithstanding industry practice or any oral communication, action, inaction, course of performance, or course of dealing, no amendment of or supplement to the terms of this Master Lease Agreement or a Lease will be effective unless it is in writing and executed by authorized representatives of the parties.

**(L)** All Lessee notices, consents, and other communications required or permitted hereunder will be in writing and deemed delivered in (i) three business days if sent via certified mail, return receipt requested or (ii) one business day if sent via a nationally recognized overnight courier service, in each case to Lessor's principal place of business set forth herein or another address designated by Lessor.

**(M)** This Master Lease Agreement and each Lease will be governed by and construed under the laws of the State of Ohio without regard to

conflict-of-law principles that would require the application of any other law. Any litigation or other proceeding brought by Lessee relating to a Lease or the Equipment must be brought in the state or federal courts located in Hamilton County, Ohio. Lessee submits to the nonexclusive jurisdiction of these courts (and, upon signing a Notice of Assignment, the state and federal courts located in the county in which Lessor's Assignee maintains its principal place of business) and waives all existing and hereafter arising objections to venue and convenience of forum relating to the courts referred to in this paragraph. **EACH PARTY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY LITIGATION OR OTHER PROCEEDING RELATING TO A LEASE OR THE EQUIPMENT.** Lessee waives its right to bring claims against Lessor relating to a Lease or the Equipment one year or more after the claims arise.

**(N)** This Master Lease Agreement and each Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy, and all of which, when taken together, will be deemed to constitute one and the same Document. To the extent that a Lease constitutes "chattel paper" under the UCC, no security in the Lease may be created in any Document other than the one marked "Original" or "Counterpart No. 1."

IN WITNESS WHEREOF, the undersigned have executed the foregoing effective as of the date first set forth above.

Summit Funding Group, Inc.

By: _____
Name: _____
       Patricia A. Neff
Title: _____
       Assistant Vice President

Los Paisanos Autobuses, Inc.

By: _____
Name: _____
Title: _____

# EXHIBIT M

*Counterpart No. 1 of 2*

**Equipment Schedule**
**No. 001**

This Equipment Schedule ("**Lease**") is entered into February 24, 2017, between the following parties:

**"Lessor"**

Summit Funding Group, Inc.
4680 Parkway Drive, Suite 300
Mason, Ohio 45040
State of Organization: Delaware
Form of Organization: Corporation
State-Issued Identification Number: 2███5

**"Lessee"**

Los Paisanos Autobuses, Inc.
6767 Gateway Boulevard West
El Paso, TX 79925
State of Organization: Texas
Form of Organization: Corporation
State-Issued Identification Number: ███████0
Federal Tax ID #:███████0

The parties agree as follows:

A.    The terms of Master Lease Agreement No. 2665 dated February 24, 2017, between Lessor and Lessee ("**Master Lease Agreement**") are incorporated in this Lease as if fully set forth herein.

B.    Lessee certifies that all of Lessee's representations and warranties set forth herein and in the Master Lease Agreement are complete and accurate as of the date hereof.

C.    Lessor will lease to Lessee, and Lessee will lease from Lessor, the Equipment listed on Schedule A attached hereto, which is incorporated in this Lease as if fully set forth herein.

D.    Words and phrases capitalized but not defined herein will be given the meanings ascribed to them in the Master Lease Agreement. Consistent with the foregoing, Delivery Date, Base Rent Commencement Date, Base Rent, Firm Term, and Casualty Value will be given the following, more specific meanings:

| | |
|---|---|
| Total Equipment Cost: | $546,388.00 |
| Initial Payment: | $ 20,000.00 |
| Financed Equipment Cost: | $526,388.00 |
| Delivery Date: | As set forth in the Acceptance Certificate(s) |
| Base Rent Commencement Date: | MARCH 1, 2017 |
| Base Rent: | $8,726.99 (does not include Taxes or other charges) |
| Firm Term: | The period of time beginning on the Delivery Date and ending upon the expiration of 72 full consecutive calendar months from and after the Base Rent Commencement Date. |
| Casualty Value: | The applicable stipulated loss value or casualty value of the Equipment specified in Schedule B attached hereto, which is incorporated in this Lease as if fully set forth herein, together with all accrued and unpaid amounts due and owing when Lessee pays the same. |

E.    Unless otherwise directed by Lessor or Lessor's Assignee, or in the Event of Default, Lessee will pay to the Lessor at the address first set forth in the Master Lease Agreement: (i) the Initial Payment due upon receipt of this signed Lease, and (ii) the Base Rent on the Base Rent Commencement Date and then on the first date of each subsequent calendar month following the Base Rent Commencement Date in advance until the expiration of the Firm Term.

F.    To the extent that this Lease constitutes "chattel paper" under the UCC, no security interest may be created in any Document other than the one marked "Original" or "Counterpart No. 1."

G.    For purposes of this Lease only, Section 17 of the Master Lease Agreement is hereby deleted in its entirety and replaced with the following:

Lessee will purchase all, but not less than all, of the Equipment from Lessor at the expiration of the Firm Term. The purchase price will be $1.00 plus applicable Taxes. **THE PURCHASE AND SALE WILL BE "AS IS," "WHERE IS," AND WITHOUT OPINION, REPRESENTATION, WARRANTY, PROMISE, OR GUARANTEE OF ANY KIND OR NATURE, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY OPINION, REPRESENTATION, WARRANTY, PROMISE, OR GUARANTEE OF QUALITY, WORKMANSHIP, DESIGN, CONFIGURATION, STYLE, CONDITION, FUNCTIONALITY, PERFORMANCE, OPERATION, CAPABILITY, CAPACITY, POWER, SIZE, RANGE, DURABILITY, USEFUL LIFE, ECONOMIC LIFE, EXISTENCE, DELIVERY, INSURABILITY, UTILITY, SUITABILITY, VALUE, NEWNESS, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INTERFERENCE BY THIRD PARTIES, NON-INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS, LICENSE OR**

**CERTIFICATION REQUIREMENTS, TAX OR ACCOUNTING IMPLICATIONS, OR LEGAL OR REGULATORY COMPLIANCE.** Title will pass to Lessee immediately upon Lessee's payment of all amounts due hereunder and without any other action required of Lessee or Lessor.

IN WITNESS WHEREOF, the undersigned have executed this Lease effective as of the date first set forth above.

Summit Funding Group, Inc.

By: _____

Name: _____**Patricia A. Neff**_____

Title: _____**Assistant Vice President**_____

Los Paisanos Autobuses, Inc.

By: _____

Name: _____ _VRISE CHANIEH_ _____

Title: _____ _Pundit_ _____

SCHEDULE A

| Lease Number | VIN # | PO Number | Desc | Manufacturer | Model | Feature | Vendor Inv # | C of A | Cost | Soft Cost | Total Cost | Rent | Street | City | State | Zip |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LPAUTO001 | YE2XC82B7H3049201 | | COACH | VANHOOL | CX45L | 2017 VANHOOL CX45 COACH – VIN #YE2XC82B7H3049201 – DETROIT DIESEL DD13 EPA 2016 ENGINE - ALLISON B500 G5 TRANSMISSION | dated 2/22/17 | 001 | $546,388.00 | $0.00 | $546,388.00 | $9,058.57 | 6767 Gateway Boulevard West | El Paso | TX | 79925 |

|  |  |  |  |
|---|---|---|---|
| | $546,388.00 | $0.00 | $546,388.00 | $9,058.57 |
| INITIAL PAYMENT: | | $ (20,000.00) | $-331.58 |
| | | $526,388.00 | $8,726.99 |

1

ORIGINAL

Schedule B

Casualty Value Table

Equipment Schedule No. 001 dated February 24, 2017
Incorporating Master Lease Agreement No. 2665 dated February 24, 2017

The stipulated loss value or casualty value of the Equipment is equal to the product of the Casualty Base set forth below and the applicable Casualty Value Percentage set forth in the following table (together with all accrued and unpaid amounts due and owing when Lessee pays the same):

| After Payment of Base Rent for Month | Casualty Value Percentage | After Payment of Base Rent for Month | Casualty Value Percentage | After Payment of Base Rent for Month | Casualty Value Percentage | After Payment of Base Rent for Month | Casualty Value Percentage |
|---|---|---|---|---|---|---|---|
| 0 | 115.00% | -- | -- | -- | -- | -- | -- |
| 1 | 111.34% | 21 | 83.05% | 41 | 52.48% | 61 | 19.44% |
| 2 | 109.98% | 22 | 81.58% | 42 | 50.89% | 62 | 17.72% |
| 3 | 108.61% | 23 | 80.10% | 43 | 49.29% | 63 | 16.00% |
| 4 | 107.23% | 24 | 78.61% | 44 | 47.69% | 64 | 14.26% |
| 5 | 105.85% | 25 | 77.12% | 45 | 46.08% | 65 | 12.52% |
| 6 | 104.47% | 26 | 75.63% | 46 | 44.46% | 66 | 10.77% |
| 7 | 103.08% | 27 | 74.13% | 47 | 42.84% | 67 | 9.02% |
| 8 | 101.68% | 28 | 72.62% | 48 | 41.21% | 68 | 7.26% |
| 9 | 100.28% | 29 | 71.11% | 49 | 39.58% | 69 | 5.49% |
| 10 | 98.88% | 30 | 69.59% | 50 | 37.93% | 70 | 3.71% |
| 11 | 97.47% | 31 | 68.06% | 51 | 36.29% | 71 | 1.93% |
| 12 | 96.05% | 32 | 66.53% | 52 | 34.63% | 72 and thereafter | 0.00% |
| 13 | 94.63% | 33 | 64.99% | 53 | 32.97% | | |
| 14 | 93.20% | 34 | 63.45% | 54 | 31.30% | | |
| 15 | 91.77% | 35 | 61.90% | 55 | 29.63% | | |
| 16 | 90.33% | 36 | 60.35% | 56 | 27.95% | | |
| 17 | 88.88% | 37 | 58.79% | 57 | 26.26% | | |
| 18 | 87.43% | 38 | 57.22% | 58 | 24.57% | | |
| 19 | 85.98% | 39 | 55.65% | 59 | 22.87% | | |
| 20 | 84.51% | 40 | 54.07% | 60 | 21.16% | | |

Casualty Base:    $526,388.00

Summit Funding Group, Inc.

By: _____

Name: _____
            Patricia A. Neff
Title: _____
            Assistant Vice President

Los Paisanos Autobuses, Inc.

By: _____

Name: _____URIEL CHAVIRA____

Title: _____President_____

# EXHIBIT N

PERSONAL GUARANTY                    ORIGINAL

Los Paisanos Autobuses, Inc. ("Lessee"), a company owned in whole or in part by Uriel J. Chavira ("Guarantor"), intends to enter into Master Lease Agreement No. 2665 dated February 24, 2017 and/or Leases, Equipment Schedules, Acceptance Certificates, Progress Payment Agreements, and/or other agreements and documents (collectively, the "Agreements") with Summit Funding Group, Inc. or one of its direct or indirect subsidiaries or affiliates ("Lessor"). Guarantor represents and warrants to Lessor that Guarantor has a substantial financial interest in Lessee and believes that the execution and delivery of the Agreements is in the best interests of Guarantor and Lessee. As an inducement for Lessor to enter into the Agreements, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor and Lessor enter into this Guaranty ("Guaranty") on the following terms and conditions:

1.      Guaranty. Guarantor absolutely, irrevocably, continuously, and unconditionally guarantees to Lessor (i) the full and prompt payment of any and all amounts now and hereafter due from Lessee to Lessor under the Agreements, and (ii) the full and prompt performance, accuracy of, and compliance with all of the terms, conditions, representations, warranties, covenants, and obligations now and hereafter applicable to Lessee under the Agreements, all without regard to the validity, enforceability, or regularity thereof, regardless of their kind or nature, and regardless of when or how such amounts or obligations become due, including, but not limited to, obligations owed at maturity, upon default, by acceleration, or otherwise (collectively, the "Guaranteed Obligations"). Guarantor's obligations under this Guaranty are not subject to offset or counterclaim for any reason whatsoever, are absolute and unconditional, and will continue in full force and effect until terminated as set forth herein. This Guaranty is a continuing guaranty of payment and not of collection. Except as specifically set forth herein, Guarantor's obligations under this Guaranty will not be released, discharged, affected, modified, or impaired by any event or occurrence whatsoever. As used herein, an "Agreement" means an Agreement as originally entered into and as modified, amended, extended, or renewed from time to time.

2.      Waiver. Guarantor waives in full notice of acceptance of this Guaranty, as well as any and all demands, presentments, notices of protest, and notices of any kind or nature, including, but not limited to, those of any action or non-action by Lessor, Lessee, or any other person or entity. Upon a breach, default, event of default, or similar event by Lessee, Lessor may proceed directly and at once, without notice, against Guarantor to collect and recover the full amount of Guaranteed Obligations due under the Agreements, without proceeding against Lessee or any other person or entity, foreclosing upon, selling, or otherwise disposing of the equipment or other items subject to the Agreements, or collecting accrued payments or other amounts. Guarantor waives the right to require Lessor to proceed against Lessee or to pursue any other remedy, and Guarantor waives the pleading of any statute of limitations as a defense. Guarantor assumes the responsibility for keeping himself or herself informed of the financial condition of Lessee and any and all endorsers and other guarantors of any instrument or document evidencing all or any part of the Guaranteed Obligations and of all other circumstances bearing upon the risk of nonpayment or nonperformance of the Guaranteed Obligations or any part thereof that diligent inquiry would reveal. Lessor shall have no duty to advise Guarantor of information known to Lessor regarding such condition or any such circumstance. Lessor shall have full power to modify, amend, cancel, renew, or extend the Agreements, and to grant consents and waivers of the terms and conditions thereof, without in any way diminishing, releasing, or discharging the liability of Guarantor hereunder. No payments made by or on behalf of Guarantor shall be deemed to discharge or diminish the continuing liability of Guarantor hereunder, unless and until written notice is given to Lessor that such payments are at the time thereof being made for the purpose of liquidating such liability.

3.      Representations and Warranties. Guarantor represents and warrants to Lessor that (i) this Guaranty constitutes the legal, valid, and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as the enforcement thereof may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally, (ii) the execution and delivery of this Guaranty, and the performance of Guarantor's obligations hereunder, do not, directly or indirectly (with or without notice or lapse of time) (A) violate or contravene applicable law, (B) require the consent or approval of any person or entity, or (C) result in the creation or imposition of any lien or encumbrance on any property or asset of Guarantor, except in favor of Lessor, and (iv) there is no action or proceeding pending before any court or governmental entity that adversely and materially affects the condition (financial or otherwise) of Guarantor or any of its properties or assets.

4.      Tax Returns. No later than 120 days after the end of the calendar year, Guarantor shall provide to Lessor Guarantor's federal and state tax returns for the preceding year, all as filed with the appropriate tax authorities, and such additional information as Lessor may reasonably request.

5.    <u>Warrant of Attorney</u>. Guarantor authorizes any attorney of record to appear for it in any court, after maturity of the Guaranteed Obligations, or upon default, acceleration, or otherwise, to waive the issuance and service of process, and to release all errors, and to confess judgment against it in favor of Lessor for the amount of the Guaranteed Obligations due Lessor together with interest, charges, court costs, and attorneys' fees. Stay of execution and all exemptions are hereby waived. If this Guaranty, the Agreements or any Guaranteed Obligation is referred to an attorney for collection, Guarantor shall pay to Lessor or the then holder of the Guaranteed Obligations its attorneys' fees. GUARANTOR AGREES THAT AN ATTORNEY WHO IS COUNSEL TO LESSOR OR ANY OTHER HOLDER OF SUCH GUARANTEED OBLIGATIONS MAY ALSO ACT AS ATTORNEY OF RECORD FOR ANY OR ALL GUARANTORS WHEN TAKING THE ACTIONS DESCRIBED ABOVE. GUARANTOR AGREES THAT ANY ATTORNEY TAKING SUCH ACTIONS MAY BE PAID FOR THOSE SERVICES BY LESSOR OR THE HOLDER OF SUCH GUARANTEED OBLIGATION. GUARANTOR WAIVES ANY CONFLICT OF INTEREST THAT MAY BE CREATED BECAUSE THE ATTORNEY REPRESENTING GUARANTOR IS BEING PAID BY LESSOR OR THE HOLDER OF SUCH GUARANTEED OBLIGATION.

6.    <u>Termination</u>. Guarantor's obligations under this Guaranty shall continue in full force and effect until payment and performance of the Guaranteed Obligations have been indefeasibly discharged in full and any and all Agreements between Lessor and Lessee have been terminated.

7.    <u>Miscellaneous</u>.

(a)    Guarantor represents and warrants to Lessor that Guarantor has had an opportunity to review all Agreement forms and other information requested by Guarantor.

(b)    Guarantor will pay all of the costs, expenses, and fees, including, but not limited to, all attorneys' fees, incurred by Lessor in enforcing or attempting to enforce this Guaranty, whether the same is enforced by suit or otherwise, and all amounts recoverable by law, including, but not limited to, interest on any unpaid amounts due under this Guaranty.

(c)    If a person or entity guarantees the Guaranteed Obligations pursuant to an agreement or arrangement substantially similar to this Guaranty, then the obligations of Guarantor and such other persons and entities shall be joint and several.

(d)    Any proceeding arising out of or relating to this Guaranty must be brought in the courts of Hamilton County, Ohio or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of Ohio, and each party hereto irrevocably submits to the exclusive jurisdiction of each such court in any such proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, and agrees that all claims in respect of such proceeding shall be heard and determined only in any such court.

(e)    EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.

(f)    The rights and remedies of Lessor are cumulative and not alternative. No failure, delay, or single or partial exercise of any right, power, or privilege by Lessor will operate as a waiver of such right, power, or privilege or will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (i) no claim or right arising out of this Guaranty can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party, (ii) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (iii) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Guaranty.

(g)    This Guaranty supersedes all prior agreements and arrangements, whether written or oral, between or among the parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.

(h)    This Guaranty may not be amended, supplemented, or otherwise modified except by a written agreement executed by the party to be charged with the amendment.

2

(i)    No party may assign any of its rights or delegate any of its obligations under this Guaranty without the prior written consent of the other party, except that Lessor may sell, assign, grant a security interest in, or otherwise transfer some or all of its right, title, or interest in and to this Guaranty without notice to or the consent of Guarantor. Subject to the preceding sentence, this Guaranty will apply to, be binding in all respects upon, and inure to the benefit of the heirs, successors, and permitted assigns of the parties. Nothing expressed or referred to in this Guaranty will be construed to give any person or entity other than the parties to this Guaranty any legal or equitable right, remedy, or claim under or with respect to this Guaranty or any provision of this Guaranty, except such rights as shall inure to an heir, successor, or permitted assignee pursuant to this paragraph.

(j)    If any provision of this Guaranty is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Guaranty will remain in full force and effect. Any provision of this Guaranty held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

(k)    This Guaranty will be governed by and construed under the laws of the State of Ohio without regard to conflicts-of-laws principles that would require the application of any other law.

(l)    This Guaranty may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Guaranty and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Guaranty and of signature pages by fax or e-mail shall constitute effective execution and delivery of this Guaranty as to the parties and may be used in lieu of the original for all purposes. Signatures of the parties transmitted by fax or e-mail shall be deemed to be original signatures for all purposes.

IN WITNESS WHEREOF, the undersigned have executed this Guaranty effective as of the 24th day of February, 2017.

Print Name:    Uriel J. Chavira

ACKNOWLEDGED AND AGREED:

SUMMIT FUNDING GROUP, INC.

By:

Name:    **Patricia A. Neff**
Title:    **Assistant Vice President**

# EXHIBIT O

## AMENDMENT AGREEMENT

**AGREEMENT** dated as of the 14th day December, 2020, between **People's Capital and Leasing Corp.,** 850 Main Street, Bridgeport, CT 06604 (hereafter called "**PCLC**") and **Los Paisanos Autobuses, Inc.,** 6767 Gateway West Blvd., El Paso, TX 79925 (hereafter called "**Obligor**").

### RECITALS

**A.** PCLC via assignment from Summit Funding Group, Inc. and Obligor are parties to Equipment Schedule No. 001 dated February 24, 2017 to Master Lease Agreement No. 2665 dated February 24, 2017 (PCLC No. 4491-001), as amended, including all exhibits, attachments and prior amendments (collectively, the "**Lease Agreement**").

**B.** All terms used herein which are defined in the Lease Agreement and not otherwise specifically defined herein shall have the same meanings as set forth in the Lease Agreement.

**C.** Obligor's obligations under the Loan Agreement are guaranteed by Uriel J. Chavira (the "**Guarantor**").

**D.** Certain Events of Default have occurred and are continuing as a result of the Obligor's failure to comply with certain terms of the Lease Agreement.

**E.** Obligor desires that the Lease Agreement be amended as set forth below and has requested that PCLC forbear from enforcing its rights pursuant to the Lease Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

**1.** Obligor acknowledges and agrees that all of the Recitals set forth above are accurate and correct.

**2.** PCLC agrees to forbear from enforcing its rights pursuant to the Lease Agreement until the earliest to occur of an Event of Default under the Lease Agreement as hereby modified, or September 21, 2024 (the "Expiration Date") as applicable.

**3.** The remaining payments under the Lease Agreement are hereby amended as follows:

| LEASE AGREEMENT | EXISTING REMAINING PAYMENTS | REVISED REMAINING PAYMENTS |
|---|---|---|
| No. 4491-001 | Thirty-Three (33) successive monthly installments commencing December 1, 2020 consisting of Thirty-Three (33) @ $8,863.36 | Thirty-Seven (37) successive monthly installments commencing December 1, 2020, consisting of Four (4) @ $1,389.88 followed by Thirty-Three (33) @ $8,863.36 plus any and all amounts that come due under the Lease Agreement. |

The Lease Agreement is hereby amended to reflect the above revised remaining payments. Obligor acknowledges that Obligor understands and agrees to the calculation of the revised remaining payments.

**4.** Obligor and PCLC agree the term "Government Grant" means a financial award given by a federal, state or local government authority that provides support or stimulation to accomplish a public purpose. The term does not include: technical assistance, which provides services instead of money; other assistance in the form of loans, loan guarantees, interest subsidies, or insurance; direct payments of any kind to individuals; and contracts which are required to be entered into and administered under procurement laws and regulations.

5. Obligor agrees that within 30 days of receipt of any and all money in the form of a Government Grant, Obligor shall pay to PCLC a sum equal to 20%, not to exceed $800,000.00, of the Government Grant which shall be applied to the Lease Agreement as a principal pay down at PCLC's sole discretion.

6. Obligor agrees that Obligor shall not make any distribution or loan to related parties without PCLC's prior written consent.

7. In addition to all other Event(s) of Default under the Lease Agreement, the following shall constitute an Event of Default under the Lease Agreement and this Amendment:

(a)  Obligor's failure to pay any amount when due under this Amendment or to perform any covenant or other agreement contained in this Amendment or any other document entered into pursuant hereto.

(b)  Obligor's failure to pay to PCLC, upon receipt of any and all money in the form of a Government Grant, a sum equal to 20% and not to exceed $800,000.00 of such Government Grant.

(c)  Obligor's failure to obtain PCLC's prior written consent before making any distribution or loan to related parties.

8. Obligor agrees and acknowledges that this Agreement does not waive, alter, or modify the Lender's rights under the Lease Agreement or otherwise waive or excuse any defaults thereunder.

9. Obligor agrees and acknowledges that there has been an Event of Default and PCLC is forbearing on exercising its rights and remedies until the Expiration Date above. If the Expiration Date is not extended or an Event of Default were to occur before the Expiration Date, Obligor agrees that:

(a)  Obligor will surrender and return to PCLC at a reasonable time and place of PCLC's choosing and at the sole cost and expense of the Obligor the Equipment and all documents and records related to the Equipment, including but not limited to, without limitation, manuals, warranties, attachments, accessions and additions to the Equipment; and

(b)  PCLC may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Obligor

(1)  Take action against Obligor or any Guarantor if applicable for payment under the Lease Agreement and this Amendment; and

(2)  Exercise any right and remedy authorized by the Lease Agreement and/or this Amendment and/or applicable law.

10. Obligor hereby affirms and agrees that, notwithstanding anything set forth herein, it owes and is indebted to PCLC for the full remaining outstanding balance due under the Lease Agreement, including all exhibits, attachments, schedules, amendments, riders, certifications, or agreements thereto. Notwithstanding any terms or conditions set forth herein or within the Lease Agreement, including all exhibits, attachments, schedules, amendments, modifications, riders, certifications, or agreements related thereto, Obligor agrees to hold PCLC harmless, and Obligor hereby affirmatively waives any claim, counterclaim, action, defense, affirmative defense, or special defense arising out of or relating to any inadvertent error or omission by PCLC in the calculation or accounting of the amount due under the Lease Agreement, including all exhibits, attachments, schedules, amendments, modifications, riders, certifications, or agreements related thereto, and Obligor agrees that it shall not be relieved from any liability or obligation due under the terms of the Lease Agreement, including all exhibits, attachments, schedules, amendments, modifications, riders, certifications, or agreements related thereto.

11. Except as herein specifically modified, the Lease Agreement shall continue in full force and effect, and Obligor hereby reaffirms the terms and conditions of the Lease Agreement, including but not limited to PCLC's rights and remedies provided thereunder. Obligor warrants and represents that the Lease Agreement as hereby modified constitutes the legal, valid and binding obligation of Obligor, free of all defenses, setoffs and counterclaims. The forbearance set forth herein shall not constitute a course of dealing between Obligor and

PCLC, and the grant of any additional extension or forbearance beyond the Expiration Date shall not be assumed or relied upon by Obligor, because any additional extension or other financial accommodations by PCLC shall be at PCLC's sole discretion. In consideration of this Agreement, Obligor releases PCLC of all claims, suits, defenses and liabilities whether known or unknown arising from any matter prior to the date hereof. This Agreement may be executed in counterparts and delivered by fax but Obligor agrees to deliver an ink-signed original to PCLC.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

**PEOPLE'S CAPITAL AND LEASING CORP.**                **LOS PAISANOS AUTOBUSES, INC.**

BY:_____                BY:_____

NAME: _____                NAME:  Uriel J. Chavira_____

TITLE: _____                TITLE:  President_____

# EXHIBIT P

**Acceptance Certificate**

**February 24, 2017**

ORIGINAL

Pursuant to Master Lease Agreement No. 2665 dated February 24, 2017, between Summit Funding Group, Inc. and the undersigned Lessee ("**Master Lease Agreement**"), Lessee represents, warrants, covenants, agrees, certifies, and acknowledges as follows:

1.      The terms of the Master Lease Agreement are incorporated in this Acceptance Certificate as if fully set forth herein.

2.      Lessee certifies that all of Lessee's representations and warranties set forth herein and in the Master Lease Agreement are complete and accurate as of the date hereof and no Event of Default has occurred and is occurring.

3.      The equipment, goods, assets, hardware, software, personal property, and other items listed on Attachment #001/001 hereto ("**Equipment**"), which is incorporated in this Acceptance Certificate as if fully set forth herein, has been delivered to, and, if applicable, fully and properly installed at, the locations specified herein. Lessee has had a reasonable opportunity to examine, assess, evaluate, test, and inspect the Equipment. The Equipment is in its original condition, is in good working order, is capable of performing all functions that Lessee desires, is suitable for Lessee's purposes, is free from latent and patent damage, flaws, and defects, and can be placed in immediate use for its intended purposes. Lessee absolutely, irrevocably, and unconditionally accepts the Equipment.

4.      Words and phrases capitalized but not defined herein will be given the meanings ascribed to them in the Master Lease Agreement. Consistent with the foregoing, Delivery Date has the meaning given to it below:

Delivery Date(s):          February 28, 2017

IN WITNESS WHEREOF, the undersigned has executed this Acceptance Certificate effective as of the date first set forth above.

Los Paisanos Autobuses, Inc. ("**Lessee**")

By: _____

Name: _____

Title: _____

Acknowledged and Agreed:

Summit Funding Group, Inc. ("**Lessor**")

By: _____

Name: _____**Patricia A. Neff**_____

Title: _____**Assistant Vice President**_____

# EXHIBIT Q

Upon sale of this vehicle, the purchaser must apply for a new title within 30 days unless the vehicle is purchased by a dealer. Until a new title is issued, the vehicle record will continue to reflect the owner's name listed on the current title. SEE BACK OF TAB FOR ADDITIONAL INFORMATION.

PEOPLE'S CAPITAL&LEASING CORP
850 MAIN STREET BC03/RC871
BRIDGEPORT, CT 06604

DETACH HERE

– – – – – –

## TEXAS CERTIFICATE OF TITLE

TEXAS DEPARTMENT OF MOTOR VEHICLES

**TxDMV**

133096565

| VEHICLE IDENTIFICATION NUMBER | YEAR MODEL | MAKE OF VEHICLE | BODY STYLE |
|---|---|---|---|
| YE2XC82B7H3049201 | 2017 | VANH | BU |

| | TITLE/DOCUMENT NUMBER | DATE TITLE ISSUED |
|---|---|---|
| | 0713064281516 0727 | 03/31/2017 |

| MODEL | MFG. CAPACITY IN TONS | WEIGHT | LICENSE NUMBER | ODOMETER READING |
|---|---|---|---|---|
| | | 39100 | K056572 | EXEMPT |

PREVIOUS OWNER
ABC BUS INC WINTERGARDE FL

OWNER
LOS PAISANOS AUTOBUSES INC
6767 GATEWAY WEST BLVD
00000000000000000-
EL PASO, TX 79925

REMARK(S)
DIESEL

X _____
SIGNATURE OF OWNER OR AGENT MUST BE IN INK

UNLESS OTHERWISE AUTHORIZED BY LAW, IT IS A VIOLATION OF STATE LAW TO SIGN THE NAME OF ANOTHER PERSON ON A CERTIFICATE OF TITLE OR OTHERWISE GIVE FALSE INFORMATION ON A CERTIFICATE OF TITLE.

DATE OF LIEN                1ST LIENHOLDER
03/06/2017 PEOPLE'S CAPITAL&LEASING CORP
            850 MAIN STREET BC03/RC871
            BRIDGEPORT, CT 06604

1ST LIEN RELEASED _____
                              DATE

BY _____
        AUTHORIZED AGENT

DATE OF LIEN                2ND LIENHOLDER

2ND LIEN RELEASED _____
                              DATE

BY _____
        AUTHORIZED AGENT

DATE OF LIEN                3RD LIENHOLDER

3RD LIEN RELEASED _____
                              DATE

BY _____
        AUTHORIZED AGENT

IT IS HEREBY CERTIFIED THAT THE PERSON HEREIN NAMED IS THE OWNER OF THE VEHICLE DESCRIBED ABOVE WHICH IS SUBJECT TO THE ABOVE LIENS.

R I G H T S  O F  S U R V I V O R S H I P  A G R E E M E N T
WE, THE MARRIED PERSONS WHOSE SIGNATURES APPEAR HEREIN, HEREBY AGREE THAT THE OWNERSHIP OF THE VEHICLE DESCRIBED ON THIS CERTIFICATE OF TITLE SHALL FROM THIS DAY FORWARD BE HELD JOINTLY, AND IN THE EVENT OF DEATH OF ANY OF THE PERSONS NAMED IN THE AGREEMENT, THE OWNERSHIP OF THE VEHICLE SHALL VEST IN THE SURVIVOR(S).

SIGNATURE _____ DATE ____
SIGNATURE _____ DATE ____
SIGNATURE _____ DATE ____

FORM 30-C REV. 05/2016          DO NOT ACCEPT TITLE SHOWING ERASURE, ALTERATION, OR MUTILATION.

Whenever you sell or trade in a vehicle, be sure to **protect yourself by filing the Vehicle Transfer Notification online** at www.TxDMV.gov. The notification removes your responsibility for anything the buyer might do with the vehicle. It's free!

**You ONLY have 30 days to submit the Vehicle Transfer Notification from the date you sell or trade in the vehicle to remove your liability.**

Before you buy, do a Title Check. For more information, go to www.TxDMV.gov and click on the "Title Check" icon.

---

| | |
|---|---|
| WHEN VEHICLE IS SOLD, TITLE HOLDER MUST ASSIGN AND FURNISH THIS TITLE INDICATING A DATE OF SALE TO THE PURCHASER WHO MUST FILE APPLICATION WITH COUNTY TAX ASSESSOR-COLLECTOR WITHIN 30 DAYS TO AVOID PENALTY. | 133096565 |

► FEDERAL AND STATE LAW REQUIRES THAT YOU STATE THE MILEAGE IN CONNECTION WITH THE TRANSFER OF OWNERSHIP. FAILURE TO COMPLETE OR PROVIDING A FALSE STATEMENT MAY RESULT IN FINES AND/OR IMPRISONMENT.

**ASSIGNMENT OF TITLE**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser          Street          City          State          Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

► _____ ODOMETER READING (No Tenths)

Date of Sale _____

Signature of Seller/Agent _____          Printed Name (same as signature) _____

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent _____          Printed Name (same as signature) _____

**FIRST REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser          Street          City          State          Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

► _____ ODOMETER READING (No Tenths)

Date of Sale _____          Dealer No. _____

Dealer's Name _____

Agent's Signature _____          Printed Name (same as signature) _____

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent _____          Printed Name (same as signature) _____

**SECOND REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser          Street          City          State          Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

► _____ ODOMETER READING (No Tenths)

Date of Sale _____          Dealer No. _____

Dealer's Name _____

Agent's Signature _____          Printed Name (same as signature) _____

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent _____          Printed Name (same as signature) _____

**THIRD REASSIGNMENT DEALER ONLY**

The undersigned hereby certifies that the vehicle described in this title is free and clear of all liens, except as noted herein, and has been transferred to the following printed name and address:

Name of Purchaser          Street          City          State          Zip

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:
☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

► _____ ODOMETER READING (No Tenths)

Date of Sale _____          Dealer No. _____

Dealer's Name _____

Agent's Signature _____          Printed Name (same as signature) _____

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent _____          Printed Name (same as signature) _____

**LIEN**

LIENHOLDER TO BE RECORDED AND SHOWN ON NEW TITLE:
1ST LIEN IN FAVOR OF (NAME & ADDRESS)

# EXHIBIT R



Evan S. Goldstein
(t) 860.548.2609
(f) 860.548.2680
egoldstein@uks.com

September 24, 2021

***Via Certified Mail - Return Receipt Requested and
First Class Mail***

Los Paisanos Autobuses, Inc.            Los Paisanos Autobuses, Inc.
C/o Its President, Uriel Chavira        C/o Its Registered Agent, Mannie Kalman
410 S. Santa Fe Street                  1214 Montana Avenue
El Paso, TX 79901                       El Paso, TX 79902

Uriel J. Chavira
1082 Eagle Ridge Drive
El Paso, TX 79912

      Re:   *Notice of Default, Acceleration and Demand for Payment against borrower*
            *Los Paisanos Autobuses, Inc. and guarantor Uriel J. Chavira*

Dear Messrs. Chavira and Kalman:

People's Capital and Leasing Corp. ("People's Capital") is herein formally notifying borrower
Los Paisanos Autobuses, Inc. ("Borrower") and guarantor Uriel J. Chavira (collectively, with
Borrower, the "Obligors") that Master Loan and Security Agreement No. 4075 dated as of
December 14, 2015, as amended from time to time, between Borrower and People's Capital,
Schedule No. 001 to Master Loan and Security Agreement No. 4075 dated as of December 14,
2015, as amended from time to time, Schedule No. 002 to Master Loan and Security Agreement
No. 4075 dated as of March 3, 2016, as amended from time to time, Schedule No. 003 to Master
Loan and Security Agreement No. 4075 dated as of February 24, 2017, as amended from time to
time, Schedule No. 004 to Master Loan and Security Agreement No. 4075 dated as of September
19, 2017, as amended from time to time, Master Lease Agreement No. 2665 dated as of February
24, 2017, between Borrower and People's Capital, as assignee,[1] Equipment Schedule No. 001 to
Master Lease Agreement No. 2665 dated as of February 24, 2017, as amended from time to time,
the Individual Guaranty made by Uriel J. Chavira in favor of People's Capital dated on or about
December 14, 2015, and the Personal Guaranty made by Uriel J. Chavira in favor of People's

---

[1] All of Summit Funding Group, Inc.'s rights, title, and interest to the Master Lease Agreement
No. 2665 and all related documents, including any notes, security agreements, schedules,
exhibits, riders, modifications, amendments, restatements, or extensions thereto were assigned to
People's Capital pursuant to that certain Purchase Schedule No. 034 dated March 6, 2017 to the
Master Purchase Agreement dated December 13, 2013.

**Updike, Kelly & Spellacy, P.C.**
**100 Pearl Street • PO Box 231277 • Hartford, CT 06123 (t) 860.548.2600 (f) 860.548.2680 www.uks.com**

3376452

Los Paisanos Autobuses, Inc.
September 24, 2021
Page 2

Capital, as assignee, dated on or about February 24, 2017 (collectively, the "Loan and Lease Documents") are in default.

Obligors have failed to comply with all of their covenants and obligations under the Loan and Lease Documents, including but not limited to their failure to timely pay the amounts due under the Loan and Lease Documents, and thus, as a result, Obligors are now in Default, and People's Capital is declaring all obligations under the Loan and Lease Documents immediately due and payable. Said sums now include all principal, late fees, accrued interest, costs and expenses incurred by People's Capital, together with default interest that continues to accrue. The costs associated with the Loan and Lease Documents now include any legal fees or expenses incurred by People's Capital in the collection of the amounts due and owing under the Loan and Lease Documents or the foreclosure of any security interest, lien or collateral interest granted to People's Capital. All sums due under the Loan and Lease Documents have been accelerated and are now immediately due and payable, for which demand is hereby made.

Accordingly, People's Capital demands from the Obligors payment in the amount of $2,089,507.27 as of September 24, 2021, plus costs, expenses, and attorneys' fees, all of which continue to accrue, as well as default interest that continues to accrue. People's Capital will accept payment in the form of bank or certified funds. If payment in full is not received within five (5) business days after the date of this demand letter, People's Capital has instructed its counsel, Updike, Kelly & Spellacy, P.C. to initiate an action against you without further notice or demand. Failure to resolve the Obligors' default within the time set forth above will result in People's Capital enforcing its rights pursuant to the Loan and Lease Documents, including but not limited to replevying and repossessing all collateral securing the Loan and Lease Documents and seeking money damages.

People's Capital is also demanding immediate surrender of the collateral securing the Loan and Lease Documents. Please provide People's Capital with the location and whereabouts of the collateral securing the Loan and Lease Documents.

Any forbearance or extensions under the Loan and Lease Documents by People's Capital prior to the date hereof or hereinafter shall not imply any obligation or commitment of People's Capital to further forbear and does not constitute a course of dealing or a course of conduct. The acceptance of any partial payment of any of your obligations to People's Capital shall not be deemed a waiver or limitation of any of People's Capital's rights reserved herein as to the full amount of any unpaid balance. People's Capital reserves all rights and remedies available to it under the Loan and Lease Documents, and applicable law, all of which are expressly hereby reserved.

The Loan and Lease Documents shall remain in full force and effect in accordance with their terms and conditions. Nothing in this letter, any other correspondence, any oral communication between People's Capital and the Obligors should be construed to be a waiver,



Los Paisanos Autobuses, Inc.
September 24, 2021
Page 3

modification or release of any breach or default, whether now existing or hereafter arising, or of any of People's Capital's rights and remedies arising under the Loan and Lease Documents or common law.

In the event that it becomes necessary to initiate litigation to resolve this debt and enforce People's Capital's rights and remedies under the Loan and Lease Documents, all costs incurred by People's Capital (including but not limited to legal counsel, interest, costs, expenses, collection agents, and repair costs) will be the responsibility of the Obligors, as stated in the Loan and Lease Documents.

Please give me a call immediately to discuss default, demand, surrender of collateral, ability to make payments and the resolution of your default without People's Capital's commencing legal proceedings against borrower Los Paisanos Autobuses, Inc. and guarantor Uriel J. Chavira.

Respectfully,
People's Capital and Leasing Corp.

_____
Evan S. Goldstein, Esq.



# EXHIBIT S



# Secretary of the
# State of Connecticut

PHONE: 860-509-6003 • EMAIL: crd@ct.gov • WEB: www.concord-sots.ct.gov

**OFFICE USE ONLY**
*(label)*

## CERTIFICATE OF AMENDMENT
## STOCK CORPORATION

• *Use ink.*  • *Print or type.*
• *Attach additional 8 1/2 x 11 sheets if necessary*

**FILING PARTY** *(confirmation will be sent to this address)*:

NAME:  CSC

ADDRESS:  251 Little Falls Drive

CITY:  Wilmington

STATE:  DE          ZIP:  19808

**FILING FEE: $100.00**

*Make checks payable to
"Secretary of the State"*

**1. NAME OF CORPORATION** *(required) (must exactly match the name on record with our office, including the business designation, (e.g., Inc., Corp, Corporation, etc)*:

People's Capital and Leasing Corp

**2. STATEMENT OF AMENDMENT** *(required) (check only one of the following statements, 2A, 2B, or 2C)*

### THE CERTIFICATE OF INCORPORATION IS:

[✓]  **2A** **AMENDED ONLY.** *In section 3A below, provide the full text of any amendments to the corporation's certificate of incorporation, including any name changes.*

[ ]  **2B** **AMENDED AND RESTATED.** *In section 3A below, provide the full text of each amendment **and** attach a complete restatement of the corporation's certificate of incorporation, incorporating the amendments.*

[ ]  **2C** **RESTATED.** *Attach one document consolidating all previous amendments into the corporation's Certificate of Incorporation.*

**3.** *CHECK THE BOX 3A, 3B ON THE NEXT PAGE, OR BOTH, AS APPLICABLE*

[✓]  **3A.** **TEXT OF AMENDMENTS / SPECIFIC PUBLIC BENEFITS**
*(if electing Benefit Corporation status in Section 3B on the next page, provide the text of the specific public benefits here, if any.)*

The name of the corporation is M&T Capital and Leasing Corporation.

[ ] *check box if additional pages are attached*

PAGE 1 OF 2          BUS-018 (CERTIFICATE OF AMENDMENT, STOCK CORPORATION)          REV. 11/2020

**Page 1 of 2**

OFFICE USE ONLY
*(label)*

☐ **3B. STATEMENT ELECTING BENEFIT CORPORATION STATUS**
*(**Must** check box 3B to elect benefit corporation status)*

The corporation elects to be a Benefit Corporation. In addition to the stated purposes for which the corporation is formed, the corporation shall also have the purpose to create a general public benefit as defined in the Connecticut Benefit Corporation Act.

*NOTE: If the Benefit Corporation adopts one or more specific public benefits in addition to the required general public benefit, check box 3A in addition to 3B, and set forth the specific public benefits in the space provided for in section 3A above.*

**4. STATEMENT OF APPROVAL** *(required) (must check the box for only **one** statement, 4A, 4B, 4C **or** 4D)*

☑ **4A** THE AMENDMENT WAS APPROVED BY SHAREHOLDERS IN THE MANNER REQUIRED BY SECTIONS 33-600 TO 33-998 OF THE CONNECTICUT GENERAL STATUTES, AND BY THE CERTIFICATE OF INCORPORATION.

☐ **4B** THE AMENDMENT WAS APPROVED BY THE INCORPORATORS. NO SHAREHOLDER APPROVAL WAS REQUIRED.

☐ **4C** THE AMENDMENT WAS APPROVED BY THE BOARD OF DIRECTORS. NO SHAREHOLDER APPROVAL WAS REQUIRED.

☐ **4D** THE AMENDMENT WAS APPROVED BY A MINIMUM STATUS VOTE, AS REQUIRED BY THE CONNECTICUT BENEFIT CORPORATION ACT. SELECT D IF A MINIMUM STATUS VOTE RESULTED IN THE ELECTION OF BENEFIT CORPORATION STATUS.

**5. EXECUTION/SIGNATURE** *(required) (subject to penalty of false statement)*

**DATE** *(mm/dd/yyyy):* _____ / _____ / _____

| NAME OF SIGNATORY *(print or type)* | CAPACITY/TITLE OF SIGNATORY *(print or type)* | SIGNATURE |
|---|---|---|
| Marie King | Corporate Secretary | ▶ *Marie King* |